USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:____10 8 14____

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

JAMES H. FISCHER ) Case 14cv1304(PAE)
) Case 14cv1307(PAE)
      Plaintiff )
)
      v. )
)
STEPHEN T. FORREST, JR and )
SANDRA F. FORREST )
)
      Defendants )

-------------------------------------------------------------------x

## PLAINTIFF'S MOTION
## TO FILE SUR-REPLY

Plaintiff, James Fischer, respectfully requests permission to file a sur-reply in further opposition to

Defendants' motions to dismiss. The Defense has raised multiple new arguments in their reply of

10/06/2014, which, if left unanswered, would leave these newly-raised issues briefed only by the Defense.

At first glance, the Defense reply includes at least the following completely new arguments:

1) A claim that the Plaintiff must "pierce the corporate veil" for the strict liability torts at issue
2) That the "URL Was Not Used For Same Goods"
3) That a trademark infringed in a website URL is somehow not trademark infringement at all
4) That Defendants are now suddenly not the sole shareholders, despite being the sole shareholders of record at the time of filing of this action.
5) A mis-quoting of 17 USC 411(a), deliberately excluding mention of §106A(a)

Plaintiff lacks the research facilities available to the Defense, a date of no later than 10/16/14 is

requested for his sur-reply, as each Defense citation and claim must be read, understood, and refuted.

James Fischer
Plaintiff Pro se
PO Box 287048
New York, NY 10128
917-628-4052

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
JAMES H. FISCHER                    )        Case 14cv1304(PAE)
        Plaintiff                    )        Case 14cv1307(PAE)
                        )
        v.                    )
                        )
STEPHEN T. FORREST, JR and          )
SANDRA F. FORREST                   )
        Defendants                    )
-----------------------------------------------------------x

## PLAINTIFF'S SUR-REPLY TO DEFENSE REPLY OF 10/06/2014

Plaintiff James Fischer respectfully submits a Sur-reply in further opposition to Defendants'

motions to dismiss.  The Defense has raised at least 12 new arguments in their reply.  Each new

argument is completely refuted in turn, in the order of the Defense Reply (case 14cv1307,

Document 56).  The Defense raises no valid points in their reply.

In "*Defendants are Not Liable in Their Individual Capacities*", new arguments are raised:

1) A NEW argument That "Piercing The Corporate Veil" is necessary (pg 1):

> "*Plaintiff, albeit reluctantly, agrees Defendants are not individually liable, but liable
> under a piercing the corporate veil theory without any specifics as to why the corporate
> veil should be pierced.*"

Plaintiff clearly said no such thing, nor agreed to any such theory.  Plaintiff's sole use of the

term "corporate veil" was in identical statements in each Amended Complaint:

> "*'Piercing the corporate veil' is not a prerequisite to imposing personal liability upon
> corporate officers for infringement of intellectual property, when they are involved in,
> approve of, or even merely do nothing to stop infringing activity of which they are
> aware.*"[1]

2) The Defense makes the NEW claim that Plaintiff "*aims to harass Mr. Forrest, and if that

was not good enough, Plaintiff added his wife, Mrs. Forrest, as a defendant*" (pg 1) without

---

[1] In 14cv1304, see ¶ 17, in 14cv1307 see ¶ 15

explaining why Plaintiff might wish to do so, or how a Federal suit for damages could be "harassment" unless the action was utterly frivolous.  No reply is necessary. Plaintiff has clearly explained his reasons, and has spent much time and money successfully deflecting and defusing press inquiries, both from the beekeeping trade press, and from the local media in Defendants' area.  Plaintiff's "reward" for his considerate restraint is disparagement.

3)  The Defense then makes the NEW claim that "*Defendants are not sole shareholders*" (pg 2). Plaintiff is left wondering what part of the phrase "*strict tort liability*" might be unclear. These principal shareholders were the sole proprietors of their business dealings for years before making any effort to construct the legal fiction of their "corporate" alter-ego for their business dealings.  If they are suddenly not the "sole" shareholders, they presumably still are majority shareholders, which combined with their hands-on direct day-to-day management, is all the Court needs to confirm joint and several liability for both Defendants.

Regardless, for vicarious liability, the Defendants need merely personally benefit. They need not be the only ones to do so, or the ones to benefit most.  The Defendants must also have the right/ability to control the process of infringement.  The Defendants also meet the criteria for "Contributory" liability, and even "Inducement", for all their own direct infringements and all the secondary copyright infringement pled, so no matter which theory of liability is used, no matter what specific infringement of Plaintiff's rights is considered, Defendants are each clearly personally and individually, jointly and severally liable.

