UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
JAMES H. FISCHER,

                              Plaintiff,

                -v-

STEPHEN T. FORREST, SANDRA F. FORREST,

                            Defendants.
------------------------------------------------------------------------X

14 Civ. 1304 (PAE)
14 Civ. 1307 (PAE)

<u>ORDER</u>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/20/15

PAUL A. ENGELMAYER, District Judge:

      The Court has received the attached letter from *pro se* plaintiff James Fischer. The letter, and the enclosed article from *Bee Culture* magazine, report that defendants Stephen and Sandra Forrest have "handed over" their company, Brushy Mountain Bee Farm, to a third party, Shane Gebauer. Fischer argues that this transfer, of an asset belonging to defendants, could be "intended to frustrate enforcement of a judgment in the cases at hand" and therefore requests that the Court appoint a receiver or attach defendants' assets. The Court declines to do so, for the following reasons.

      Under Federal Rule of Civil Procedure 64, the Court may seize property when authorized "under the law of the state where the court is located." New York law establishes that:

> An order of attachment may be granted in any action, except a matrimonial action, where the plaintiff has demanded and would be entitled, in whole or in part, or in the alternative, to a money judgment against one or more defendants, when . . . (3) the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts.

N.Y. C.P.L.R. § 6201. To obtain attachment pursuant to this section, "fraudulent intent must be

1

proven, not simply alleged or inferred in the moving papers." *Nat'l Audubon Soc., Inc. v. Sonopia Corp.*, No. 09 Civ. 975 (PGG), 2009 WL 636952, at *5 (S.D.N.Y. Mar. 6, 2009). "[T]he defendant is entitled to a presumption of innocence," and the Court must consider any "legitimate business purpose" for the defendant's actions. *Bank of Leumi Trust Co. of New York v. Istim, Inc.*, 892 F. Supp. 478, 483 (S.D.N.Y. 1995).

Further, even taking the representations in the article as accurate, the events related therein do not support the inference that defendants transferred Brushy Mountain to Gebauer in order to frustrate enforcement of an unfavorable judgment in this case. The article reports that Gebauer began working as the General Manager of Brushy Mountain in 2007, and "part of the agreement was that he would slowly gain more of an ownership role in the business." Stephen and Sandra Forrest "slowly relinquished more and more responsibilities to Shane over the years," and they "formally handed over the company" when they retired in September 2014. Accordingly, the transfer of assets began several years before Fischer commenced this action in February 2014, *see* Dkt. 1, and was completed in accordance with a longstanding plan a few months before the Court denied defendants' motion to dismiss in January 2015, *see* Dkt. 45. Without more, the Court finds no basis to view with suspicion a small business owner's decision to hand over the reins to a trusted employee and retire.

Additionally, although Fischer's amended complaints contain various colorable claims, the Court's decision to deny defendants' motion to dismiss does not equate to a finding of a likelihood of success on the merits. In resolving the motion to dismiss, the Court accepted all allegations in Fischer's complaints as true, drew every reasonable inference in his favor, and found only that his claims are plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014). To prevail on the merits, by

contrast, Fischer must provide enough admissible evidence to overcome any evidence offered by defendants and prove his claims by a preponderance of the evidence, *see, e.g.*, *Mayimba Music, Inc. v. Sony Corp. of Am.*, No. 12 Civ. 1094 (AKH), 2014 WL 5334698, at *14 (S.D.N.Y. Aug. 19, 2014), meaning that his account of the facts "is more likely true than not true," *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997).

For the foregoing reasons, the Court denies Fischer's request without prejudice. If discovery reveals concrete evidence that defendants have transferred their assets in bad faith, Fischer is at liberty to renew his request.

SO ORDERED.

_Paul A. Engelmayer_
Paul A. Engelmayer
United States District Judge

Dated: January 20, 2015
       New York, New York

 Letter Concerning 14cv1304 and 14cv1307
James Fischer
to:
engelmayerNYSDChambers
01/16/2015 09:54 AM
Hide Details
From: "James Fischer" <james.fischer@gmail.com>

To: <engelmayerNYSDChambers@nysd.uscourts.gov>

2 Attachments

 

BeeCulture_Article.pdf  Letter_Asset_Shielding.pdf

Your Honor and His Staff:

I am the Plaintiff in 14cv1304, and 14cv1307.

