**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
JAMES H. FISCHER,            Plaintiff    :  Case 14cv1304(PAE)
                                        :
             v.                      :  **THIRD AMENDED COMPLAINT**
                                        :
STEPHEN T. FORREST, Jr.,        :  **JURY TRIAL DEMANDED**
SANDRA F. FORREST,         :
SHANE R. GEBAUER  and           :
BRUSHY MOUNTAIN BEE FARM, INC.    :      :
                                        :
                            Defendants.  :
------------------------------------------------------------x

       Plaintiff James H. Fischer (hereinafter "Plaintiff"), for his amended Complaint against

Defendants Stephen Taylor Forrest, Jr., Sandra Fincher Forrest, Shane R. Gebauer, and Brushy

Mountain Bee Farm, Inc. (hereinafter "Defendants") alleges as follows:

### PRELIMINARY STATEMENT

**1.**  This is an action for: (1) copyright infringement, trademark infringement, false designations

    of origin, false descriptions, and unfair competition under Federal law; and (2) breach of

    contract, unfair business practices, and unjust enrichment under New York State Law, and

    violation of the New York Civil Rights law.  This action arises from Defendants' willful,

    deliberate, and systematic misappropriation of Plaintiff's intellectual property in marketing

    an unauthorized knock-off product using Defendants' website, deception, misrepresentation,

    Plaintiff's Copyrights and Trademark, and even his respected family name.

**2.**  From 2002 to 2010, Defendants were an Authorized Dealer for Plaintiff's product. In late

    2010, Defendants breached the Dealership agreement, and also announced their immediate

    termination of the already-breached agreement in the same email (*see* Exhibit 3).

**3.**  Regardless whether the breach or termination happened first, any permission to use

    Plaintiff's intellectual property was revoked on the day when Defendants lost their

Authorized Dealer status, as no permission was granted to use Plaintiff's copyrights, trademark, or name in any way except specifically in the sales of Plaintiff's product, and Defendants had none to sell.

4.   In March 2011, Defendants began marketing an unauthorized knock-off of Plaintiff's product. Defendants displayed word-for-word verbatim copies of Plaintiff's copyrighted works on their sales web pages describing their cheap knock-off.  Defendants also misappropriated Plaintiff's trademark and even his family name in multiple places on the same website.

5.   Defendants' illegal use of Plaintiff's intellectual property in selling their cheap knock-off product was intended to create the false impression that Defendants were manufacturing and/or still selling Plaintiff's well-known and well-respected product. Defendants' conduct constituted a bad-faith attempt to trade upon and profit from the goodwill associated with the distinctive trademarks, copyrights, and advertising created by Plaintiff to promote his product.  The unusual length of this Amended Complaint is due to the large number of individual illegal acts committed and causes of action deliberately created by Defendants with that goal in mind.  So many individual illegal acts cannot be inadvertent.

6.   In April 2011, Plaintiff demanded in writing that Defendants cease and desist their infringement and reminding Defendants of Plaintiff's registered trademark and registered copyrights (*see* Exhibit 15).  Defendants refused (*see* Exhibit 16), deliberately, knowingly, and willfully continuing their multiple infringements of Plaintiff's exclusive rights. Defendants have profited from Plaintiff's name and good will, done irreparable harm to his intellectual property, caused an incalculable loss of goodwill, caused loss of market share, caused market confusion, profited at Plaintiff's direct expense, and will continue to do so

unless enjoined. Plaintiff seeks permanent injunctions halting all infringing activities, and ordering Court-supervised corrective advertising. Plaintiff also seeks defendants' profits, damages, exemplary damages, pre- and post-judgment interest, and where appropriate, punitive damages, costs, and attorney's fees.

### THE PARTIES

7.   James H. Fischer ("Plaintiff"), resides in Manhattan in the City of New York and is the inventor and supplier of "Fischer's Bee-Quick®," a product developed for the purpose of facilitating honey harvesting. Plaintiff's copyrights and trademark were registered in the city of New York. Additionally, Plaintiff is the Director of Education for The Honey Bee Conservancy, a nonprofit organization with 501(c)(3) status, and teaches the "*Absolutely Free Beekeeping Course*" to the 1500-member co-op "New York City Beekeeping" and to other groups nationally and internationally via live multi-way videoconferencing.

8.   Defendant Stephen Taylor Forrest, Jr. (aka "Stephen Taylor Forrest") is President and a principal shareholder of Brushy Mountain Bee Farm, Inc. with its principal place of business at 610 Bethany Church Road, Moravian Falls, NC 28564, and, on information and belief, additional manufacturing/warehouse operations in New Columbia, PA, and Wilkesboro, NC. Mr. Forrest exerts extensive direct day-to-day control over all Brushy activities. He has a direct and obvious financial interest in Brushy. He has personal liability as an individual for all claims, and is personally jointly and severally liable with both Sandra Fincher Forrest and Shane R. Gebauer for all damages, costs, and attorney's fees.

9.   Defendant Sandra Fincher Forrest is Secretary/Treasurer and a principal shareholder of Brushy Mountain Bee Farm, Inc. at the same addresses listed above.  Mrs. Forrest exerts extensive direct day-to-day control over all Brushy activities. She has a direct and obvious

financial interest in Brushy. She has personal liability identical to, and is personally jointly and severally liable with both Steven Taylor Forrest and Shane R. Gebauer for all damages, costs, and attorney's fees.

**9a.** Defendant Shane R. Gebauer was, on information and belief, at the time of filing this lawsuit, General Manager of Brushy Mountain Bee Farm, at the same address listed above, and party to an agreement that makes him a principal (or significant) shareholder in Brushy Mountain Bee Farm via an outright grant or gift of shares, rather than via purchase of shares at fair market value.  Mr. Gebauer exerts extensive direct day-to-day control over all Brushy activities. He has a direct and obvious financial interest in Brushy. He has personal liability identical to, and is personally jointly and severally liable with both Steven Taylor Forrest and Sandra Fincher Forrest for all damages, costs, and attorney's fees.  Note that acts of "Defendants" prior to Mr. Gebauer's employment should apply only to the Forrests.

**10.** Mr. and Mrs. Forrest have been listed as the sole officers and shareholders on every NC corporate filing made since their incorporation in 1981. (see Exhibit 1)  Mr. Gebauer has not been listed on any NC corporate filing, but his status as "*President*" of Brushy Mountain Bee Farm, and his "*gain[ing] more of an ownership role in the business*" were first announced in  the Dec 2014 "Bee Culture" magazine article attached to 14cv1304 Docket number 47, included by reference in this pleading. Mr. Gebauer knew or should have known that the actions 14cv1304 and 14cv1307 would have properly named him as a co-defendant but for the deliberate concealment of his agreement(s) with Mr. and Mrs. Forrest and their legal fiction of a corporation concerning his "office" and "ownership", and/or the backdating of such agreement(s), either being attempts to frustrate enforcement of a judgment in this case.

11.  Brushy Mountain Bee Farm, Inc. is a North Carolina corporation with its principal place of business at 610 Bethany Church Road, Moravian Falls, NC 28564. It is the corporate entity owned, managed, directed, and operated by Defendants Stephen Taylor Forrest, Jr., Sandra Fincher Forrest and Shane Gebauer.

## JURISDICTION AND VENUE

**12.** This is a civil action seeking injunctive relief and damages for copyright infringement under the Copyright Act, 17 USC §§ 101, 106, and 501 *et seq.*, trademark infringement under the Lanham Act, 15 USC § 1051 *et seq.*, unfair competition, and other associated violations of Federal, NY State, and common law.

13. This court has original subject matter jurisdiction over the Copyright Act claims pursuant to 28 USC §§ 1331, 1332, and 1338.

14. This court has original subject matter jurisdiction over the trademark claims pursuant to the Lanham Act, 15 USC § 1051, *et seq.*, and the statutory and common laws of the State of New York.  This court has supplemental jurisdiction over the related federal, state, and common law claims pursuant to 28 USC §§ 1338(b) and 1367(a), since these claims are joined with substantial and related claims brought under federal law.

15.  This Court has personal jurisdiction over Defendants pursuant to N.Y. Civ. Prac. L. & R. ("CPLR") §§ 301 and 302(a), as Defendants have (i) regularly transacted business within the state (CPLR § 302(a)(l)); (ii) conducted a tortious act within the state by delivering and offering to deliver products sold with infringing promotional materials  to residents of New York (CPLR § 302(a)(2)); and/or (iii) committed a tortious act without the state causing injury to Plaintiff resident of New York; and (a) regularly does or solicits business, and engages in other persistent courses of conduct, in the State (CPLR § 302(a)(3)(i)) or (b)

expects or should reasonably expect the act to have consequences in the State, and derives substantial revenue from interstate commerce (CPLR § (302(a)(3)(ii)). Upon information, belief, and first-hand knowledge, Defendants continuously solicit business from New York residents over the internet via a website, e-mail solicitations, via phone, via catalog mailings, by accepting payment from New York residents, by appearing at, and selling goods face-to-face at meetings held in New York, and by delivering and offering to deliver materials bearing counterfeit and/or infringing trademarks and copyrights to residents of New York.

16. Venue is proper in this Court pursuant to 28 USC § 1391(b)(2) and (c) because a substantial part of the actions and wrongful conduct underlying these claims occurred in this District.

## PERSONAL LIABILITY OF CORPORATE OFFICERS

17 Defendants are the principal shareholders and the sole officers of their closely-held company, legal fiction and/or alter-ego, "Brushy Mountain Bee Farm, Inc."  Defendants work full-time, directing, controlling, and ratifying the activities of Brushy in a hands-on manner, on a day-to-day basis, managing all details of operations from their offices at corporate headquarters, and appearing in person at numerous beekeeper meetings to peddle their wares face-to-face.