The Defense citation to *Bestfoods*[2] in support of their new argument is yet another misleading out-of-context quote from a case that actually held that vicarious liability (in this case, the liability of the parent corporation for the pollution of its subsidiary) DID exist. In a

---

[2] *United States* v. *Bestfoods,* 524 U.S. 51, 61-62 (1998)

unanimous decision, Justice Souter wrote "*a corporate parent that actively participated in, and exercised control over, the operations of the facility itself may be held directly liable in its own right as an operator of the facility.*"  But that case had nothing to do with the torts at issue here, as the issue was *CERCLA*, a law with unique specific statutory liability.

4) In their Copyright argument, the Defense first offers a NEW argument claiming that "*the work subject to the registration was not the four short phrases*". (pg 3)

   While this is clearly an issue for Discovery, Plaintiff should clarify that he has noted clerical errors on the registration form, and after asking pointed questions, filed a form CA with the Copyright Office on 7/14/14 under Service Request 1-1661855368 to correct those errors.[3]  Sadly, the Copyright office moves slowly, and has yet to fix the errors.

   First, the "Type of Work" is erroneously listed as "text" on the registration document, when the title of work is clearly "text and images of Bee-Quick.com website".  This single error led to all the other data-entry errors, at least this was the explanation given Plaintiff.

   Second, the form of work for a mix of "text and images" (web pages) should properly be listed as "Visual Arts". The registration type should be "Database". The individual creative Works at issue here are registered as part of a group registration of an automated database of works that are primarily works of the "Visual Arts" (See 37 CFR §§ 202.3(b)(4)-(9) and Circular 65).   This makes sense, as websites are "viewed" as "images".

   So, Plaintiff's Works were registered as a "*Group Registration of an Automated Database of Unpublished Works*".  (A direct quote from the Copyright Office itself.) Plaintiff has no clue as to how he might attach such a database or part thereof as an exhibit to a Compliant (DVD? μSDHC? 2,000 printed pages?), but clearly, the collection of individual

---

[3] See Exhibit A, an acknowledgement of filing from the Copyright Office

works in the database includes the most valuable and often-used works in Plaintiff's collection of epigrams, as Discovery will show.

Further, the copyrighted Works at issue are all still unpublished. A public performance or display of a work does not of itself constitute publication. A website is the property of the owner, and much like an art gallery, putting works on display for public viewing is not "distribution of copies" or "publication". So, the date of first public display of the Works at issue was Dec 21, 2000, but none of the Works were ever published. See "*Rogers v. Better Business Bureau of Metropolitan Houston*"[4], which clarified this specific issue.

5) The Defense raises a NEW argument, attempting to twist yet another of Plaintiff's clear statements, saying: "*Appearing to concede this point, Plaintiff claims "even if lacking any certificate of registration, [Plaintiff] can still bring suit...*" (pg 3) The Plaintiff conceded nothing, the Plaintiff clearly stated that even if everything the Defense claimed might somehow be true, even then Plaintiff would still prevail on the Motion to Dismiss, as no registration certificate is needed to sue for infringement under 17 USC §106A(a).

6) The Defense follows that misleading misreading with a completely NEW, innovative, and highly creative approach to quoting statute, where any part of statute that contradicts the Defense is silently deleted. (Their first such recitation is on pg 3):

> "*The Copyright Act provides: 'no action for infringement of the copyright in any work shall be instituted until registration of the copyright claim has been made in accordance with this title.' 17 U.S.C. § 411(a).*"

They even recite this exact text again on page 4, making it clear that it was not a typo.

---

[4] *Rogers v. Better Business Bureau of Metropolitan Houston*", H-10-3741 (Aug. 15, 2012)

But there's something missing from those quotes – there's no ellipsis, no hint to the reader that there might be something missing, but something is. Something very significant. The actual text of the statute includes the crucial underlined preface below:

> "*Except for an action brought for a violation of the rights of the author under section 106A (a), and subject to the provisions of subsection (b), [1] no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title…"*[5]

This is not mere lack of candor, this is more serious. 106A(a) was the crux of Plaintiff's point.

7) As for the NEW issue of "*derivative works*" (pg 4), Plaintiff's Works, when used in ads, flyers, etc, consistently had accoutrements such as artwork and additional words. As such, Plaintiff's original creative works of expression were never published themselves, but only derivative works were. Plaintiff also considers Defendants' infringements to be "derivative works", as they also added things. But Plaintiff need not register any derivative works to sue an infringer of his unpublished original creative copyrighted Works of expression.