Attached is a letter concerning what may be an attempt by Defendants to fraudulently liquidate assets required to satisfy a judgment.
More troubling is that the attempt seems to have been known to Defense council, as evinced by a very carefully-worded but cryptic Defense statement in their filings.

It seems that I must ask the Court to intervene.


Thank you for your time and attention,

    james fischer  917-628-4052

Hon. Paul A. Engelmayer
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

James Fischer
PO Box 287048
New York, NY 10128
Jan 16, 2015

Re: Fischer v. Forrest, Cases 14cv1304 and 14cv1307

Dear Judge Engelmayer:

I call the Court's attention to the attached article, published in the December, 2014 issue of *Bee Culture* magazine, saying on page 44, at bottom of the middle column:

*"And with the transition in ownership, I am pleased to announce that Shane Gebauer is now the President of Brushy Mountain Bee Farm! When Shane originally came aboard as General Manager, part of the agreement was that he would slowly gain more of an ownership role in the business."*

*"Steve and Sandy Forrest explained to me years ago that they have no children and wanted the business to go to their employees. Hence, they both slowly relinquished more and more responsibilities to Shane over the years. Steve and Sandy officially retired this past September and formally handed over the company."*

This might be nothing but the establishment of a small Employee Stock Ownership Plan, or this "Transition in ownership" could well be exactly what it seems to be - a transfer of most of Defendants' shares, intended to frustrate enforcement of a judgment in the cases at hand. But I know both Ms. Berry and the editor of *Bee Culture* well enough to be confident that all statements about ownership were fact-checked with both Mr. Gebauer and the Defendants.

Both Plaintiff and the Court can now understand the cryptic claim suddenly made by the Defense in October 2014, *"Defendants are not sole shareholders..."* (14cv1307 Doc #56, Pg 2). When Defendants "handed over the company", what, if anything, was handed over? What is "an ownership role", if not outright ownership of a significant fraction of shares?

Court oversight or a Receiver may be needed to assure that assets required to satisfy a judgment are not fraudulently liquidated. As it seems clear that this transfer of assets was well-known to Defense counsel last fall, Plaintiff looks to the Court for advice on how to proceed, and how to help Defense counsel to resist the temptation to permit advocacy to triumph over their obligations as officers of the Court.

It seems that the Court can, ex-partie, and without any prior hearing or notice, attach any or all of Defendants' assets as it sees fit, and then order hearings on the issue as the Court sees fit. Given the rejection of all Defense motions to dismiss, it is probable that plaintiff will succeed on the merits. There are also no counterclaims in this case to complicate matters.

NY CPLR 6201 provides: "An order of attachment may be granted in any action... where the plaintiff has demanded and would be entitled... to a money judgment against one or more defendants, when... 3. the defendant, with intent to... frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property... or is about to do any of these acts..."

The Supreme Court has held that this is an "exigent circumstance".[1] The *Doehr* defendant was "about to transfer or encumber his real estate or take any other action during the pendency of the action that would render his real estate unavailable to satisfy a judgment."[2]  Where the court has jurisdiction over defendant, it "has jurisdiction over that party's tangible or intangible property, even if the situs of the property is outside New York."[3]

Plaintiff has a more than colorable claim against the Defendants' assets, given that Plaintiff's claims have survived the Defense motions to dismiss intact, and that the potential statutory damages alone are substantial.

While it may seem unfair to attach first, and ask questions later, the stock in Brushy Mountain Bee Farm is not traded, has no cash value, and is therefore nothing but a way to allocate ownership of, control over, and dividends from the firm.  An attachment prior to fact-finding would not appear to impact company operations in any way.

My grasp of this area is, at best, cursory, but calling the situation to the Court's attention without delay seems more important than developing a better understanding of the law.

This is a letter, as I will not try the Court's patience with an amateur-hour "ex-partie motion".