18 "Piercing the corporate veil" is not a prerequisite to imposing personal liability upon corporate officers for infringement of intellectual property, when they are involved in, approve of, or even merely do nothing to stop infringing activity of which they are aware.

19 The personal involvement and control of the Forrests is so extensive that they live on the site of the primary company offices and production facilities. Mr. Gebauer lives only a few minutes away, at 6987 Brushy Mountain Rd. The closely-held nature of the business, combined with the extensive and exclusive hands-on control exerted over all aspects of Defendants' business by

Defendants is sufficient evidence that Defendants personally ordered, participated in, and approved of all the actions documented and alleged in this Complaint.

20.  Further, Defendants have the individual right and ability to supervise all acts in their company, and share an obvious and direct financial interest in all activities.

21.  Hence each individual Defendant is personally jointly and severally liable for all damages, costs, and attorney's fees.

## FACTUAL ALLEGATIONS RELATING TO ALL CLAIMS

22. This case is about the simple, outright, egregious theft of Plaintiff's intellectual property.

23. Defendants, running a dealership selling products by mail-order, decided to make a cheap knock-off of a successful product they had profitably and enthusiastically sold for years.

24. Defendants stole the name, copyrighted works, and trademark of the supplier-Plaintiff to create the false impression that they were still selling Plaintiff's well-known product.

25. The stolen intellectual property was used to confuse customers, create initial interest confusion, and steal sales from Plaintiff via bait-and-switch, in the process stealing Plaintiff's good will, sterling reputation, and even his good family name.

26. In 1999, Plaintiff invented a new honey harvesting aid for beekeepers named "Fischer's Bee-Quick®." Plaintiff has earned significant commercial goodwill and earned a reputation as a supplier of a unique product: a food-safe, non-toxic, not foul-smelling, and effective substance that beekeepers can trust to use with their honey and their bees.  Prior products were based on Butyric Anhydride, a highly toxic foul-smelling substance classified as "Hazardous Materials" and not approved for food-use by the FDA (being neither "Generally Recognized As Safe", nor "Food-Grade").

27. Plaintiff promoted and advertised his products in commerce worldwide with specific derivative works of his original creative unpublished works, assembling illustrative text and qualitative representations into print ads, printed flyers, brochures, point-of-sale displays, and content for Authorized Dealer catalogs. Each of these copyrighted advertising works surrounding Plaintiff's products are unique and highly valuable advertising assets and distinct derivative works of Plaintiffs original creative unpublished works.

28. Plaintiffs' product quickly became one of the most in-demand products in beekeeping. While Plaintiff's promotional efforts were effective, the product itself exceeded expectations, did not smell foul, it worked well, and has a shelf life that is measured in decades rather than months. Just two of the many unsolicited endorsements earned by the product are shown in Exhibits 18 and 19.  The popular books "*The Backyard Beekeeper*" and "*Beekeeping For Dummies*" both specifically endorsed Plaintiffs product in unequivocal glowing terms.

29. Well before Defendants became a dealer for Plaintiff's product, each of Plaintiff's Works that are at issue in this action had an independent economic value and life as the focus of several separate derivative works of advertising and promotion. Each Work became a valuable advertising asset, achieving notoriety among beekeepers and acquiring secondary meaning uniquely associated with Plaintiff, and his product "Bee-Quick®".  Humor and sexual innuendo had never been used to sell beekeeping products before, thus significant notoriety was immediately gained.

30. Plaintiff's first use of his mark "Bee-Quick" in commerce was in late 1999, and his use has been continuous from then to the present.  Plaintiff is the sole proprietor of the trademark and all rights associated.

**31.** Plaintiff registered his mark in with the US Patent and Trademark Office on the Principal Trademark Register on Dec 11, 2001 as USPTO Registration #2517553, and recently renewed it as Registration #4019052. (*see* Exhibit 2)

**32.** Defendants become an Authorized Dealer for Plaintiff's product in 2002, and requested brochures, sales flyers, a point-of-sale display, artwork, photos, and descriptive text for their use as an Authorized Bee-Quick Dealer.  In the following years, thousands of brochures and flyers were requested by Defendant, and supplied at no charge by Plaintiff.  Every brochure and flyer included proper copyright notices.

**33.** Defendants specifically requested permission to use Plaintiff's copyrighted Works on their sales website. Plaintiff gave explicit permission allowing Defendants to use specific selected works from among Plaintiff's individual copyrighted works, copyrighted photos, trademarks, and trade dress solely in connection with Defendants' efforts to sell Plaintiff's products.

**34.** On December 10, 2010, Defendants abruptly and unilaterally notified Plaintiff of their "*discontinuing Bee-Quick in our 2011 catalog*", in their e-mail to Plaintiff.  (*see* Exhibit 3) This was a unilateral termination of an agreement of many years standing.

**35.** At that point, Defendants immediately lost any right, license, or permission to use any of Plaintiff's intellectual property, as all such use was permitted solely in the selling of Plaintiff's product.

**36.** Despite having no right or permission to do so, Defendants proceeded to methodically misappropriate Plaintiff's intellectual property to mislead customers, create confusion, and misrepresent their directly-competing cheap knock-off product as Plaintiff's product to bait-and-switch unwitting customers and sell Defendants' product in place of Plaintiff's product.

## COPYRIGHT COMPLAINTS
### Factual Allegations Relating To All Copyright Claims

**37.** Plaintiff incorporates the preceding statements as if fully set forth herein.

**38.** In 1999, prior to product release, Plaintiff created original creative written works, for use in marketing and sales of his new product.

**39.** Plaintiff also created a product package and label, and made unique and creative photographs of the product, for use in promotional efforts.

**40.** Prior to product launch, Plaintiff created a database of all his individual creative unpublished works, with all works accompanied by proper copyright notice per 17 USC §401, and displayed all these works on his website (www.bee-quick.com) in 2000.

**41.** Plaintiff later registered the original, still-unpublished versions of each of these creative works as displayed on Plaintiff's website with the United States Copyright Office in accordance with 37 CFR 202, and received group registration TX-422-921, with a registration date of 2/7/2011 (*see* Exhibit 4).

**42.** Among the works mentioned above, Plaintiff specifically created several specific uniquely creative works of expression, which have become subjects in this action (Herein, "**Works**", with an initial capital):

    a.)    "Are you tired of your spouse making you sleep in the garage"?

    b.)    "Are you tired of using a hazardous product on the bees you love"?

    c.)    "A safe, gentle, and pleasant way to harvest your honey"

    d.)    "A natural, non-toxic blend of oils and herbal extracts"

    e.)    Plaintiff also created an original hi-key photo of his product, and its unique and unusual "apothecary" bottle, pump-top, and label, as shown in Exhibit 9, leftmost image.

**43.** Plaintiff, the creator of these original Works of creative expression, is the sole proprietor of all right, title, and interest in the copyrights and exclusive rights of each of these Works.

Plaintiff has the sole exclusive right to reproduce, redistribute, display, perform, and prepare derivative works from each of his copyrighted Works.

44. Plaintiff first displayed these unpublished Works on his product website, http://bee-quick.com, in early 2000, including proper copyright notice, and later created and published multiple derivative works based upon each of the unpublished Works displayed, a series of ads, brochures, flyers, and other materials, each bearing proper copyright notices when printed and distributed. The original unpublished revision of Plaintiff's brochure was displayed on Plaintiff's website, registered with the Copyright Office as a part of the Group of unpublished works, and included each of the Works (a) through (d) mentioned above.  It is attached as Exhibit 5.  A few of Plaintiff's derivative works are shown in Exhibit 17.

45. When Defendants became Authorized Dealers for Plaintiff's product in 2002, they were provided at no charge with sales materials - copies of Plaintiff's derivative works, brochures, flyers, ads, and hand-outs, along with a Point-Of-Sale display.

46. All materials provided contained proper copyright notices, and all sales materials either included the original copyrighted Works (a) - (e) listed above that were displayed on Plaintiff's website, or were derivative of these copyrighted Works.

47. Defendants would request additional copies of brochures and flyers from time to time, and these would be included in Plaintiff's product shipments at no charge.

48. Defendants asked for Plaintiff's specific permission to use his copyrighted works in their online sales website in 2002, and they were granted limited permission to use Plaintiff's copyrighted Works, but only in the sales of Plaintiff's product as an Authorized Dealer.

49. The descriptions used on each of Defendants' annual sales websites were assembled from word-for-word verbatim copies of each of the copyrighted works (a) - (d) displayed on

Plaintiff's website, as these works were considered by Defendants to be the most effective

marketing possible.

50. As each year's website was created, changes would be made, and each year's website would

use one or more of Plaintiff's copyrighted Works.