8) The Defense then offers a NEW argument that "short phrases" are somehow inherently "uncopyrigthable" (pg 4), and offer a "Circular" from the Copyright Office, which has no impact on the plain language of USC 17. But the Defense again engages in highly selective quoting, and neglects to quote the part of the Circular that soundly refutes their argument:

> "*Subject Matter of Copyright*
> *Under section 102 of the Copyright Act (title 17 of the U. S. Code), copyright protection extends only to "original works of authorship." The statute states clearly that ideas and concepts cannot be protected by copyright. To be protected by copyright, a work must contain a certain minimum amount of authorship in the form of original literary, musical, pictorial, or graphic expression.*"[6]

The Defense seems to expect this Court, as in *Foxworthy*[7], to go through the exercise of ruling that Plaintiff's works include at least a "*modicum of intellectual labor.*"

---

[5] *17 U.S.C. § 411(a)*
[6] *Circular 34*, US Copyright Office
[7] *Foxworthy v. Custom Tees*, 879 F. Supp. 1200, 1219 (N.D. Ga. 1995)

9) In *Defendants Did Not Offer for Sale a Counterfeit Mark as a Matter of Law,* (pg 5) the

Defense offers a NEW argument conflating "product counterfeiting" with Plaintiff's actual

complaint of "use of a counterfeit mark in commerce". They falsely argue that they may

only infringe by selling counterfeit products, with Plaintiff's trademark on the product.

The Lanham Act provides that, in connection with goods, a trademark is "used in

commerce" when the trademark:

> *"is placed in any manner on the goods or their containers or the displays associated*
> *therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such*
> *placement impracticable, then on documents associated with the goods or their sale."[8]*

A web page selling mail-order products is clearly "*documents associated with the goods*

*or their sale*". And it is also the "*displays associated therewith*". As the goods at issue are

being sold via the internet, infringing Plaintiff's trademark, the web page is the only thing

the shopper sees, the only manifestation of "the goods" that the buyer can examine prior

to purchase. The shopper cannot touch or see any actual goods at all, and must trust the

web page. (Come to think of it, web pages ARE essentially product packages, in the case

of online sales.)

The URLs for those webpages are how one finds those webpages, and how they are

titled and indexed. Moreover, the URL is visible to the shopper, both in search engine

listings, and at the top of each infringing web page to which the shopper is diverted.

10) The Defense then makes the NEW false argument that the "*URL Was Not Used For [the]*

*Same Goods*" (pg 6). This entire argument is completely spurious. Selling a directly-

competing knock-off of Plaintiff's Product AND a fume board in a bundle still infringes the

trademark for the product that has been knocked off. The Defense claims:

---

[8] 15 USC § 1127

> *"Plaintiff does not assert Defendants use his trademark on the same goods and services for which the trademark is registered."*

Plaintiff certainly DOES so assert, and Defendants themselves claim their knock-off to be identical goods, claiming *"we made our own"*.[9]  The addition of a fume board to a product bundle does not change the act of infringement any more than if Defendants sold "McDonalds Happy Meals", and claimed that they were not infringing because they merely included different toys from those typically provided by McDonalds.

11) In "*Defendants Have Not Engaged in Trademark Infringement*" (pg 8), a NEW and amusingly false argument is offered that any trademark infringed in the path/filename part of a website URL is somehow not trademark infringement at all. First, Defense claims *"Plaintiff fails to explain or cite any authority in his response that the use of "Fischers-Bee-Quick" in the post domain path of a URL constitutes trademark infringement.*"

Plaintiff did not think that he needed to cite something so obvious, it has become part of the zeitgeist. On Facebook, it is called "Fakebooking". Another term is "Brand-Jacking". All social media sites vigorously police the "post-domain path of the URL" for trademark infringement, as the power of the post-domain path to mislead as to source and endorsement is well-known, and the subject of many lightning-speed takedowns prompted by ever vigilant brand managers and compliance staff at the social media companies, all doing their best to avoid trademark suits just like this one.