*J H F*

James Fischer

---

[1] Connecticut v. Doehr, 501 U.S. 1, 16 (1991)
[2] Id.
[3] Hotel 71 Mezz Lender LLC v. Falor, 14 N.Y.3d 303 (2010)

14cv1304 & 14cv1307    Request For Pre-Judgment Attachment    Page 2 of 2

# SHANE GEBAUER

*Interviewed by* Jennifer **Berry**

## A New Voice At The Helm Of Brushy Mountain Bee Farm



For sometime now, I've wanted to interview Shane Gebauer for an article. I knew he had a story to tell, but I have to admit, I was a bit wary about approaching him because of a certain history that we share. See, I was raised in a family that loved to play practical jokes. And over the years, I've perpetrated a few jokes on my friends – including Shane! So, I figured he would never agree to an interview given an underlying distrust of my motives. Yet, after asking several times, he begrudgingly said, "Yes," but only after I convinced him that I wouldn't include any stories or pictures of the antics that I'd pulled in the past. So, in keeping with my promise, I will not divulge any details, but you can rest assure that they were all "top drawer" hoaxes. And I know that Shane agrees because he has a great sense of humor, too, which is why poking fun at him from time to time has been so much fun. I can only imagine that, one day, I'll "get mine" in spades, but, alas, this article isn't about practical jokes; it's about my good friend, Shane.

If you have been to a state or national meeting, wondered into the vendor area, and heard someone talking in that oh-so-recognizable New Jersey ("Yankee" is how we say it here in the south) accent, then you have likely ran into Shane Gebauer. He has been working in the bee industry for over eleven years now despite not coming originally from a beekeeping background.

Shane grew up on a dairy farm in northern New Jersey. The farm wasn't your typical dairy farm because they didn't harvest milk. Instead, they bred, raised and sold calves to other dairy farms. His interest in the environment and natural sciences led him to college where he received his Master of Science degree in Ecology and Environmental Sciences from the University of Maine. His research explored the ecological processes in peat lands, and how fire can change the dynamics of these environments. Pretty interesting stuff!

During Summers, Shane worked for the Nature Conservancy where he traveled all over the country conducting prescribed burns (legally setting fires to improve the health of the environment). Areas like the prairie lands depend on fires to keep weeds, thatch and other undesirable woody vegetation from choking out the grasses and provide needed fertilizer to the soil. Fires help to maintain these and other ecological systems, and controlled burns are much safer than the haphazard and unpredictable fires that arise from lightning strikes and human accidents.

After Shane received his graduate degree, he got a job working as an ecologist for the New York Nature Heritage Program. For four years, Shane traveled around New York State during the Summer months and assessed the impact of humans on the environment. Winter time, he entered the field information collected into a data base and applied this knowledge to anticipate how proposed development projects would impact their surroundings.

The official mission of the program, as stated on the Heritage Programs website, is to "facilitate conservation of rare animals, rare plants, and natural ecosystems, which we commonly refer to as natural communities." More specifically, Shane's purpose was to investigate how humans had altered these natural communities.

One example of human impact on the environment would be the introduction of non-indigenous plant or animal species. In Georgia, two such invasive plant species are Kudzu and Privet. Kudzu is a leafy, hearty vine that was brought in from Asia for erosion control after the Civil War. Privet is an evergreen shrub from Europe and Asia that was planted as ornamental hedges. Both have naturalized and grown unchecked since nothing in this part of the world finds them tasty. Hence, they have taken over vast areas of empty fields, roadsides, waterways, and forests and displaced the indigenous species. Each year I renew a war on privet at my farm to prevent the loss of environmental diversity. Such changes in the natural environment might not be as apparent to the casual eye, but one can easily look to the urban, retail environment to



*The Gebauer Family – Heather, Cormac, Braxton and Shane.*





*Shane, doing just one of the things he enjoys, teaching others about bees.*

see similar homogenization. Just consider the loss of interesting and varied small businesses (e.g., "mom and pop" restaurants and stores) across our country to the sterile and ubiquitous franchises, corporate monoliths, and big box stores. The same is mirrored in the natural environment with the introduction of dominating, alien plants and animals like the Asian Carp. Whether on purpose or by accident, these foreign species usually face no natural predators, and, as a result, they rapidly reproduce and push the native species out the door. Ok, enough. Let's save this discussion for another time.