51. Defendants' 2002 website listing for Plaintiff's product is shown in Exhibit 6, saying:

> "Fischer's Bee Quick (7 oz.) (779)
> 100% **NATURAL, NON-TOXIC BLEND OF OILS AND HERB EXTRACTS** works just as well as Bee Go or Honey Robber. Put the Bee Quick on a fume pad and then place on top of the supers you wish to remove. **A SAFE AND GENTLE WAY TO HARVEST YOUR HONEY**.  Price for this item:   $12.30"

The text in all caps is directly quoted from Plaintiff's copyrighted Works, and was used with

specific permission from Plaintiff.  The Internet Archive has a copy of this web page at:

http://web.archive.org/web/20020628024037/http://www.beeequipment.com/shop.asp?p=11

52. Defendants and Plaintiff would change the text, images, pricing, and layout of Defendants'

product web pages each year. Examples can be viewed at the Internet Archive URLs[1] below:

**In 2003:**
http://web.archive.org/web/20030222214600/http://www.beeequipment.com/shop.asp?p=11

**In 2004:**
http://web.archive.org/web/20040214060644/http://www.beeequipment.com/shop.asp?p=13
http://web.archive.org/web/20040214061304/http://www.beeequipment.com/shop.asp?p=14

**In 2005:**
http://web.archive.org/web/20050211161056/http://www.beeequipment.com/shop.asp?p=14

**In 2007:**
http://web.archive.org/web/20071020004930/http://www.beeequipment.com/products.asp?pcode=779G

**In 2010:**
http://web.archive.org/web/20101226075553/
http://www.brushymountainbeefarm.com/Fischers-Bee-Quick-8-oz/productinfo/779/

---

[1] Archive.org URLs consist of "http://web/.archive.org/" followed by a date-time stamp (YYYYMMDDHHMMSS), followed by the actual internet URL of the object archived.  When using archive.org, one can skip forward and backward between different points in time at which the archive.org "spider" "crawled the web", and encountered a change in a website sufficient to prompt a partial or complete copying of the site to the archive. In this complaint, some URLs are split into two lines to respect page margins, splitting after the slash that follows the date-time stamp.

Defendants' 2010 web page is shown in Exhibit 7.

53. In all of the above, Defendants' had access to and full knowledge of Plaintiff's copyrighted

Works, providing them the source material with which to infringe.

54. After announcing that they would no longer carry Plaintiff's product in their Dec 2010 email,

Defendants' permission to use Plaintiff's copyrighted works was inherently revoked, along

with their status as an Authorized Dealer for Plaintiff's product.[2]

55. After disposing of all remaining inventory of Plaintiff's product shortly after their Dec 2010

email, Defendants displayed Plaintiff's copyrighted Works on Defendants' 2011 online sales

website, no longer as a description for Plaintiff's well-known and trusted product, but

instead, as a description for their cheap knock-off product, "Natural Honey Harvester",

without any permission, license, or right to do so.

56. See Exhibit 8 for the infringing 2011 sales order website page.  The product description

includes word-for-word verbatim copies of Plaintiff's copyrighted Works (a) through (d).

57. An archive copy of the infringing 2011 sales order website page can be found at:

http://web.archive.org/web/20111228021343/
http://www.brushymountainbeefarm.com/Natural-Honey-Harvester/productinfo/474/

58. Defendants' infringing 2011 web page said:

"For years we have promoted the use of a natural product to harvest honey but an unreliable supply of such a product has forced us to come out with our own. This 100% **NATURAL, NON-TOXIC BLEND OF OILS AND HERB EXTRACTS** works just like Bee Go and it smells good! Natural Honey Harvester **IS A SAFE, GENTLE, AND PLEASANT WAY TO HARVEST YOUR HONEY**. **ARE YOU TIRED OF YOUR SPOUSE MAKING YOU SLEEP IN THE GARAGE** after using Bee Go? **ARE YOU TIRED OF USING HAZARDOUS PRODUCTS ON THE BEES YOU LOVE?** Then this is the product for you!"

Each all-caps phrase in the above is a verbatim infringing copy of one of Plaintiff's original, creative, copyrighted Works (a) through (d) as listed above.

---

[2] Elsewhere, Plaintiff addresses Defendants' breach of contract. It does not matter which happened first, the dropping of Plaintiff's product from Defendants' product line, or the contract breach, either way, Defendants lost any/all rights to use Plaintiff's intellectual property in December 2010.

59. The clear intent of the infringement was to confuse customers, giving the impression that Defendants were selling or making Plaintiff's trusted product rather than a cheap knock-off.

60. In late March of 2011, Plaintiff became aware that Defendants had infringed Plaintiff's Works in Defendants' 2011 online ordering website.  At that time, Plaintiff additionally discovered Defendants' infringing display of Work (e), his product photos.

61. Defendants did not have any license, authorization, permission, or consent to use any of the Works once they stopped carrying Plaintiff's product. When Defendants had announced in their email of Dec 2010 that they would no longer carry Plaintiff's product, any permission to use Plaintiff's copyrighted works was inherently revoked.

62. Further, all remaining inventory of Plaintiff's product had long since been liquidated and shipped from Defendants' warehouse to another dealer.

63. Even further still, Defendants had a full 3 additional months for any "transitional period" after Defendants' termination email for Defendants to update their website.

64. Yet further still, Defendants were displaying Plaintiff's copyrighted Works on web pages clearly intended to sell Defendants' cheap knock-off of Plaintiff's product.

65. Thus, Defendants' misuse of Plaintiff's multiple copyrighted Works was willful infringement.

66. The copyright owner's particular unique expressions of ideas covered by Copyright were duplicated exactly and used by Defendants to compete directly with Plaintiff, the copyright owner. Far beyond mere similarity or derivation, the infringing misappropriations are word-for-word verbatim duplicates of the infringed copyrighted Works.

67. One can verify the unique and distinctly uncommon nature of each Work with a search engine – one can search for the Works at issue, enclosing each in quotes without question

marks, and find each used only in authorized descriptions of Plaintiff's product, Bee-Quick, and in unauthorized infringing uses to describe Defendants' product "Natural Honey Harvester".  Each work is truly unique, and each is properly used only by Plaintiff.

68. The acts performed to infringe Plaintiff's Works included multiple overt, deliberate, knowing, and willful acts, each act deliberately ordered by, supervised by, and approved by the Defendants in or about March of 2011, but the single clearest act of infringement is the unauthorized display of Plaintiff's copyrighted Works.

   a.  Defendants' sales order website is their primary sales tool, and therefore is the focus of intense personal attention from Defendants.  Their role as the ultimate reviewers and approvers of all aspects of the web site makes them the directly-involved supervisors of each and every page, each and every image, and each and every line of text.

   b.  Their orders to change, correct, or leave elements "as is" are the primary method by which they can increase sales, and their ability to review, and approve or veto proposed changes is unquestioned.

69. Along with the substantial direct participation by the Defendants in the infringing activities, the Defendants have (i) the right and ability to supervise the activities that directly infringed Plaintiff's copyrights; and (ii) a direct financial interest in such activities, as Defendants are officers of and/or the principal shareholders in their privately-held company.

70. Defendants have thereby infringed upon Plaintiff's copyrights in each of his copyrighted works, by unlawfully displaying Plaintiff's copyrighted works on their sales order website without Plaintiff's express permission.

71. Defendants' freely-acknowledged need for permission to use Plaintiff's works in prior years, contrasted with their infringements in 2011, show that their infringements were knowing and

willful, and were executed with full knowledge of Plaintiff's copyrights, and were committed in conscious disregard for Plaintiff's exclusive rights in his copyrighted Works.

72. In April 2011, Plaintiff demanded in writing that Defendants cease and desist, reminding them of his exclusive rights (*see* Exhibit 15), but Defendants refused (*see* Exhibit 16), and continued their infringement.

73. Defendants' acts were willful, intentional and purposeful, in knowing disregard of, and indifferent to the rights of Plaintiff.  Defendants willfully infringed Plaintiff's copyrighted text and photographic images to fraudulently attract and divert to themselves online, mail, and telephone orders from customers wanting to buy Plaintiff's product by giving the false impression that Defendants were still selling or manufacturing Plaintiff's product.

74. Defendants have also facilitated secondary infringement of Plaintiff's exclusive rights, encouraging and/or allowing smaller bee supply dealers to copy Defendants' infringing display, and utilize it themselves in the sale of Defendants' cheap knock-off.  Plaintiff makes no claim at this time against such secondary infringers, but will demand specific injunction and appropriate corrective advertising by Defendant for these additional infringements.

75. In all of the above, Plaintiff has been damaged by the willful acts of Defendants in an amount to be proven at trial.

## 1st Complaint - Copyright Infringement – Work (a)

76. Plaintiff incorporates the preceding statements as if fully set forth herein.

77. This complaint is for the infringement of Plaintiff's exclusive rights to his original Work of expression (a) "***Are you tired of your spouse making you sleep in the garage***"***?*** per 17 USC §106 and § 501. This Work enjoyed a valuable economic life as a separate and independent work from Plaintiff's other Works at issue in this matter, and was a valuable marketing asset

well before Defendants became an Authorized Dealer.  Numerous derivative works were created from this Work, but the original creative Work, the specific question posed directly to the beekeeper regarding the foul and highly persistent odor of the only competition, Butyric Anhydride, was, and still is, a valuable asset, and the word-for-word verbatim infringing display by the Defendants is the best proof of its independent value.

**78.** Defendants displayed this Work verbatim and without any permission from Plaintiff on their website in 2011, starting in March, to sell their cheap knock-off.  (*see* Exhibit 8)

### 2nd Complaint - Copyright Infringement – Work (b)

**79.** Plaintiff incorporates the preceding statements as if fully set forth herein.

**80.** This complaint is for the infringement of Plaintiff's exclusive rights to his original Work of expression (b) "***Are you tired of using a hazardous product on the bees you love?***" per 17 USC §106 and § 501. This Work enjoyed a valuable economic life as a separate and independent work from Plaintiff's other Works at issue in this matter, and was a valuable marketing asset well before Defendants became an Authorized Dealer.  Numerous derivative works were created from this Work, but the original creative Work, the specific question posed directly to the beekeeper regarding the Haz-Mat status of the only competition, Butyric Anhydride, was, and still is, a valuable asset, and the word-for-word verbatim infringing display by the Defendants is the best proof of its independent value.