If a case citation is needed, *Playboy v. Universal Tel-A-Talk* [10] is likely the most famous and apt authority in this area, as it specifically deals with the infringing Trademark in the "post-domain path" of the URL, and the Plaintiff prevailed on a specific charge of

---

[9] See Plaintiff's Exhibits of Defendants' catalog and web pages in both Amended Complaints
[10] *Playboy v. Universal Tel-A-Talk, Inc.*, 1998 WL 767440

Trademark Counterfeiting in regard to those post-domain path URL infringements. But the case is so famous, neither the Court nor the Defense could possibly be unaware of it.

There's an even more famous case, at least to baseball fans - *LaRussa v. Twitter[11]*. Cardinals manager Tony LaRussa sued Twitter over *http://twitter.com/TonyLaRussa*, claiming trademark infringement, dilution, and cybersquatting, in addition to the obvious misappropriation of name and likeness. Note that the infringement here was, of course, in the "post-domain path" of the URL. Twitter settled quickly, and tried to keep it quiet.

12) Defense then makes the NEW false claim that "*the use of 'Fischers-Bee-Quick' in a URL does not constitute use*" (pg 8), hoping the Court is unaware *of Playboy v. Universal Tel-A-Talk*. They then quote the Lanham Act, which promptly refutes the claim anyway:

> "*...if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale.*"

As mentioned before in this document, when the forum for sales is an internet website, the URL is a visible part of the web page, and is part of the "*documents associated with the goods or their sale*", and the "*displays associated therewith*". All the shopper can see is the web page, not products, not packages, not labels. The webpage essentially is "the product package" until the shopper receives the tangible goods in the mail only to find that what was shipped by Defendants was not what the shopper thought he ordered. This is exactly the same as opening a Tiffany-blue box, only to find a cheap knock-off inside. Plaintiff dubs this the "Schrödinger's Cat Principal" of trademark counterfeiting in internet mail-order.[12]

Even a mere metatag[13], invisible to everyone except a search engine, is infringement -

---

[11] *LaRussa v. Twitter*, CGC-09-488101 (state); 3:09-cv-02503-EMC (federal)
[12] Schrödinger, Erwin (Nov 1935). "Die gegenwärtige Situation in der Quantenmechanik (The present situation in quantum mechanics)". *Naturwissenschaften* **23** (49): 807–812.
[13] Plaintiff assumes that the Court needs no definition of a web page "metatag" from Plaintiff

*Brookfield v. West Coast Entertainment*[14] is the authority on this issue, and it is cited often. In that case, the court used an offline analogy to find initial interest confusion when a defendant used the trademark of their competitor in their metatags:

> *"If Blockbuster put up a billboard with West Coast Video's trademark advertising a store location off the next exit, and the consumer exited only to find a Blockbuster instead, she may simply go to Blockbuster, which has now capitalized on West Coast's goodwill."*

To further their new argument, the Defense offers up yet another utterly misleading citation, the *Go-Ped*[15] case (pg 9). This citation is completely misleading, as the use was strictly nominative. The accused infringer was selling the brand-name product of the trademark owner, the "Go-Ped". Later, the accused infringer was also disparaging the manufacturer, bringing in "free speech", but the Court cited the nominative fair use:

> *"The Court has reviewed this printout carefully, and it demonstrates unambiguously that there was no mislabeling. DeBartolo certainly advertised that he had Go-Ped scooters for sale, but all of the Go-Ped pictures were clearly labeled as such."*[16]

Regardless, it would be a strange world indeed if one specific part of a web-page, clearly visible to both search engines and visitors to the page, were somehow magically immune to all claims of trademark infringement, when any trademark misuse in any other visible parts of the page would be infringement without question. Even invisible-to-the-shopper metatags can infringe, so any visible part of a web page certainly can.

The Defense then cites *Interactive v. A2z*[17], but neglects to admit that the findings in this very misleading case were based upon several very distinct, complex, and unusual facts:

---

[14] *Brookfield v. West Coast Entertainment* (174 F.3d 1036)(9th Cir. 1999)
[15] *Patmont Motor Werks, Inc.* v. *Gateway Marine, Inc.*, 1997 WL 811770 (N.D. Cal. 1997)
[16] Id. Note 5
[17] *Interactive Prods. Corp.* v. *A2ZMobile Office Solutions, Inc.*, 195 F.Supp.2d 1024 (S.D. Ohio 2001)

a) The Plaintiff's own expert inexplicably testified that the URL "beyond the domain" did not matter to search engines. This was and is very wrong. (See the videos listed below and the pages from Google's instructional "webmaster course" attached.)