So, you may be thinking to yourself, when do the bees and Shane get introduced? Well, it's not quite yet. Even though he loved his job, the weekly travel (living out of suitcases, tents and cheap hotels) gathering the data in the Summer, and the Winters cooped up in windowless cubicles processing the data, really started to wear on him. He was married and spending way too much time away from his lovely wife.

Enter Heather. Shane and Heather met in school, but it was not the typical way that you might expect most college students to meet. You know what I'm talking about. The usual stories would include bumping into each other on campus, having a class together, borrowing study notes, or meeting at a frat party. No, Shane met Heather at a knitting class! Of course, once he told me that, I had to know the rest of story . . .

Heather's mom worked at a coffee house close to campus. Shane, being the coffee addict that he is, was a frequent customer. He probably teetered on being the compulsive, scary guy who shows up three times a day! So, he got to know Heather's mom. She not only served up the joe, but also shared that she taught a knitting class. After what I'm sure was several conversations on the topic, Shane admirably decided to stretch his boundaries and try knitting. The class was held at Heather's mom's house. And Shane met Heather when she stopped by to do laundry, which just goes to show you that you never know what fate might throw your way when you're willing to step out of your comfort zone. Dating, however, was still a little ways off.

Heather mentioned that she owned a florist shop. As a grad student, Shane was a teaching assistant and taught lab sessions that included botany. Well, low and behold, the idea dawned on Shane to visit Heather at work for the flowers that he needed for dissections at school. So, he began to make regular trips to the florist's to visit, flirt, and, of course, buy flowers. Seeking a clear sign of mutual enthusiasm from Heather before asking her out, Shane bided his time. Finally, it took Heather's friend to point out to her that Shane could have very easily picked flowers from anywhere on campus for free, and he was obviously not returning regularly to the shop "for the flora, but the fauna!" Soon after, they became an item.

Heather was the beekeeper. Heather's father had also been a beekeeper, and she had fond memories of working hives and extracting honey with him. So, when Shane and Heather purchased their first home outside of Greenwich, New York, she wanted a beehive. Shane thought this was crazy. "Bees! Stinging insects," Shane exclaimed! "Are you nuts???" But as most beekeepers know, once you get stung, you're hooked. Well, it didn't take long before Shane was stung and wanted to learn more. "They drew me in," he said.

Around this time, Heather was working at Betterbee, and Shane would periodically stop by on his way to or from work. One day in August, he noticed a note on the door, "Weekend help needed to harvest honey," and he thought that this would be a perfect opportunity to learn more. It didn't take long for him to realize that bees were becoming a regular part of his life, and, five months later, he joined Betterbee as their general manager. "Bees really intrigued me, and they still do even today. They're so captivating; they drag you into their world and hold on to your attention. The more I learn, the more I want to know. Plus, in working with bees, I get to stay connected to wildlife and the ecology of things, which is my background," he said.

Heather and Shane wanted to have a simple wedding, so, they decided to take their vows in front of family and friends in their intimate backyard. Well, you can guess what was also in their backyard . . . Yup, there were beehives – eight to be exact! And I'm thinking bees and wedding guests don't mix well together. Lots of people showing up in various styles and colors of dress, including dark clothing, exposed arms and shoulders, and open-toed shoes none of which resembled a beesuit.

So, the day before the wedding, Shane and his French friend from work, Giles, were going to move the bees off site. Simple, right? Well, if you've ever moved bees, then you know there is nothing simple about picking up 200-pound boxes full of stinging insects that can be very sensitive to noise and vibrations, and carrying them, bouncing up and down, step-by-step, for several hundred feet. Actually, it's an opportunity (recipe) for disaster.