**81.** Defendants displayed this Work verbatim and without any permission from Plaintiff on their website in 2011, starting in March, to sell their cheap knock-off. (*see* Exhibit 8)

### 3rd Complaint - Copyright Infringement – Work (c)

**82.** Plaintiff incorporates the preceding statements as if fully set forth herein.

**83.** This complaint is for the infringement of Plaintiff's exclusive rights to his original Work of expression (c) "*A safe, gentle, and pleasant way to harvest your honey.*" per 17 USC §106 and § 501. This Work enjoyed a valuable economic life as a separate and independent work from Plaintiff's other works at issue in this matter, and was a valuable marketing asset well before Defendants became an Authorized Dealer.  Numerous derivative works were created from this Work, but the original creative Work, the specific assurance to the beekeeper regarding the safety and pleasant odor of Bee-Quick, was, and still is, a valuable asset, and the word-for-word verbatim infringing display by the Defendants is the best proof of its independent value.

**84.** Defendants displayed this Work verbatim and without any permission from Plaintiff on their website in 2011, starting in March, to sell their cheap knock-off.  (s*ee* Exhibit 8)

### 4th Complaint - Copyright Infringement – Work (d)

**85.** Plaintiff incorporates the preceding statements as if fully set forth herein.

**86.** This complaint is for the infringement of Plaintiff's exclusive rights to his original Work of expression (d) "*A natural, non-toxic blend of oils and herbal extracts.*" per 17 USC §106 and § 501. This Work enjoyed a valuable economic life as a separate and independent Work from Plaintiff's other Works at issue in this matter, and was a valuable marketing asset well before Defendants became an Authorized Dealer.  Numerous derivative works were created from this Work, but the original creative Work, the specific assurance to the beekeeper regarding the natural, rather than synthetic, nature of the product, was, and still is, a valuable

asset, and the word-for-word verbatim infringing display by the Defendants is the best proof of its independent value.

87. Defendants displayed this Work verbatim and without any permission from Plaintiff on their website in 2011, starting in March, to sell their cheap knock-off.  (*see* Exhibit 8)

**5th Complaint - Copyright Infringement – Product Photo**

88. Plaintiff incorporates the preceding statements as if fully set forth herein.

89. This complaint is for the infringement of Plaintiff's exclusive rights to his original Work of expression (e), his hi-key product photo, per 17 USC §106 and § 501. This Work enjoyed a valuable economic life as a separate and independent Work from Plaintiff's other Works at issue in this matter, and was a valuable marketing asset well before Defendants became an Authorized Dealer.  Numerous derivative works were created from this Work, but the original creative Work, the hi-key photo of the unique pocket-shaped "medicine bottle", continued to be used in many dealer catalogs and dealer promotions long after the actual product packaging had changed from the 7oz "apothecary" bottle to a taller, cylindrical 8oz "bullet" bottle in 2007. The image is still a valuable asset, and the verbatim infringing display by the Defendants is the best proof of its independent value.[3]

90. Defendants displayed this Work verbatim and without any permission from Plaintiff on their website in 2011, starting in March, to sell their cheap knock-off.  (*see* Exhibits 9, 11, and 12)

**DMCA COMPLAINTS**
**Factual Allegations Relating To All DMCA Complaints**

91. Plaintiff incorporates the preceding statements as if fully set forth herein.

---

[3] The goal in copying photos and placing them on Defendants' online order web site was to create initial interest confusion among those who might type nothing more than "Fischer Bee" or "Fisher Bee" into a search engine, and see the image of the familiar-looking bottle with the well-known logo in the search results. The search results would lead to Defendant's web site, where only Defendants' cheap knock-off was actually for sale.

**92.** Each year, at Defendants' request, Plaintiff sent Defendants "layout-ready artwork" and "description text" for Defendants' use on their website, consisting of images of brochures, flyers and other sales materials, each image with imbedded EXIF metadata including appropriate copyright notices per 17 USC §1202(c)(3). The images also included text copyright notices, visible on the face of each image.  All text supplied was also accompanied by appropriate copyright notices in text.  All items described were derivative works of Plaintiff's original creative unpublished copyrighted Works.  All materials were provided solely for Defendants' use in sales of Plaintiff's product.  For an example of one such copyright notice, see Exhibit 5, first page, associated with Works (a) – (d).

**93.** In March 2011, Defendants infringed upon Plaintiff's rights by ordering, overseeing, participating in, and approving of the verbatim display of Plaintiff's copyrighted Works to describe Defendants' cheap knock-off product as detailed in Plaintiff's Complaints 1-5, and additionally ordering, overseeing, participating in, and approving of the intentional removal of all of Plaintiff's copyright notices from each of the infringed Works in violation of 17 USC § 1202(b)(1).

**94.** Defendants ordered the intentional display of the infringing Works on Defendants' 2011 online ordering website, knowing that copyright management information had been removed without authority of the copyright owner, and knowing that it would conceal an infringement of rights under 17 USC § 1202(b)(3).

**95.** As a result of Defendants' willful actions, Defendants have violated the DMCA, and Plaintiff has been damaged in an amount to be proven at trial.

### 6th Complaint - Removal of Copyright Management Information – Work (a)

**96.** Plaintiff incorporates the preceding statements as if fully set forth herein.

**97.** This complaint is for the intentional and willful removal of Plaintiff's Copyright

Management Information imbedded in and attached to, and visible on the face of his original

Work of expression (a), described in Plaintiff's 1st Complaint.

**98.** In March 2011, Defendants ordered the intentional removal of all of Plaintiff's copyright

notices from this Work in violation of 17 USC § 1202(b)(1).

**99.** In March 2011, Defendants ordered the intentional display of the infringing Work on

Defendants' 2011 online ordering website, knowing that copyright management information

had been removed without authority of the copyright owner, and knowing that it would

conceal an infringement of rights under 17 USC § 1202(b)(3).  (*see* Exhibit 8)

**100.**   Defendants' infringing display of Work (a) on their 2011 website did not include

Plaintiff's copyright notice, because Defendants' had ordered it removed.

### 7th Complaint - Removal of Copyright Management Information - Work (b)

**101.**   Plaintiff incorporates the preceding statements as if fully set forth herein.

**102.**   This complaint is for the intentional and willful removal of Plaintiff's Copyright

Management Information imbedded in and attached to, and visible on the face of his original

Work of expression (b), described in Plaintiff's 2nd Complaint.

**103.**   In March 2011, Defendants ordered the intentional removal of all of Plaintiff's copyright

notices from this Work in violation of 17 USC § 1202(b)(1).

**104.**   In March 2011, Defendants ordered the intentional display of the infringing Work on

Defendants' 2011 online ordering website, knowing that copyright management information

had been removed without authority of the copyright owner, and knowing that it would

conceal an infringement of rights under 17 USC § 1202(b)(3). (*see* Exhibit 8)

**105.**    Defendants' infringing display of Work (b) on their 2011 website did not include Plaintiff's copyright notice, because Defendants' had ordered it removed.

### 8th Complaint - Removal of Copyright Management Information - Work (c)

**106.**    Plaintiff incorporates the preceding statements as if fully set forth herein.

**107.**    This complaint is for the intentional and willful removal of Plaintiff's Copyright Management Information imbedded in and attached to, and visible on the face of his original Work of expression (c), described in Plaintiff's 3rd Complaint.

**108.**    In March 2011, Defendants ordered the intentional removal of all of Plaintiff's copyright notices from this Work in violation of 17 USC § 1202(b)(1).

**109.**    In March 2011, Defendants ordered the intentional display of the infringing Work on Defendants' 2011 online ordering website, knowing that copyright management information had been removed without authority of the copyright owner, and knowing that it would conceal an infringement of rights under 17 USC § 1202(b)(3). (*see* Exhibit 8)

**110.**    Defendants' infringing display of Work (c) on their 2011 website did not include Plaintiff's copyright notice, because Defendants' had ordered it removed.

### 9th Complaint - Removal of Copyright Management Information – Work (d)

**111.**    Plaintiff incorporates the preceding statements as if fully set forth herein.

**112.**    This complaint is for the intentional and willful removal of Plaintiff's Copyright Management Information imbedded in and attached to, and visible on the face of his original Work of expression (d), described in Plaintiff's 4th Complaint.

**113.**    In March 2011, Defendants ordered the intentional removal of all of Plaintiff's copyright notices from this Work in violation of 17 USC § 1202(b)(1).

114.   In March 2011, Defendants ordered the intentional display of the infringing Work on Defendants' 2011 online ordering website, knowing that copyright management information had been removed without authority of the copyright owner, and knowing that it would conceal an infringement of rights under 17 USC § 1202(b)(3). (*see* Exhibit 8)

115.   Defendants' infringing display of Work (d) on their 2011 website did not include Plaintiff's copyright notice, because Defendants' had ordered it removed.

### 10th Complaint - Removal of Copyright Management Information – Work (e)

116.   Plaintiff incorporates the preceding statements as if fully set forth herein.

117.   This complaint is for the intentional removal of Plaintiff's Copyright Management Information imbedded in and attached to, and visible on the face of his original Work of expression (e), the product photos, described in Plaintiff's 5th Complaint.

118.   In March 2011, Defendants ordered the intentional removal of all of Plaintiff's copyright notices from this Work in violation of 17 USC § 1202(b)(1).

119.   In March 2011, Defendants ordered the intentional display of the infringing Work on Defendants' 2011 online ordering website, knowing that copyright management information had been removed without authority of the copyright owner, and knowing that it would conceal an infringement of rights under 17 USC § 1202(b)(3). (*see* Exhibits 9, 11, and 12)

120.   Defendants' infringing display of Work (e) on their 2011 website did not include Plaintiff's copyright notice, because Defendants' had ordered it removed

### TRADEMARK COMPLAINTS
### Factual Allegations Relating To All Trademark Complaints

121.   Plaintiff incorporates the preceding statements as if fully set forth herein.

122.   Plaintiff's first use of his mark "Bee-Quick" in commerce was in late 1999, and his use has been exclusive and continuous from then to the present.  Plaintiff is the sole proprietor of the trademark and all associated rights.