b) There was no evidence presented that A2z knowingly attempted to deceive the public by failing to alter the post-domain path of its URL.[18] The district court noted it seemed likely A2z simply neglected to change its URL after A2z and IPC ended their relationship, and gave it no thought. This contrasts sharply with the case at hand, where new web-pages were specifically created to infringe, and the Defense has claimed that the Defense is somehow entitled to infringe or is not infringing, rather than claiming innocent error.

c) Both Defendant and Plaintiff were each, by written agreement, "*entitled to claim that they were jointly the inventor of Lap Traveler products*", which introduces a large helping of "nominative fair use" into the *A2z* case.

d) Most important, this was a case where a prior agreement was supposed to govern the behavior of the parties, making this more a "breach of contract" case, where nominative fair use was certainly a major factor, even to the point of the "*Important announcement about the Lap Traveler Product*" on the Defendant's website being a specifically authorized act under their written agreement.

The above, and far more harsh critique of the ruling in this case are contained in paper with an epic-length title, cited below.[19]

---

[18] Id. at 1031

[19] "*Interactive Products Corp. v. A2z Mobile Office Solutions, Inc.:* The Sixth Circuit failed to conduct a thorough analysis in determining whether using a trademark in the post-domain path of a URL is trademark infringement" Sara L. Keenan  Creighton Law Review Vol 37, 2004 pp 967-1028

The new arguments offered by the Defense may raise questions like "Do 'post-domain' URLs matter on a practical basis?" and "Can they misdirect (hijack) shoppers searching for a trademarked product by its brand name?" and "Can they create initial interest confusion?"

The technique for using the "post-domain URL" information as a key element in search engine results is so valuable, it is patented in US20090083266 "Techniques for Tokenizing URLs", Invented by Poola and Ramanujapuram, and assigned to Yahoo.

As for the importance of the post-domain path in attracting shoppers, Google produced the document excerpted in Exhibit B and the videos listed below, all which resoundingly emphasize that the post-domain path is mission-critical to both web searches and the representation of web pages in search engine results, which prominently display the full URLs.  Further, the videos indicate that Defendants deliberately optimized their infringing URLs to maximize their search-engine impact, using hyphens, not underscores or some other separator character.

So, do post-domain elements of a URL path or filename matter? Clearly, yes.  They are far more important than metatags, according to Google's last instructional video in the list below.

> "Is it better to have keywords in the URL (post-domain) path or filename?"
> http://www.youtube.com/watch?v=971qGsTPs8M
>
> "Should I use underscores or hyphens in (post-domain) URLs?"
> http://www.youtube.com/watch?v=Q3SFVfDIS5k
>
> "Underscores vs. dashes in (post-domain) URLs"
> http://www.youtube.com/watch?v=AQcSFsQyct8
>
> Q: "How important is it to have keywords in a domain name?"
> A: "It's definitely possible to succeed without keywords in the domain name"
> http://www.youtube.com/watch?v=rAWFv43qubI
>
> Q: "What are some examples of SEO misinformation?"
> A: "Keyword Metatags don't matter any more – Google ignores them" (@ 2:50 into the video)
> http://www.youtube.com/watch?v=xh2pndFKtsg

James Fischer
Plaintiff Pro se
PO Box 287048
New York, NY 10128

**From:** Garrett, Denise <dgar@loc.gov>
**Sent:** Tuesday, October 7, 2014 1:11 PM
**To:** 'james.fischer@gmail.com'

**Subject:** Form CA receipt in the Copyright Office

Dear Mr. Fischer,

This is a courtesy email to inform you that the U.S. Copyright did receive your Form CA for the following item.

Title: TEXT AND IMAGES OF BEE-QUICK.COM WEBSITE
Name: James Fischer
Receipt Date: 07/14/2014
Original Registration: TX 7422921
Status: INPROCESS
IPN: 162324643
Service Request Number: 1-1661855368

If you have additional questions or need assistance, my contact information is listed below.

Warm regards,

*Denise D. Garrett*

Section Head |Public Information & Education Office| U.S. Copyright Office
101 Independence Ave, Suite 401 Washington DC 20559
Phone: 877.476.0778 (toll free) or 202.707.5959
Direct: 202.707.0600 or 202.707.6665 | dgar@loc.gov| www.copyright.gov

**Exhibit A** – Acknowledgement from Copyright Office of Receipt of Form CA
(They do not automatically issue acknowledgements upon receipt, hence the email)



# Improve the structure of your URLs

## Simple-to-understand URLs will convey content information easily

Creating descriptive categories and filenames for the documents on your website can not only help you keep your site better organized, but it could also lead to better crawling of your documents by search engines. Also, it can create easier, "friendlier" URLs for those that want to link to your content. Visitors may be intimidated by extremely long and cryptic URLs that contain few recognizable words.