To make matters worse, Giles wasn't your, how do you say, "seasoned" beekeeper. In fact, while he deserves major kudos for his intention to help out a friend in need, he was clearly not comfortable among the buzzing insects. The immediate destination for the hives was the truck and trailer parked at

Case 1:14-cv-01304-PAE-HBP   Document 47   Filed 01/20/15   Page 9 of 10



*Braxton, ready to go.*

the bottom of the hill. And, about half way down the hill on the very first trip, Giles felt something crawling up his leg. Quickly, they set down the hive, and Giles addressed his plight. A while later, assured that his garments were intruder-free, they recommenced moving the hive down the hill. But, when more bees found their way up his leg once again, Giles panicked and retreated to the house, not to return. Shane was on his own.

Since Shane could not lift the hives by himself, he planned to dismantle each one, carry a super at a time to the trailer, and reassemble the hives there. Yet once those boxes were opened, the bees came rushing out! They were everywhere: in the grass, on the trailer, crawling on the driveway, flying in the air, and hanging from the trees. Diligently, Shane worked to brush, vacuum, and sweep until he was confident that there was not a single, loose bee to be found. His hard work luckily paid off. The wedding took place without one bee incident, except for Shane; he was still tender and itchy from the multitude of stings he took the previous day.

Shane remained at Betterbee for four years, where he learned a good bit about the business end of beekeeping. He also built relationships with a number of beekeepers and other beekeeping industry folk. It was during this time that he met Steve and Sandy Forrest. Steve instantly saw the potential in Shane and wanted him at his company, Brushy Mountain Bee Farm (Brushy). If you have ever met Steve, then you know he has a very tenacious personality, and, once he locks onto something, he doesn't let go. Eventually, the circumstances were right to make a move, and Shane resigned from Betterbee. He moved his family, Heather and Braxton (their firstborn son), from upper state New York to Moravian Falls, North Carolina in 2007 and he became the General Manager of Brushy. Since that time, Brushy has grown considerably along with something else . . . Heather and Shane's family!

First came Braxton, who is now seven, exceptionally bright, and a first grader. I can attest to his intellect by first-hand experience! He was born just prior to Heather and Shane's moving to North Carolina. Cormac came two-and-one-half years later. And he would be ecstatic to tell you that he'll be five in January.

Since Shane's arrival at Brushy, some major changes have occurred. They now have an expanded website – complete with an online catalog. A manufacturing and shipping facility complete with a retail store located in Pennsylvania, which helps to alleviate the pressure of meeting all of the demand for equipment from Moravian Falls. They have a public store at the Moravian Falls location where folks can shop. And, the newest change is that the manufacturing facility at Moravian Falls is no longer located on the mountain, but, instead, has been moved into a 21,000 square foot building in town. They needed a bigger facility, and building onto the original location was cost prohibitive. As a result, the area for the wood shop and assembly room has almost doubled in size, which has greatly increased production capacity. And with the transition in ownership, I am pleased to announce that Shane Gebauer is now the President of Brushy Mountain Bee Farm!

When Shane originally came aboard as General Manager, part of the agreement was that he would slowly gain more of an ownership role in the business. Steve and Sandy Forrest explained to me years ago that they have no children and wanted the business to go to their employees. Hence, they both slowly relinquished more and more responsibilities to Shane over the years. Steve and Sandy officially retired this past September and formally handed over the company. Shane is quick to point out that, while there have been many changes, the core values set by Steve and Sandy will remain: to constantly aspire to offer the best service, quality and customer support in the industry.

If you go to any state or national meetings, then you will more than likely find yourself strolling by a Brushy Mountain Bee Farm display, where you will probably find Shane working on the front line. He personally attends from 10 to 15 meetings each year. Despite the hard work and other demands on his time, he really loves interacting with the customers. "Meeting folks, learning new tricks, and discovering new ideas are what makes these meetings fun," he said. He also loves cajoling with the other industry folks, vendors and speakers, but it's the backyard beekeepers that most attract his attention. "Some (beekeepers) are very passionate about their bees. The bees are like their pets, and even a member of the family, like a dog or cat, and it is really fun to hear the stories and share the passion that these beekeepers have," he said.