123.   Plaintiff registered his mark with the US Patent and Trademark Office on the Principal Trademark Register on Dec 11, 2001 as USPTO Registration #2517553, and recently renewed it as Registration #4019052 (*see* Exhibit 2). The symbol ® has been properly and consistently displayed on Plaintiff's product label, ads, website, and flyers per 15 USC § 1111, giving proper notice of trademark registration since 2000.  Plaintiff's mark is suggestive in nature, and thus inherently distinctive.  Plaintiff's mark is respected and well-known even in countries where English is not often spoken by beekeepers. See Exhibit 17, 4th item - the name "Bee-Quick" is not translated, and needs no translation in this French catalog, as is the case in catalogs in languages ranging from Serbo-Croatian to Korean.  This is just about as "famous" as a mark can get within the constraints of an admittedly obscure community like beekeepers.

124.   When Defendants became Authorized Dealers for Plaintiff's product in 2002, their use of Plaintiff's trademark on their online sales website was solely associated with the sale of Plaintiff's product, and no specific permission was requested or needed for such use, as it was unnecessary for an Authorized Dealer to ask permission for purely nominative use.

125.   After Defendants ceased carrying Plaintiff's product, Defendants willfully and deliberately continued to display Plaintiff's trademark on Defendants' online ordering website, continuing to display the product page for Plaintiff's product in interstate commerce.

126.    Plaintiff sent a letter to Defendants in April 2011, demanding that they cease misusing

Plaintiff's trademark and copyrights. By the end of 2011, Defendants had partially complied,

at least removing that specific product web page for Plaintiff's product:

http://brushymountainbeefarm.com/Fischers-Bee-Quick-8-oz/productinfo/779/

127.    It had been removed from Defendants' website by late November, 2011.

128.    When preparing the cease and desist letter, Plaintiff noticed the administrative error made

by the USPTO, and addressed the matter, ultimately having no option but to renew his

registration, which resulted in a new registration number for Plaintiff's long-standing

trademark, #401905, issued in August, 2011.

129.    In March and April 2012, Plaintiff discovered that Defendants had willfully and

deliberately ordered the creation and display of multiple new Counterfeit Marks infringing

Plaintiff's trademark on Defendants' 2012 online ordering website.

130.    Each of the Counterfeit Marks ordered by Defendants' to be added to their online

ordering website in 2012 was intended to willfully mislead customers as to the source and

origin of the products offered and sold by Defendants and to sell multiple types of goods in

interstate commerce.

131.    The uses were related to sales of Defendants' directly-competing cheap knock-off of

Plaintiff's product as a stand-alone product, and additionally in the sales of multiple

additional types of goods beyond the specific "Honey Harvesting Aid" type, in both "8-

Frame Hive" type goods and "10-Frame Hive" type goods.

132.    The acts performed to create multiple Counterfeit Marks included multiple overt,

deliberate, knowing, and willful acts, each act in March of 2012 (subject to clarification in

discovery).  As the sole owners and proprietors of their business, they had direct control over,

and ultimate approval for, the entire contents of their most important sales tool – their website:

a)  First, the web page text was drafted. The Counterfeit Marks were typed, edited, proofread, and then reviewed and approved by Defendants.

b)  Then photos were selected and "layout" was done, with final approval by Defendants.

c)  Then the web page was coded, integrated into the content management system, and transformed into a working web page with a clickable order button and a database entry to hold web URL, product price, shipping weight, and inventory status for display on the web page.

d)  The final page was reviewed in detail by Defendants before the revised ordering website was distributed to Defendants' web servers for release to the public, with corrections made as required.

In sum, Defendants were active, conscious forces behind the Trademark Counterfeiting, and gave their sales website the intense personal hands-on attention that any proprietors would give their primary sales tool.

133.    Along with the substantial direct participation by the Defendants in the counterfeiting activities, the Defendants have (i) the right and ability to supervise the activities that directly infringed Plaintiff's trademarks; and (ii) a direct financial interest in such activities, as Defendants are officers of and/or the principal shareholders in their privately-held company.

134.    While Defendants strived through intentional, culpable, and reckless conduct to create initial interest confusion for customers using search engines to locate Plaintiff's product, the only such product Defendants could actually sell was Defendants' own cheap knock-off product, offered in direct competition with Plaintiff.

**135.**    These are each willful Counterfeits of Plaintiff's mark in connection with the sale,

offering for sale, and distribution of goods other than those made by Plaintiff.   Defendants'

willfulness extended into hubris and recklessness when they continued to infringe Plaintiff's

trademark even after the filing of this action.   As of 05/20/14, each and every one of these

infringements of Plaintiff's trademark are still actively creating Actual Confusion.

**136.**    These are Counterfeit Marks under 15 USC § 1114.

**137.**    Defendants used the Counterfeit Marks in a manner likely to confuse consumers. As

Defendants were formerly Authorized Dealers for Plaintiff's product, any misuse of and/or

Counterfeiting of Plaintiff's trademark after termination of the dealer relationship creates, as

a matter of law, Actual Confusion.   As Defendants were formerly a legitimate source of

Plaintiff's product for many years, they were and are in a unique position to confuse

customers, and use "bait-and-switch" tactics to sell their own cheap knock-off to customers

who desired and sought only Plaintiff's well-known, and long-trusted product.

**138.**    Each of the infringing images of Plaintiff's product, having file names containing the

string "Fischers" (*see* Exhibit 10) would appear as images in internet searches that included

"Fischer's", "Fischer", "Fisher" or "Fisher's" and/or "Bee-Quick" and would create initial

interest confusion, and bring customers to Defendants' website where they could then be

misled with Defendants' false advertising claims of "*an unreliable supply*", and "*we made

our own*", (*see* Exhibit 8) and thus become victims of a bait-and-switch to Defendants' cheap

knock-off product.   The web pages having Counterfeit Marks in their URLs (see Exhibits 12

and 13) would perform a similar function for prospective customers not using image search,

as search engines give very significant weight between even a partial match of the search

term and a specific URL for a web page.   The use of Plaintiff's trademark in the illustration

photos on sales pages for Defendants' cheap knock-off product (see Exhibits 11 and 12)

would only further confuse customers.

139.     Defendants' product is targeted to the exact same customers as Plaintiff's product.  Each

sale made by Defendants is stolen revenue from Plaintiff, as Defendants only sell their

product in misrepresentation.

### 11th Complaint - Use of a Counterfeit Mark In Commerce – Two Photos

140.     Plaintiff incorporates the preceding statements as if fully set forth herein.

141.     The image files:

"http://brushymountainbeefarm.com/images/799fischers.jpg" and

"http://brushymountainbeefarm.com/images/799fischerssm.jpg"

are photos of Plaintiff's product, overlaid with a watermark logo for Defendants' company,

"Brushy Mountain Bee Farm" (*see* Exhibit 10).  These photos each include a clearly-legible

Copy of Plaintiff's trademark on the bottle label.

142.     As Defendants could only sell their cheap knock-off of Plaintiff's product, these images

are each Counterfeit Marks.  (Note: These image files have been removed or hidden by

Defendants from their website since this action was filed.)

143.     These Counterfeit Marks were used in the sale of, and offering for sale of, Defendants'

directly-competing cheap knock-off of Plaintiff's product as a stand-alone product, the Type

of Goods being "Honey Harvesting Aids".  These are willful Counterfeits of Plaintiff's mark

in connection with the sale, offering for sale, and distribution of goods other than those made

by Plaintiff.

144.     These are each Counterfeit Marks under 15 USC § 1114

### 12th Complaint - Use of a Counterfeit Mark In Commerce – A 3rd Photo

145.     Plaintiff incorporates the preceding statements as if fully set forth herein.

**146.**    The image file:

> http://brushymountainbeefarm.com/images/777F-FumeNBQ.jpg

is a photo of a 10-frame fume board and a bottle of Plaintiff's product Bee-Quick, with its

original distinctive bottle shape, red text, mascot bee,  pump-spray top, and Trademark on the

label, "Bee-Quick".  (*see* Exhibit 11) This photo includes a clearly-legible image of

Plaintiff's trademark on the bottle label.  As Defendants could only sell their cheap knock-off

of Plaintiff's product, these were Counterfeit Marks.  This image file has not been removed

since this action was filed, and was still on Defendants' website as of 5/21/2014.

**147.**    This Counterfeit Mark was used in relation to sales of, and offering for sale of,

Defendants' directly-competing cheap knock-off of Plaintiff's product as a unique type of

goods, the type of goods being "10-Frame Bee Equipment".

**148.**    This is a willful Counterfeit of Plaintiff's mark in connection with the sale, offering for

sale, and distribution of goods other than those made by Plaintiff.

**149.**    This is a Counterfeit Mark under 15 USC § 1114.

### 13th Complaint - Use of a Counterfeit Mark In Commerce - In A Website URL

**150.**    Plaintiff incorporates the preceding statements as if fully set forth herein.

**151.**    The URL for the web page:

> http://brushymountainbeefarm.com/Fume-Pad-w_-Fischers-**Bee-Quick**/productinfo/777F

includes the Plaintiff's Trademark "Bee-Quick", as well as the possessive modifier

"Fischer's" (*see* Exhibit 12).

**152.**    The image on that page is a photo of a 8-frame fume board and a bottle of Bee-Quick,

with its original distinctive bottle shape, red text, mascot bee, pump-spray top, and label with

distinctive trademark and logo.  But the text above the photo says "8-Frame Fume Pad w/ Natural Honey Harvester", Defendants' cheap knock-off product.