URLs like (1) can be confusing and unfriendly. Users would have a hard time reciting the URL from memory or creating a link to it. Also, users may believe that a portion of the URL is unnecessary, especially if the URL shows many unrecognizable parameters. They might leave off a part, breaking the link.

Some users might link to your page using the URL of that page as the anchor text. **If your URL contains relevant words, this provides users and search engines with more information about the page than an ID or oddly named parameter would (2).**

## URLs are displayed in search results

Lastly, remember that the URL to a document is displayed as part of a search result in Google, below the document's title and snippet. Like the title and snippet, words in the URL on the search result appear in bold if they appear in the user's query (3). To their right is another example showing a URL on our domain for a page containing an article about the rarest baseball cards. The words in the URL might appeal to a search user more than an ID number like "www.brandonsbaseballcards.com/article/102125/" would.

Google is good at crawling all types of URL structures, even if they're quite complex, but spending the time to make your URLs as simple as possible for both users and search engines can help. Some webmasters try to achieve this by rewriting their dynamic URLs to static ones; while Google is fine with this, we'd like to note that this is an advanced procedure and if done incorrectly, could cause crawling issues with your site. To learn even more about good URL structure, we recommend this Webmaster Help Center page on creating Google-friendly URLs.



(1) A URL to a page on our baseball card site that a user might have a hard time with.



(2) The highlighted words above could inform a user or search engine what the target page is about before following the link.



(3) A user performs the query [baseball cards]. Our homepage appears as a result, with the URL listed under the title and snippet.

### Glossary

**Crawl**
Exploration of websites by search engine software (robots) in order to index their content

**Parameter**
Data provided in the URL to uniquely define a resource

**ID (session ID)**
Data provided here for the identification and to increase the management of a user who is currently accessing a session in a particular web session

**301 redirect**
A kind of HTTP status code (see page 12). Causes a site visitor to automatically arrive to a new (redirect) URL

**Subdomain**
A type of domain used to identify a subset of that is smaller than a regular domain (see page 6).

**Root directory**
The level at the top of the structure of a site. It is sometimes called "root".

---

**Exhibit B** – Google's Advice on optimizing the post-domain path of URLs (from Google's
*"Search Engine Optimization Starter Guide"* pg 8 & 9 )
http://www.google.com/webmasters/docs/search-engine-optimization-starter-guide.pdf



## Use words in URLs

URLs with words that are relevant to your site's content and structure are friendlier for visitors navigating your site. Visitors remember them better and might be more willing to link to them.

> **Avoid:**
> - using lengthy URLs with unnecessary parameters and session IDs
> - choosing generic page names like "page1.html"
> - using excessive keywords like "baseball-cards-baseball-cards-baseballcards.htm"

## Create a simple directory structure

Use a directory structure that organizes your content well and makes it easy for visitors to know where they're at on your site. Try using your directory structure to indicate the type of content found at that URL.

> **Avoid:**
> - having deep nesting of subdirectories like ".../dir1/dir2/dir3/dir4/dir5/dir6/page.html"
> - using directory names that have no relation to the content in them

## Provide one version of a URL to reach a document

To prevent users from linking to one version of a URL and others linking to a different version (this could split the reputation of that content between the URLs) focus on using and referring to one URL in the structure and internal linking of your pages. If you do find that people are accessing the same content through multiple URLs, setting up a 301 redirect from non-preferred URLs to the dominant URL is a good solution for this. You may also use canonical URL or use the rel="canonical" link element if you cannot redirect.

> **Avoid:**
> - having pages from subdomains and the root directory access the same content
>   - ex: "domain.com/page.htm" and "subdomain.com/page.htm"
> - using odd capitalization of URLs
>   - many users expect lower-case URLs and remember them better

**Links**

- Dynamic URLs
  http://www.google.com/support/webmasters/bin/answer.py?answer=40349
- Creating Google-friendly URLs
  http://www.google.com/support/webmasters/bin/answer.py?answer=76329

- 301 redirect
  http://www.google.com/support/webmasters/bin/answer.py?answer=93633
- rel="canonical"
  http://www.google.com/support/webmasters/bin/answer.py?answer=139394

**Exhibit B** (pg 2) – More Google advice on optimizing the post-domain path of URLs