We next talked about the future of beekeeping here in the U.S., which Shane believes is bright. "There is exponential growth in farmers' markets, locally grown movements, the Slow Food group, and many other environmental enthusiasts. There is momentum, and the pendulum is swinging towards folks being concerned about the environment. More interest in beekeeping is a logical extension of that," he said. We both agreed that this is a good thing. However, there are still huge hurdles facing bees and beekeepers, which we can't ignore: *Varroa*, viruses, AFB, EFB, SHB, Nosema, pesticides, etc. And it is very important that beekeepers pay attention to these challenges and take them seriously. "It is imperative that beekeepers educate themselves because beekeeping isn't intuitive," Shane added.

Even though he's been at this for over a decade, Shane still considers himself green, and quickly concedes that he still has a lot to learn. His advice to new beekeepers is not

to get lost in the hype – especially in the fads that come and go. "I am a little concerned about the latest 'natural movement,'" he said. Shane and I are both seeing folks abandoning traditional management practices because they are not considered "natural" or "healthy." These practices have worked for years and still work today. Take the standardized, Langstroth hive for instance. Just because they've been around for decades doesn't mean that they're out of fashion! They work. They offer a beekeeper a lot of flexibility to interchange components within a hive as well as between hives. They offer the opportunity to inspect the hive and extract honey without destroying the comb. Are they what's found in nature (aka "natural")? No. But beekeeping is a relationship between man and bees. And our contributions to this relationship not only make things easier for us, but they benefit the health, stability and longevity of the colonies. Some of the emerging trends that we see, such as "having" bees instead of "keeping" bees, are actually doing more harm than good. We don't need to reinvent the wheel because round has somehow become boring or it is not the shape that occurs naturally.

Another issue that concerns us both is this particular scenario: people decide to become beekeepers. They go out, purchase all the necessary equipment, and put it together. They order, pick up, and install bees. Bam! Now, they're beekeepers. However, they possess hardly any beekeeper tested or research-supported information about managing bees. They've received virtually no training or education other than what they may have read casually on the internet. The first season, the bees do great, but they don't survive the Winter. So, the beginners order more, and the bees die again. They become frustrated and walk away from beekeeping forever.

This isn't right! Shane explained, "We need these people! I am a huge advocate for the backyard beekeeper. I appreciate what they do, not only for their particular bees, but for the environment as well. These folks are not insignificant. Their bees make up probably a third of all the bee biomass in the U.S., and they play a critical role – not just in pollination, but also for the benefit they provide for wildlife. They're hobbyists, yes, but their efforts are a huge contribution to the world! I think that we are more dependent on them than we realize. Their importance is understated!"

So, what can we do," I asked Shane. "How can we keep them in the fold?" "Again, (we) teach them solid information," he replied sagely.

Since the publicity associated with Colony Collapse Disorder began, honey bees have been catapulted into the mainstream media, and, as a result, the mainstream consciousness. "Memberships in beekeeping clubs and associations are increasing like never before, but, on



*Cormac getting ready to smoke some bees.*

the flip side, beekeepers are leaving in record numbers as well. That's where the clubs and associations, with their monthly meetings, newsletters, beekeeper mentorship programs, short courses and workshops are making a difference. Most of these groups are doing a great job getting the information out, doing the outreach, and pairing newbie's up with mentors, but we need to do more," he said. And Shane will!

Memories of her father drew Heather back to the bees and opening a hive is all it took to draw Shane in. Even after 11 years, the fascination continues. His excitement is contagions and his expertise amazing. I imagine Steve and Sandy rest easy at the end of the day knowing they have chosen the right person to take over Brushy Mountain Bee Farm. All the hard work and time they devoted over the decades building up the business won't be in vain because they found someone who's not only crazy about bees, but also someone with good business sense. Shane truly is an ambassador, not just for the beekeeper but also the bees. I'm glad he walked into the store that day, saw the sign and wanted to know more about bees. Since then, he's been working hard to ensure a better future for them. Thanks Shane! BC

*Jennifer Berry is the Research Director at the University of Georgia Honey Bee Lab.*



*Planting* **Natives for Pollinator Habitat?**

ernstseed.com
sales@ernstseed.com
800-873-3321
814-336-5191 (fax)

ERNST SEEDS