153.    As Defendants could only sell their cheap knock-off of Plaintiff's product, this is a Counterfeit Mark.  This web page has not been removed by Defendants since this action was filed, and is still on the website as of 5/21/2014.

154.    This Counterfeit Mark was used in relation to sales of, and offering for sale of, Defendants' directly-competing cheap knock-off of Plaintiff's product as a unique type of goods, the type of goods being "8-Frame Bee Equipment".

155.    This is a willful Counterfeit of Plaintiff's mark in connection with the sale, offering for sale, and distribution of goods other than those made by Plaintiff.

156.    This is a Counterfeit Mark under 15 USC § 1114.

### 14th Complaint - Use of a Counterfeit Mark In Commerce – In A 2nd Website URL

157.    Plaintiff incorporates the preceding statements as if fully set forth herein.

158.    The URL for the web page:

http://brushymountainbeefarm.com/8-Frame-Fume-Pad-w_Fischers-**Bee-Quick**/productinfo/254FPQ/

includes the Plaintiff's Trademark "Bee-Quick", as well as the possessive modifier "Fischer's". (*see* Exhibit 13)

159.    But the text says " 8- Frame Fume Pad w/Honey Harvester", and the link in the detailed description takes the customer to the product information page for Defendants' cheap knock-off of Plaintiff's product:

http://brushymountainbeefarm.com/Natural-Honey-Harvester/productinfo/474/

160.    As Defendants could only sell their cheap knock-off of Plaintiff's product, this is a Counterfeit Mark.  This web page has not been removed by Defendants since this action was filed, and is still on the website as of 5/21/2014.

161.    These Counterfeit Marks were used in relation to sales of, and offering for sale of, Defendants' directly-competing cheap knock-off of Plaintiff's product as a stand-alone product, the type of goods being "8-Frame Bee Equipment".

162.    This is a willful Counterfeit of Plaintiff's mark in connection with the sale, offering for sale, and distribution of goods other than those made by Plaintiff.

163.    This is a Counterfeit Mark under 15 USC § 1114.

# RIGHT OF PUBLICITY COMPLAINT

164.    Plaintiff incorporates the preceding statements as if fully set forth herein.

165.    Defendants' actions to willfully violate Plaintiff's Right of Publicity make Defendants liable for (i) violation of 15 USC § 1125(a) et seq.; (ii) violation of Plaintiff's right of privacy and publicity under Sections 50 and 51 of the New York Civil Rights Law; and (iii) unfair competition under New York law.  Each of these claims arise from Defendants' knowing and willful unauthorized use of Plaintiff's  family name for commercial advertising and trade purposes within New York State and elsewhere.

## Plaintiff's Use and Protection of His Valuable Professional Persona

166.    Plaintiff (James Fischer) is a successful lecturer, writer, educator, mentor, and ersatz curmudgeon in the fields of beekeeping and environmental science.  While the bulk of the fees and honorariums paid are given by Plaintiff to charitable efforts and good works, Plaintiff enjoys a level of "celebrity" within the beekeeping community that gives his recommendations and opinions considerable weight, and significant success directly results for any product or technique that he considers worthy of praise rather than criticism.

167.   As such, Plaintiff's name is a valuable asset, one that he has leveraged by putting his name on his own products. To prevent any diminution of that value, Plaintiff has carefully and methodically protected his valuable name, picture, image, likeness, and persona -- that is, his legally-recognized right of privacy and publicity, from exploitation through unauthorized use and/or commercial advertising.  Accordingly, when Plaintiff chooses to associate his name with a product, event, or service, to appear and speak at an event, or to even offer quotable comments to the media, he is extremely selective, and profits from each and every interaction.  Plaintiff was never approached by, nor did he authorize Defendants to license or use Plaintiff's name, picture, image, or likeness for any purpose, including commercial advertising, sponsorship, or endorsement.

168.   Plaintiff puts his name, and hence his reputation, on the labels of his products, and hence stands behind his products in no uncertain terms. Plaintiff's unconditional guarantee stated on every label is "*Your Money's Worth, or Your Money Back*" (*see* Exhibit 17).  This is an unprecedented and unmatched assurance in the beekeeping industry, in that it offers a full refund at the customer's whim.  (Only a handful of refunds have been requested since 1999.)

169.   During the time that Defendants were an Authorized Dealer for Plaintiff's product, Defendants were inherently permitted to use Plaintiff's name, but only as a nominative designation for Plaintiff's product, (i.e. "Fischer's Bee-Quick", rather than merely "Bee-Quick".) Once Defendants stopped selling Plaintiff's product in Dec 2010, Defendants lost all right to use any form of Plaintiff's name in any way.

170.   The sole purpose of Defendants' website is commercial advertising and sales, aimed at attracting customers and revenue for their exclusive personal profit.

**Defendants Violated Plaintiff's Right of Publicity by Misusing Plaintiff's Name**

**171.**     In or about March, 2011, Defendants ordered the creation of the website URLs, each

beginning:  "http://brushymountainbeefarm.com/"

and ending in:

>   "…Fume-Pad-w_-**Fischers**-Bee-Quick/productinfo/777F/"   (*see* Exhibit 12)
>    "…8-Frame-Fume-Pad-w_**Fischers**-Bee-Quick/productinfo/254FPQ/"  (*see* Exhibit 13)
>    "...images/799**fischers**.jpg" (*see* Exhibit 10)
>   "...images/799**fischers**sm.jpg"  (*see* Exhibit 10)

**172.**     These URLs are the only uses of the name of any living party not in the employ of

Defendants in Defendants' online sales website, and were intended to exploit Plaintiff's

name to provide false cachet for Defendants, create confusion, and imply falsely that Plaintiff

endorses Defendants and their products.

**173.**     This misuse by Defendants was calculated to attract customers to Defendants' website

and these specific pages by falsely implying that Defendants are selling Plaintiff's product, or

that Plaintiff endorses Defendants' cheap knock-off product, or that Defendants' cheap

knock-off product is made under license from Plaintiff.

**174.**     The misuse of Plaintiff's name in Defendants' website URLs allowed Defendants to

appear in search engine results where initial interest confusion could be leveraged to bait-

and-switch customers to Defendants' directly-competing cheap knock-off product.  Searches

by customers with only a vague recollection of the product name would logically consist of

variants "*Fischer Bee(s)*" or even "*Fisher Bee(s)*", misspelling Plaintiff's name.

**175.**     With either search type, web pages for dealers selling Plaintiff's product appear in the

first page of search results.  With the deliberate misuse of Plaintiff's name, Defendants' web

pages appeared among them, cleverly seeming to offer the Plaintiff's product for which the

customer was searching, "*Bee-Quick*", but actually exploiting initial interest confusion, as in

*Mobil Oil Corp. v Pegasus Petroleum Corp* to instead sell Defendants' cheap knock-off, "*Natural Honey Harvester*" via bait-and-switch.

176.    Defendants singled out and misused Plaintiff's name simply to exploit the name recognition it enjoys to directly and unfairly compete with Plaintiff.

177.    Use of Plaintiff's name under these circumstances improperly exploited Plaintiff's name, as a minor "celebrity", for Defendants' commercial advertising and purposes of trade, without authorization.  Such use was knowing and willful, as evidenced by Defendants' manipulation of and changes to the web page for the 10-frame product class and the creation of the new web page for 8-frame product class.

178.    Defendants' infringing and illegal acts required multiple, discrete steps, including, (i) editing out of Plaintiff's product name, "Bee-Quick" from the body text of the 10-Frame web page, (ii) replacing it with the name of Defendants' cheap knock-off product, "Natural Honey Harvester", in several places, then (iii) creating a new page for a new product class, the 8-Frame web page, (iv) assigning it a new product number, and (v) creating the body text, or editing the text from the 10-Frame web page to apply to the case of 8-Frame equipment.

179.    Defendants' actions were at all times willful, intentional, knowing, and in bad faith.  At no time did Defendants seek or obtain any authorization from Plaintiff for Defendants' use of Plaintiff's name.

180.    In April, 2011, Plaintiff sent a cease and desist letter to Defendant, demanding that Defendants cease their multiple illegal acts and respond immediately. Defendants ignored Plaintiff's demands. (*see* Exhibits 14 and 15)

### 15th Complaint - Federal Right of Publicity Claim (Section 43(a) of the Lanham Act)

181.    Plaintiff incorporates the preceding statements as if fully set forth herein.

182.    Defendants have in commerce made a false or misleading representation of fact in connection with goods or services that is likely to cause consumer confusion as to the origin, sponsorship, or approval of the goods or services.

183.    Defendants' commercial advertising and promotional campaigns on the Internet are aimed and occur across state lines in the New York metropolitan area, including New York, and via the Internet to all fifty states and internationally.

184.    Plaintiff has not authorized Defendants to use his valuable name.

185.    Defendants' use of Plaintiff's valuable name falsely implies that Plaintiff sponsors, endorses, or is affiliated with Defendants' goods and services and is likely to cause consumer confusion, and therefore constitutes false advertising and unfair competition.

186.    Further, Defendants enjoy considerable "initial interest confusion" in the ongoing use of Plaintiff's valuable name after dropping Plaintiff's product from his offered product line. Their misuse lulls the customer into believing that nothing has changed, that Defendants are still selling the well-established and long-trusted product of the Plaintiff.

187.    Defendants' acts have been willful, knowing, deliberate, and intended to benefit Defendants at Plaintiff's direct expense.

188.    As a direct and proximate result of Defendants' unlawful acts, Plaintiff has been, and continues to be, damaged.  Plaintiff has suffered economic and reputational injury flowing directly from Defendants' unlawful acts, including reputational injury resulting from false endorsement of Defendants' services and products which deprived Plaintiff of his valuable right to select what endorsements to grant, including how those endorsements are presented to and perceived by the public, all of which directly damage Plaintiffs ability to control and negotiate agreements as to his Right of Publicity and his other valuable rights.

**189.**    Plaintiff is entitled to recover from Defendants compensatory damages, Defendants'

profits resulting from its unlawful conduct, treble damages, and reasonable attorney fees and

costs in such amounts to be determined at trial.

**190.**    Furthermore, Plaintiff has no adequate remedy at law to compensate him fully for the

injury caused by Defendants' unlawful acts and which would be caused by any further

infringement of Plaintiffs rights.   Accordingly, the Court should enjoin Defendants from

committing future unlawful acts and infringements as alleged here.

### 16th Complaint - NY State Right of Publicity Claim (NY Civil Rights Law § 50 and 51)

**191.**    Plaintiff incorporates the preceding statements as if fully set forth herein.

**192.**    Defendants have used Plaintiff's valuable name within the State of New York for

advertising purposes or for the purpose of trade without Plaintiff's consent.

**193.**    Defendants' use of Plaintiff's valuable name, is willful, deliberate, malicious, and in

conscious disregard of Plaintiff's rights.

**194.**    Defendants' conduct violates Plaintiff's rights under Sections 50 and 51 of the Civil

Rights Law of the State of New York.

**195.**    As a result of Defendants' unauthorized use of Plaintiff's valuable name, Plaintiff has

been, and continues to be, damaged.

**196.**    Defendants received a cease and desist letter from Plaintiff, but continues to intentionally

ignore Plaintiff's legal rights and to profit therefrom. (*see* Exhibits 14 and 15)

**197.**    Defendants have purposefully used Plaintiff's valuable name in a manner known to be

unlawful pursuant to Sections 50 and 51 of the New York Civil Rights Law. Defendants

knew it was required to obtain Plaintiff's consent for its use of his valuable name. Defendants

never sought such consent.

198.    Plaintiff is entitled to recover from Defendants all damages for his injuries sustained by

reason of Defendants' unlawful actions, as well as exemplary and punitive damages, under

Section 51 of the New York Civil Rights Law in such amounts to be determined at trial.

199.    Furthermore, Plaintiff has no adequate remedy at law to compensate him fully for the

injury caused by Defendants' past unlawful acts and the injury which would be caused by

any further infringement of Plaintiffs rights.

200.    Accordingly, the Court should specifically enjoin Defendants from committing future

unlawful acts and infringements as alleged here.

### 17th Complaint - Right of Publicity Claim
### (Common Law Unfair Competition and Personal Injury)

201.    Plaintiff incorporates the preceding statements as if fully set forth herein.

202.    Defendants' actions alleged herein constitute unfair competition within the State of New

York and in violation of New York law because Defendants acted intentionally to mislead

and confuse consumers, or caused a likelihood of consumer confusion, and acted in bad faith.

203.    Plaintiff carefully monitors and controls the commercial use of his name, picture, image,

and likeness. Plaintiff rarely allows his image to appear anywhere.

204.    Defendants' website uses Plaintiff's name in a manner that is intended solely to mislead

and confuse both customers and web search engines.

205.    Defendants acted in bad faith by misusing Plaintiff's name to falsely imply that

Plaintiff's valuable endorsement rights were granted to Defendant, even though they were

not, and by using Plaintiffs valuable name in conjunction with multiple website URLs for

pages intended to sell Defendants' directly-competing cheap knock-off product.

206.    As a direct and proximate result of Defendants' acts of unfair competition, Plaintiff has

been, and continues to be, damaged, and is entitled to recover from Defendants damages in

such amount to be determined at trial.  Defendants' acts of unfair competition were willful, malicious and in conscious disregard of Plaintiffs rights, entitling Plaintiff to recover punitive damages.

207.    Furthermore, Plaintiff has no adequate remedy at law to compensate him fully for the injury caused by Defendants' past unlawful acts and injury which would be caused by any further infringement of Plaintiffs rights.  Accordingly, the Court should enjoin Defendants from committing future unlawful acts and infringements as alleged here.

208.    Still further, Defendants' actions have caused tangible injury and damage to the physical health and well-being of Plaintiff, as their acts took Plaintiff's name and reputation, and used it against Plaintiff to undermine the basis for Plaintiff's income in his retirement years.  This has resulted in specific tangible physical health problems for Plaintiff, and has caused permanent injury to Plaintiff's health, resulting in pain and suffering, for which Plaintiff is entitled to be compensated.

## 18th Complaint - False Advertising

209.    Plaintiff incorporates the preceding statements as if fully set forth herein.

210.    The Defendants' statement on their 2011 web page (*see* Exhibit 8), created and displayed under the direct orders and personal supervision of Defendants, states:

> *"For years we have promoted the use of a natural product to harvest honey but an unreliable supply of such a product has forced us to come out with our own."*

this includes several statements:

a)    The "*natural product to harvest honey*" can be only refer to Plaintiff's product

b)    The "*unreliable supply*" claim is a blatant falsehood – Defendants' merely needed to pre-pay to get delivery at any time they pleased.  Otherwise, production runs were made

quarterly.  This false statement gives the impression that Plaintiff cannot produce his product, which is disparagement.

c) In fact, the web page **http://www.sbtdc.org/results/success/brushy-mountain/** explains how Defendants needed tax-payer-funded state government assistance in 2010 to fix their:

> *"...inefficient inventory management systems and warehouse layout, office operations, and purchasing department processes leading to a high number of out-of-stock orders and the inability to forecast demand."*

See Exhibit 14 and/or the cited web page.  Plaintiff, supplying customers world-wide for over a decade, was clearly not the cause of Defendants' inventory planning and control issues, and Defendants' own actions and statements prove this.

d) The claim "*has forced us to come out with our own*" implies that they are somehow making the same product, or have taken over the manufacturing of Plaintiff's product, and/or that their product is related to, approved by, endorsed by, licensed, or authorized by Plaintiff.

211.  These verifiably false statements, offered in connection and association with their product is a false description and a false representation that Defendants' product is:

a) Sponsored by, or otherwise affiliated with Plaintiff

b) Manufactured under license from Plaintiff

c) Approved or endorsed by Plaintiff

d) Related in any way to Plaintiff

e) A replacement for Plaintiff's product

212.  Said acts are in violation of 15 USC §1125(a) in that Defendants are using false or misleading attribution of fact, which is likely to cause confusion or to deceive as to affiliation, connection, relationship, or association as to the nature of their goods, and the

sponsorship or approval of their goods, and have caused such goods and representations to enter into or affect interstate commerce.

213.    Defendant has been, is now, and will be damaged by such false descriptions and representations by reason of the likelihood that customers will be confused as to the true source, sponsorship or affiliation of Defendants' product and Plaintiff's product.

214.    Defendants have used and continue to use in connection and association with their own services and goods in interstate commerce these false representations of association with Plaintiff without license or authorization from Plaintiff.

215.    Defendants' product is targeted to the exact same consumers as Plaintiff's product.

216.    Defendants' product directly competes with Plaintiff's product.

217.    Defendants' false statement imply that their product is Plaintiff's product.

218.    Defendants' misrepresentations of fact are intentionally designed to deceive, and have deceived, consumers and customers, that Defendants' product is authorized and/or licensed or otherwise approved by Plaintiff, when it certainly is not.

219.    As a direct and proximate result of the willful and wanton conduct of Defendants, Plaintiff has been injured and will continue to suffer commercial harm in this District, the State of New York, and worldwide due to the pervasive reach of the  Internet, in an amount unknown at present and to be determined at trial.

220.     As a direct result of Defendants' willful misrepresentation of fact, Plaintiff is entitled to enhanced damages as provided by law.

221.     As a direct and proximate result thereof, Plaintiff is entitled to injunctive relief enjoining and restraining Defendants from use of any suggestion that Plaintiff has endorsed, approved, or licensed Defendants in any way, including the imposition of corrective advertising

approved by Defendant to all Defendant's customers of record since 2011, and in Beekeeping

Periodicals within the US, Canada, and other countries where Defendants do business.

222.    Plaintiff is damaged by Defendants' false advertising, and has no adequate remedy at

law.


### 19th Complaint – Unfair Business Practices Under NY GBL § 349

223.    Plaintiff incorporates the preceding statements as if fully set forth herein.

224.    Defendants' extensive personal efforts at passing-off their own product as Plaintiff's

product as described above was a scheme primarily aimed at Defendants' customers -

beekeepers - but by misleading beekeepers, Defendants' passing-off also defrauded the

beekeepers' honey customers, who would have no idea that they were buying honey that

could be tainted with Defendants' unknown mix of chemicals having unknown

vaporization/evaporation/volatility properties, rather than Plaintiff's well-known and long-

trusted product, with a proven track record of never tainting honey.  In detail:

a)  Defendants misleads the beekeeper with techniques described above

b)  Beekeeper is misled to think he bought Plaintiff's product

c)  Beekeeper uses Defendants' product to harvest his honey thinking it is Plaintiff's

d)  Beekeeper mistakenly relies on the long track record of Plaintiff's product to be:

    i.      Highly volatile, and not leave residues, to not taint honey
    ii.     Approved for use in organic beekeeping (only Plaintiff's product is)

f)  The beekeeper, in good faith, sells his honey to consumers.

g)  The consumers trust the beekeeper's label that his honey is one or more of:

    i.      Untainted honey

*ii.*   Honey Produced Using Organic Methods

*iii.*   Certified Organic Honey

**224.**   Yet both beekeeper and honey consumer are deceived by Defendants' deceptive conduct, with possibly drastic consequences for both beekeeper and honey consumer.  The beekeeper would face the loss of his certification to label his honey as "Produced Using Organic Methods", or where applicable, "Certified Organic" if his carefully-kept and required records revealed that he used Defendants' unapproved product rather than Plaintiff's approved product.  The honey consumer is unknowingly defrauded, but could face health risks from Defendants' product of unproven formulation and untested safety.

**225.**   Under FDA rules, any substance not specifically approved for Food Use, if coming into contact with food for human consumption, or, even if used in close proximity, will render that food "Adulterated", and unfit for human consumption.  Even if it is possible to process the food to filter out or otherwise make the adulteration "undetectable", the food is still considered Adulterated, and unfit for human consumption.  The beekeeper, using an untested and unproven product of dubious origin, made by a company with no expertise in organic chemistry, risks rendering his entire honey crop inedible and unsalable.  Note that Defendants, despite extensive puffery, copyright infringement, and trademark infringement pointedly decline to state if their product is "Food Grade", "Generally Recognized As Safe", or in compliance with any FDA requirements for substances that come into close contact with food.

**226.**   Plaintiff, like any other honey consumer, cannot know if he faces harm when consuming the honey of other beekeepers, or if he is being defrauded when paying extra for honey that is "Certified Organic" or "Produced Using Organic Methods", and this is why Defendants' deceptive practice is so insidious.  The deception undermines the trust a customer has in their

local beekeeper, or favorite beekeeper's honey, and the impact could be on any consumer of

honey anywhere, including in the State of New York, as honey is commonly sold outside

states where it is produced.  No one can say for sure without sending specific notice to each

and every purchaser of Defendants' knock-off product, and waiting for each beekeeper to do

his best to trace his honey through distribution channels and, if incorrect assurances were

made, recall the honey.

227.    Plaintiff is therefore damaged in two ways by Defendants' deceptive practices, first, as a

beekeeper who sells his honey, in that all trust in honey as wholesome, pure and

unadulterated is undermined by such a knock-off product of dubious quality and untested

nature, and second, as a consumer of honey, as he has no way of knowing if honey he trades,

buys, or receives as a gift would be tainted by Defendants' product of questionable quality

and negotiable ethics, and may pose an actual health hazard, or at minimum, a significant risk

of adulterated food.

228.    Both beekeepers in the State of New York and honey consumers in the State of New

York face equal peril from Defendants' deception, as Defendants clearly do sell their

products to New York beekeepers, moreso given Defendants' new PA warehouse.

Regardless, honey from any beekeeper misled by Defendants' deception, no matter the

beekeeper's location, can easily be sold to New York State honey consumers.

228.    The above constitutes a deceptive act or practice in the conduct of Defendants' business,

trade or commerce, and in the furnishing of products and services to consumers in New York

State, and thereby, a violation of N.Y. Gen Bus. Law § 349 *et seq*.

229.    In the environment of mail-order, phone-order, and internet-order sales, the product

deceptively sold cannot be meaningfully inspected by the buyer until after the purchase.  As

the Defendants are engaged in passing-off non-Plaintiff products under color of Plaintiff's

trademark, copyrights, and even Plaintiff's good family name, they are perpetrating a fraud

on the beekeeper, and thereby, the honey-consuming public.

230.   As a result of Defendant's deceptive actions, Plaintiff has been damaged in an amount to

be proven at trial.

### 20th Complaint – Breach Of Contract (UCC-1)

231.   Plaintiff incorporates the preceding statements as if fully set forth herein.

232.   Plaintiff and Defendants particularly Defendant Brushy engaged in a very amicable and

uninterrupted "Contract of Indefinite Duration" under the Uniform Commercial Code. It

existed from early 2002 onward, and was fully performed by both parties. This is an

appropriate form of agreement for two sole proprietors engaged in the regular cyclical sale of

goods in quantities that may be hard to estimate in advance.  Although either party may

terminate a Contract of Indefinite Duration at will, it must give the other party "reasonable

notification" of its intention to terminate.   UCC 2-309 states in relevant part:

> "Termination of a contract by one party except on the happening of an agreed event
> requires that reasonable notification be received by the other party and an agreement
> dispensing with notification is invalid if its operation would be unconscionable."

233.   In Dec 2010, no notice of termination was given by Defendants, violating UCC 2-309.

234.   Further, Defendant Brushy attempted to cancel a Purchase Order after having accepted

the shipment of a Commercial Unit of Goods (UCC Article 2 § 2-105) under the PO, and

after opening seals, breaking apart the Commercial Unit, and selling/shipping part of that

Commercial Unit of Goods to Defendants' customers.  Both acts are feely admitted in

Defendants' email of Dec 2010 (*see* Exhibit 3).

235.   If these unconscionable acts by the Defendant were not a clear enough breach of the

agreement, the introduction of Defendant's directly-competing cheap knock-off product

raised the level of unconscionably well beyond that required to constitute a breach of the agreement that had been continuously fully performed by both parties from 2002 to 2010 without any dispute, argument, or animosity.

236.    Damages in amounts to be proven at trial are demanded.

237.    The fact of this breach of contract is of particular note in this litigation as a firm basis for the loss of any and all license, permission, or grant of rights Defendants had as a result of their status as an Authorized Dealer for Plaintiff.  Any/all rights terminated in Dec 2010.

238.    The fact of this breach of contract is also a firm basis for classifying all of Defendants' acts as "Willful" infringement of Plaintiff's rights.

239.    The fact of this breach of contract, and also Defendants' openly proclaimed voluntary termination of their Authorized Dealer status, establishes a clear basis for a condition of "Actual Confusion" in regard to all their violations of 15 USC, as a matter of law.

### 21st Complaint – Unjust Enrichment

240.    Plaintiff incorporates the preceding statements as if fully set forth herein.

241.    By reason of the foregoing illegal acts, Defendants have infringed Plaintiff's rights, and, in doing so, have baited-and-switched customers who before bought only Plaintiff's product, to mistakenly buying Defendants' knock-off.  Each and every sale of Defendants' knock-off is nothing more than an outright theft of revenue directly from Plaintiff.

242.    Further, Defendant enjoys the additional revenue from sales of impulse-purchase items and commodity items sold in the same purchase with what the customer is misled to think is Plaintiff's well-respected product.

243.    In a mail-order, phone-order, and internet-order business, the product deceptively sold cannot be meaningfully inspected by the buyer until after the purchase.  As the Defendant is

engaged in passing off a non-Plaintiff product under color of Plaintiff's trademark, copyrights, and good family name, Defendants are perpetrating a fraud on the public.

244.    Defendants have been greatly enriched by their illegal acts. Defendants' unlawful conduct has been and will continue to be willful, as Defendants have had clear knowledge of Plaintiff's rights, demonstrating clear knowledge of Plaintiff's exclusive rights during Defendants' term as an Authorized Dealer, and their own sophisticated use of proper designations such as "TM" for their own product name.

245.    Defendants' illegal acts are purely commercial and intricately designed for the sole personal profit of Defendants at the direct expense of Plaintiff.

246.    As such, it would inherently be "against equity and good conscience" to permit the Defendants to retain what they have taken from Plaintiff through guile and theft of intellectual property.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1. For a declaration that Defendants have willfully infringed Plaintiff's copyrights and trademark both directly and secondarily.

2. For a permanent injunction requiring that Defendants cease directly and indirectly infringing, or causing the infringement of Plaintiff's exclusive rights in Copyright, Trademark, and Right to Publicity.

3. For clear corrective advertising, with ad copy that meets with Plaintiff's approval at Plaintiff's sole discretion, and without excuse or equivocation, to correct all false advertising and market confusion caused by Defendants' multiple infringements, mailed to (a) all Defendants' customers and postal mailing list subscribers from 2010 to present via USPS at

Defendants' expense, and (b) to all email list subscribers from 2010 to present, again at Defendants' expense, and (c) in each and every print and online media publication/outlet in which Defendants advertised from 2011 to present, including local association newsletters, and including online ad networks and other ad-brokerage schemes, at Defendants' expense.

4.  For clear corrective advertising, as in (3) above for the customer lists and advertising outlets used by all resellers and sub-dealers to which Defendants sold their knock-off product "for resale", including those who unwittingly infringed Plaintiff's exclusive rights by copying and/or distributing Defendants' infringing sales materials.

5.  For statutory damages pursuant to 17 USC § 504, 17 USC § 1202 and § 1203, 15 USC §1114, and 15 USC § 1125, in such amounts as may be found or established at trial, arising from Defendants' violations of Plaintiff's rights under each of the applicable statutes. Additionally, for exemplary/enhanced damages for Defendants' willful violations of Plaintiff's rights under the applicable statutes.

6.  At Plaintiff's election, pursuant to statute, Plaintiff shall be entitled to Defendants' profits from their illegal acts, as will be proven at trial, and trebled damages, where appropriate.

7.  For compensatory and punitive damages in such amounts as may be found or established at trial arising from Defendants' willful and wanton violations of New York state law, and where applicable, Federal Law.

8.  For Plaintiff's costs, including reasonable attorney's fees, pursuant to 17 USC § 505, 17 USC § 1202 and § 1203, 15 USC § 1114, 15 USC § 1125, and under New York state law.

9.  For additional specific relief as outlined in each of the sections above.

10. For pre-judgment and post-judgment interest according to law.

11. For such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: Mineola, New York

December 28, 2015

Respectfully submitted,

/s/ Oscar Michelen /s/

CUOMO LLC
BY: OSCAR MICHELEN (OM 5199)
Attorneys for Plaintiff
200 Old Country Road
Suite 2 South
Mineola NY 11501
516-741-3222
omichelen@cuomollc.com