```
                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK

In re:                          :
                                    Docket #14cv1304
 FISCHER,                       : 1:14-cv-01304-PAE-AJP

               Plaintiff,       :

  - against -                   :

 FORREST,                       :
                                    New York, New York
               Defendant.       : May 27, 2016

------------------------------------ :

                    PROCEEDINGS BEFORE
               THE HONORABLE HENRY B. PITMAN
          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:          CUOMO LLC
                        BY:  CHRISTOPHER GIOIA, ESQ.
                        200 Old Country Road, Suite 2 South
                        Mineola, New York 11501


For Defendant:          CLEMENTS BERNARD, PLLC
                        BY:  SETH HUDSON, ESQ.
                        4500 Cameron Valley Parkway
                        Suite 350
                        Charlotte, North Carolina 28211

                        CAHN & CAHN, PC
                        BY:  DANIEL CAHN, ESQ.
                        105 Maxess Road, Suite 124
                        Melville, New York 11747




Transcription Service: Carole Ludwig, *Transcription Services*
                       141 East Third Street #3E
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Fax:  (212) 420-6007


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

<u>**INDEX**</u>

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-Direct | Re-Cross | Court |
|---------|--------|-------|-----------|----------|-------|
| None | | | | | |

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None | | | | |

1

```
 1                                                       3
 2          THE CLERK:  Fischer against Forrest, counsel
 3  please state your name for the record.
 4          MR. CHRISTOPHER GIOIA:  Christopher Gioia, Cuomo
 5  LLC, 200 Old Country Road, Mineola, New York 11501, on
 6  behalf of the plaintiff, James H. Fischer.  Good morning.
 7          THE COURT:  Good afternoon.
 8          MR. GIOIA:    Excuse me.
 9          MR. SETH HUDSON:  Seth Hudson of Clements Bernard,
10  4500 Cameron Valley Parkway, Suite 350, Charlotte, North
11  Carolina, on behalf of the defendants.
12          MR. DANIEL CAHN:  And Daniel Cahn of Cahn & Cahn,
13  PC, 105 Maxess Road, Suite 124, Melville, New York, also for
14  the defendants. Good morning, I mean good afternoon, Judge.
15          THE COURT:  Good afternoon all.  All right, we are
16  today to address some discovery issues.  In that regard, I
17  have a letter from, a joint letter dated May 23, 2016, which
18  annexes interrogatories and document responses and cites,
19  well, there's several disputes. There are also -- there are
20  several disputes, let's take them in the order in which they
21  are raised in the letter.
22          The first issue is plaintiff advises that
23  defendants -- I'm sorry, defendant advises that its second
24  set of requests for production of documents served on August
25  28, 2015, has not been responded to, what is the status of
```

```
1                                                    4

2  that?

3           MR. HUDSON:  Your Honor, we got those last, or we

4  got responses last night.

5           THE COURT:  Is that for I, II and III?

6           MR. HUDSON:  Yes, Your Honor.

7           THE COURT:  Okay.  All right, turning to IV, there

8  are issues with respect to a number of interrogatories, and

9  in V there are a number of issues with respect to document

10 responses.  You know, ordinarily my practice is to go

11 through these item by item, I don't like to try to guess why

12 an interrogatory is appropriate or try to guess what the

13 objections are. There are quite a few that are in issue

14 here, I think by my count there are 18 interrogatory

15 responses and 91 document requests.  I mean we can go

16 through them, one thing I'm not going to do is I'm not going

17 to rule on them without counsel's input. As I said, I'm not

18 going to read them and try to guess what arguments can be

19 made for and against or try to, you know, have some

20 schizophrenic internal conversation trying to assume I'm

21 defendant one minute and assume I'm plaintiff the next.

22           Are they all still in issue, are they all still in

23 dispute?

24           MR. HUDSON:  Yes, Your Honor, Mr. Gaia?

25           MR. GIOIA:  Gioia.
```

```
 1                                                      5
 2           MR. HUDSON:  Gioia, sorry, Mr. Gioia and I had
 3   some conversations before this conference and I think we
 4   can, you know, some of the requests for production we can
 5   work out.  You know, if Your Honor would like, Mr. --
 6           MR. GIOIA:  Gioia.
 7           MR. HUDSON:  Gioia, sorry, and I, can take maybe,
 8   you know, 15 or 20 minutes, sit down, go through them all,
 9   and then, you know, if there's some that we can't work out,
10   that may be easier and save you time.
11           THE COURT:  All right. Look, I'm not trying to
12   give anybody grief here today, but that should have been
13   done before today, the rules require a meet and confer
14   before you raise it with the Court.  Why don't you take and
15   go back in the jury room or stay here, wherever you're more
16   comfortable, see what you can work out and then we'll come
17   back and address whatever we need to address.
18           MR. HUDSON:  Thank you, Your Honor.
19               (OFF THE RECORD)
20           THE COURT:  All right, where do we stand?
21           MR. HUDSON:  All right, Your Honor, just for the
22   record, we did have a meet and confer prior to this --
23           THE COURT:  Good.
24           MR. HUDSON:  But it was not successful, but we
25   were much more successful on this try.
```

```
 1                                                        6

 2              THE COURT:  Good.

 3              MR. HUDSON:  So we only have a couple of issues,

 4   mainly, you know, what the plaintiffs have agreed to do is

 5   to go back in and look at the responses to the

 6   interrogatories, requests for production, clean them up, you

 7   know, take out some of the objections that aren't

 8   appropriate. They're also going to specify what documents

 9   respond to which requests under Rule 34 and, you know, and

10   other objections we had dealt with requests for information

11   related to actual damages, but they're going to provide

12   stipulation that they're not going to seek actual damages in

13   this case.

14              MR. GIOIA:  Just to clarify, for lack of damage,

15   we loft profits and we're seeking damages, statutory --

16              THE COURT:  Okay, you're not seeking lost profits,

17   is that right, Mr. Gioia?

18              MR. GIOIA:  That is correct.

19              THE COURT:  Okay, go ahead.

20              MR. HUDSON:  That streamlines this case

21   substantially.  Your Honor, the only things that we could

22   not come to an agreement on is some information that Mr.

23   Fischer, he's actually here in the courtroom today, claims

24   is proprietary.  We offered up that, you know, we'd be more

25   than happy to have a protective order in this case, we'd
```

7

1

2 have a two stage protective order where, you know, it even

3 has attorney's eyes only provision, he still didn't want to

4 turn that information over.  I don't know how you'd like to

5 proceed at this point, I'd be more than --

6            THE COURT:  Do you want to tell me what specific

7 request is involved?

8            MR. HUDSON:  Yes, Your Honor, they are, on the

9 interrogatories, would it be helpful to, I've got some

10 highlighted --

11            THE COURT:  No, I've got, they're annexed to the

12 letter, I can --

13            MR. HUDSON:  Okay, it's interrogatory number 2.

14            THE COURT:  All right, identify all persons or

15 entities that plaintiff is aware have used, replicated, or

16 reproduced plaintiff's mark in connection with the sale,

17 offering for sale, distribution and/or advertising of goods

18 and/or services, related to the goods and/or services

19 provided under plaintiff's mark and indicate whether

20 plaintiff has given this person or entity consent,

21 sponsorship or authorization to use plaintiff's mark, that's

22 the one we're talking about?

23            MR. HUDSON:  Yes, Your Honor.

24            THE COURT:  Okay.  And my understanding is

25 plaintiff is a manufacturer/wholesaler of products used in

```
 1                                                          8

 2  beekeeping?

 3            MR. GIOIA:  That's correct, Your Honor.

 4            THE COURT:  And what's the relevance of this?

 5            MR. HUDSON:  Your Honor, it's two-fold. One is,

 6  you know, we're asking for information about the individuals

 7  who have used his mark, that without his permission, if he's

 8  allowed people to use his mark without his permission then

 9  it goes to the enforceability and the validity of the mark.

10  If he's allowed others to use --

11            THE COURT:  Hold on a second, listen to what, I

12  don't understand what you just said.  If he's allowed people

13  to use his mark without his permission, that seems

14  internally inconsistent. How can you allow someone to do

15  something without giving them permission?

16            MR. HUDSON:  Because if I said that I didn't --

17            THE COURT:  Maybe I misunderstood, I am not sure I

18  understand --

19            MR. HUDSON:  It might be my southern drawl.

20            THE COURT:  Are you asking is he aware of other

21  infringers?

22            MR. HUDSON:  Yes, it's two-fold, is he aware of

23  any individuals that are using his mark without his

24  permission.

25            THE COURT:  Okay, so is he aware of other, and
```

1    using the mark for the same product.

2          MR. HUDSON:  Right, or has he allowed others to

3    use his mark for the same product, the validity --

4          THE COURT:  Hold on, how is the former -- look, I

5    understand the relevance of the question is he aware of any

6    other infringers, but the fact that his distributors or the

7    fact that a retailer may sell his product and use the mark

8    with his permission, so what?

9          MR. HUDSON:  Well that goes to what's called a

10   principle called naked licensing. If Mr. Fischer allows

11   someone to use his mark --

12         THE COURT:  It's not naked licensing unless --

13   it's not naked licensing with respect to products that he's

14   sold.

15         MR. HUDSON:  No, but that's not what I'm asking,

16   I'm asking for products that he allowed others to use,

17   anybody else he allowed to use his name.

18         THE COURT:  No, it's not -- no, you're saying it

19   too broadly.  If Coca-Cola sells to a deli and the deli

20   sells genuine Coca-Cola products labeled as Coca-Cola,

21   that's not naked licensing.

22         MR. HUDSON:  I would agree.

23         THE COURT:  Okay.  So your question I guess really

24   is has he licensed the, I guess the question is two-fold, is

1    using the mark for the same product.

2          MR. HUDSON:  Right, or has he allowed others to

3    use his mark for the same product, the validity --

4          THE COURT:  Hold on, how is the former -- look, I

5    understand the relevance of the question is he aware of any

6    other infringers, but the fact that his distributors or the

7    fact that a retailer may sell his product and use the mark

8    with his permission, so what?

9          MR. HUDSON:  Well that goes to what's called a

10   principle called naked licensing. If Mr. Fischer allows

11   someone to use his mark --

12         THE COURT:  It's not naked licensing unless --

13   it's not naked licensing with respect to products that he's

14   sold.

15         MR. HUDSON:  No, but that's not what I'm asking,

16   I'm asking for products that he allowed others to use,

17   anybody else he allowed to use his name.

18         THE COURT:  No, it's not -- no, you're saying it

19   too broadly.  If Coca-Cola sells to a deli and the deli

20   sells genuine Coca-Cola products labeled as Coca-Cola,

21   that's not naked licensing.

22         MR. HUDSON:  I would agree.

23         THE COURT:  Okay.  So your question I guess really

24   is has he licensed the, I guess the question is two-fold, is

1

2   he aware of any other infringers, has he licensed the mark

3   or the marks to any one independent of the sale of products

4   by him. The trademark is a source identifier, so, you know,

5   if Mr. Fischer sells one of his own products to a

6   distributor and the distributor uses Mr. Fisher's marks with

7   products that originate with Mr. Fischer, there is no naked

8   licensing issue.

9         MR. HUDSON:  Right.

10        THE COURT:  I mean is there an objection to asking

11  those questions, to answering those questions, namely is Mr.

12  Fischer aware of any other infringers or has he licensed the

13  mark to anyone to use with respect to products other than

14  products that originate with Mr. Fischer?

15        MR. GIOIA:  Yeah, it sounds more like he's asking

16  for information whether Mr. Fischer has any other lawsuits

17  available, that's almost what it sounds like to me.

18        THE COURT:  No.

19        MR. GIOIA:  I guess I'm confused, because, one, we

20  objected, it's irrelevant to this case, whether other --

21        THE COURT:  Well, there is a theory in trademark

22  law and it, I've seen it mostly discussed in treatises, it's

23  difficult to, in practice you rarely see it although there

24  are some old cases, there's a notion of abandonment that if

25  you don't police a trademark it can become abandoned. The

11

examples in law school were aspirin, ping-pong, escalator,

which all used to be actually trademarks. And this is why

Xerox used to run ads saying Xerox means their own machines,

not copies made by other photostatic copiers.  There's a

notion of abandonment and if he's aware of other infringers

that he hasn't policed there may be a basis for an

abandonment issue.

The naked licensing, as far as I understand it,

only comes up when you're licensing the trademark, when

you're separating the power to control the quality of the

product from the trademark, which doesn't exist if he's only

licensing the trademark with respect to products that

originate with him.

So I guess my question to you, Mr. Gioia, is would

you be, are you adverse to answering an interrogatory asking

for the names of other infringers, if any, that Mr. Fischer

is aware of, and whether Mr. Fischer has licensed the mark

to anyone to use with respect to products that do not

originate with Mr. Fischer?

MR. GIOIA:  To address the first point, in terms

of --

THE COURT:  Maybe, do you want to turn around and

talk to Mr. Fischer, maybe you want to consult with him for

a second.

1                                                                    12

2              MR. GIOIA:  In terms of the first question, in

3    terms of if there are any other infringers, I have no issue

4    with that.

5              THE COURT:  Yeah, and they are different questions

6    than were initially posed in the interrogatory.

7              MR. GIOIA:  To the extent if that question is

8    posed to my client, we will certainly answer that

9    interrogatory.

10             THE COURT:  Yes.

11             MR. GIOIA:  I apologize, can you please restate

12   the second question?

13             THE COURT:  The second question is has he licensed

14   anyone to use the trademarks independent of products that

15   originate with Mr. Fischer?

16             MR. GIOIA:  So almost analogous to this case where

17   he's licensed the product but they can use it --

18             THE COURT:  Licensed permitting someone to use the

19   mark without buying products from Mr. Fischer, to use it

20   with respect to products other than products that originate

21   with Mr. Fischer?

22             MR. GIOIA:  As phrased to that or sum and

23   substance like that we'd have no problem answering that

24   question.

25             THE COURT:  Okay, I think that covers what you're

1

2  looking for in number 2.  Who his authorized distributors

3  are with respect to his own products, I don't think is

4  relevant.

5          MR. HUDSON:  It is -- I'd like to address that

6  right now.

7          THE COURT:  Go ahead.

8          MR. HUDSON:  Because it is relevant, Your Honor.

9  When my client came out with their own product, again, you

10 know, our own product is called Natural Honey Harvester,

11 their product is called Bee-Quick, when my client came out

12 with their own product they announced that they came out

13 with their product because of their distributor was an

14 unreliable supplier.

15         THE COURT:  Can you say that again without the

16 pronouns, with the they it becomes a little vague, I'm not

17 sure who the they is.

18         MR. HUDSON:  Sorry, Your Honor.  So my client,

19 well Brushy Mountain, the corporate entity, came out with a

20 product called Natural Honey Harvester.  They were initially

21 purchasing the plaintiff's product called Bee-Quick, but

22 they --

23         THE COURT:  And they were selling the plaintiff's

24 product under the mark Bee-Quick or something else?

25         MR. HUDSON:  No, they were selling it, yes, under

```
 1                                                    14

 2  Bee-Quick.

 3           THE COURT:  Defendant was selling plaintiff's

 4  product under plaintiff's mark.

 5           MR. HUDSON:  Right, yes, sir.

 6           THE COURT:  Go ahead.

 7           MR. HUDSON:  And then, then they couldn't get a

 8  supply from the plaintiff so they came out with their own

 9  product called Natural Honey Harvester.

10           THE COURT:  Right.

11           MR. HUDSON:  And they started selling that.  Well

12  when they came out, when my client, excuse me, came out with

13  their own product, Natural Honey Harvester, they, you know,

14  they put on their website the reasoning is because --

15           THE COURT:  I'm sorry, they put this on their

16  website?

17           MR. HUDSON:  I'm sorry, I keep saying pronouns. My

18  client, Brushy Mountain, put on their website that they came

19  out with a new product because their original supplier, the

20  original supplier being plaintiff --

21           THE COURT:  Right.

22           MR. HUDSON:  Was unreliable. So now they've been

23  hit, one of the causes of action in this complaint is the

24  defamation cause of action for that statement. So the

25  dealers of the plaintiff are important because we will know
```

```
 1                                                          15
 2   who those dealers are, we can take those dealers'
 3   depositions and determine presumably that they also had a
 4   problem with Mr. Fischer supplying the product.
 5              THE COURT:  So you want to assert truth as a
 6   defense to the defamation claim concerning the reliability
 7   of plaintiff as a supplier?
 8              MR. HUDSON:  Right, Your Honor.
 9              THE COURT:  So you want the names of plaintiff's
10   distributors.
11              MR. HUDSON:  Distributors and dealers.
12              MR. GIOIA:  If I may interject, I apologize for
13   cutting the train of thought off, plaintiff and myself are
14   unaware of a defamation actually brought, I don't know if
15   that was, I don't know that was interpreted. I don't think
16   we brought a defamation claim.
17              THE COURT:  Hold on a second, the defamation claim
18   is asserted in what action, is it 1304 or --
19              MR. HUDSON:  I think it's 1304.
20              THE COURT:  One second, let me settle this once
21   and for all.
22              MR. HUDSON:  And it may not be titled defamation
23   but --
24              THE COURT:  Well, let's see, hold on.
25              MR. HUDSON:  That's the gist of it.
```

```
 1                                                16
 2              THE COURT:  Hold on.  I can bring up the complaint
 3   here, unless one of you has the complaint.  Is there an
 4   amended complaint here or just the original complaint?
 5              MR. HUDSON:  There's a third amended complaint.
 6              THE COURT:  Third amended complaint, hold on one
 7   second.  I see a second amended complaint, is there
 8   something after that, this was February, 2015?
 9              MR. HUDSON:  Yes, Your Honor, I believe it was
10   December of 2015 was when the filed, we had a hearing in
11   November and then they filed it like 30 days later.
12              THE COURT:  In 1304?
13              MR. HUDSON:  Yes, Your Honor.
14              THE COURT:  Okay, I've got it.  All right, there
15   is a copyright claim, EMCA, trademark claims, do you know
16   whereabouts in the third amended complaint these defamation
17   claims are?
18              MR. HUDSON:  I don't remember, Your Honor, I try
19   to travel light and I didn't bring it with me.
20              THE COURT:  Fair enough.  Unfair competition.
21   This is a misappropriation, plaintiff carefully monitors and
22   controls the commercial use of his name, picture, image and
23   likeness, plaintiff rarely allows his image to appear
24   elsewhere, this is a misappropriation of plaintiff's
25   likeness.  False advertising?
```

1                                                                  17

2            MR. HUDSON:  He makes the allegation in the

3     complaint that my client's statement is untrue.

4            THE COURT:  The defendant's statement, this is

5     paragraph 2010, paragraph 210, excuse me, "the defendant's

6     statement on their 2011 webpage created and displayed under

7     the director orders and personal supervision of the

8     defendant states for years we have promoted the use of

9     natural product to harvest honey, but an unreliable supply

10    of such product has forced us to come out with our own."

11    This includes several statements, natural product to harvest

12    honey, unreliable, this is paragraph 210(B): "The

13    'unreliable supply' claim is a blatant falsehood, defendants

14    merely needed to prepay to get delivery at any time they

15    pleased, otherwise production runs were made quarterly. The

16    false statement gives the impression that plaintiff cannot

17    produce his product which is disparagement."  What do you

18    say to that, Mr. Gioia?

19            MR. GIOIA:  Hold on one second, Your Honor.

20            THE COURT:  Sure.

21            MR. GIOIA:  Your Honor, I could see that kind of

22    construed it sounded like a defamation claim.  To the extent

23    that it does --

24            THE COURT:  It's 43(A), it's false advertising,

25    it's --

1

2          MR. GIOIA:  Well, yeah, there's a false

3    advertising claim, there is no defamation claim.

4          THE COURT:  No, it's not, but it's, it's false,

5    the Lanham Act, among other things, prohibits false

6    statements about a competitor's product.  You know, there's

7    been a lot of litigation, you see it in pain relievers, you

8    know, that brand X is ten times more effective than brand Y,

9    I mean if that's untrue it's a Lanham Act violation.

10          The other thing I guess is, you know, to the

11    extent your asserting confidentiality, I'm not sure how your

12    distributors are confidential. I mean ordinarily

13    manufacturers or frequently on manufacturers' websites they

14    have a list of authorized distributors so that people who

15    want to buy it can know where to go to buy it. I mean if

16    someone wants to buy Mr. Fischer's product who is in upstate

17    in Chemung County, I mean you'd want that person to know

18    where the distributor in Chemung is located.

19          MR. GIOIA:  Our client has international business

20    ties, so I know that --

21          THE COURT:  Fair enough, but even if someone in

22    Manchester, England, wants to buy plaintiff's products, I

23    mean you'd want that person to know where in Manchester he

24    can find a place that sells them ordinarily.

25          MR. GIOIA:  Well to the extent that it is

1
2  available on my client's website, I would say we were

3  providing them with my client's website so they could find

4  that information through another source.  To the extent that

5  that information is available other than that, my client

6  does not want to disclose that information.

7          THE COURT:  Why not, I'm not sure where the

8  confidentiality issue is?

9          MR. GIOIA:  The issue is this, Your Honor, we are

10  talking about a very niche field --

11          THE COURT:   Understood.

12          MR. GIOIA:  I mean we're talking about a handful

13  of people who supply bee products in this country.  My

14  client does not want the information getting out of who he

15  markets, targets and direct as clients and dealers,

16  especially because the basis of this whole entire claim is

17  that they're trying to knock off his product and sell it to,

18  presumably, I don't know who they're trying to sell it to,

19  but could be trying to sell it to the same exact clients. My

20  client doesn't want that information leaking out there.

21          But I also don't really see the relevance --

22          THE COURT:  Well, I guess, you know, no, I mean

23  it's relevant in light of the Lanham Act claim where you're

24  attacking defendant's statement about reliability, it's

25  relevant to that. I mean essentially they're trying to offer

                                                                    20

1

2   truth as a defense, that other distributors have had the

3   same alleged problems with source of supply. So it's

4   relevant to the Lanham Act claim.  But I'm having a, it

5   seems counterintuitive to me that a manufacturer of products

6   would want to keep its distributors a secret. And, you know,

7   whether or not this is entitled to confidential, whether or

8   not it constitutes a trade secret depends on a lot of other,

9   depends, and usually there is a multipart test which

10  includes how much effort is expended to generate the list of

11  distributors.  I mean how many -- I'm just curious, do

12  either side know approximately how many retailers there are

13  for beekeeping products in the United States?  I take your

14  point that it's a niche market.

15          MR. HUDSON:  I think the fact that it's a small

16  market makes it even less likely that it's confidential

17  because there are only a couple of suppliers and it's easy

18  to find out. But I would say, I mean like big ones there are

19  five or six, rather than just a mom and pop store, I mean my

20  client is all over the US, we've got an office in North

21  Carolina but also in Oregon.

22          MR. GIOIA:  As per my client, he said there's

23  20,000 internationally.

24          THE COURT:  Well, you're willing to do eyes of

25  counsel only on distributors?

```
 1                                                    21
 2            MR. HUDSON:  Oh, yes, Your Honor, I don't want to
 3   put my clients in that position.
 4            THE COURT:  Why doesn't that eliminate the issue?
 5            MR. GIOIA:  My client would have proposed that to
 6   the extent that we will disclose this information, we'd
 7   rather it in camera first to determine the relevance and
 8   related --
 9            THE COURT:  No, the relevance, you know, look,
10   telling me it's, you know, Joe's Bee Supplies or Bill's Bee
11   Supplies isn't going to tell me anything. I mean it's not
12   going to provide useful information to resolving this
13   discovery dispute. But if you get it on an eye's of counsel
14   basis only, such that Brushy Mountain is not, the people at
15   Brushy Mountain are not going to see who your distributors
16   are, why is that not adequate protection?
17            MR. GIOIA:  Well here's what I would propose, Your
18   Honor. I mean my client is --
19            THE COURT:  Why don't you answer my question
20   first, why is that not adequate protection?
21            MR. GIOIA:  My client --
22            THE COURT:  If you want to confer --
23            MR. GIOIA:  No, no, no --
24            THE COURT:  Let me finish, I know Mr. Fischer has
25   very strong feelings about the case and I respect that, and
```

22

1

2      if you want to take a minute to consult with him, feel free.

3              MR. GIOIA:  I'll take a minute, thank you, Your

4      Honor.

5              THE COURT:  Okay, fine.  If you want to have Mr.

6      Fischer sit next to you, it's fine with me, it's up to you.

7              MR. GIOIA:  He wants to sit in the back.

8              THE COURT:  That's fine.

9              MR. GIOIA:  Thank you, Your Honor.

10             THE COURT:  My pleasure.

11             MR. GIOIA:  I think we perhaps can come to some

12     sort of resolution if it's amenable, you know, again, this

13     would all be under protective order. I want to make it clear

14     that my client, it's not a distrust or anything personal, is

15     very protective of his, what he considers his trade secrets

16     in that so much so we're not seeking any lost profits in

17     this case, it's simply statutory damages.  And he's made

18     that clear.

19             To the extent that we can provide materials, we

20     would only want that to be the distributor list for United

21     States vendors, and I think that should hopefully encompass

22     what is relevant to the case, notwithstanding whatever Mr.

23     Hudson has to say on that issue. Not the individual level,

24     on the level --

25             THE COURT:  I'm sorry, say it again, please, I

23

1

2  didn't --

3           MR. GIOIA:  It would just be limited to

4  distributors in the supply chain and nobody below that.  And

5  just for US based, not, you know, my client's international

6  clientele --

7           THE COURT:  So does your client sell directly to

8  retail or do they sell to sort of a mid level distributor

9  who then sells to retailers?

10          MR. GIOIA:  Entirely mid level distributors.  But

11 he doesn't want anyone below that, retailers, being, first

12 of all, obviously that would be a lot of information anyway.

13          THE COURT:  All right, and that's under -- does

14 that resolve it?  Distributors and retailers are clearly not

15 at the same class, if Mr. Fischer delivers 1,000 units to a

16 distributor and the distributor decides for whatever reason

17 he or she is going to favor retailer A over retailer B, and

18 maybe retailer B has an issue with the reliability of

19 supply, but in the hypothetical it's because the distributor

20 is favoring A over B.  Mr. Fischer has, once he sells it to

21 the distributor, the distributor can do what he, she or it

22 wants with it. I mean you get into a whole problem of, you

23 know, what does the reliability, if there are delivery

24 problems on the retailer level, who is responsible for

25 those?  It would seem to me that once you get who the

1

2   distributors are, and if you want to go out and depose the

3   distributors, that gets you pretty much what you need in

4   terms of reliability.

5          MR. HUDSON:  Yes, Your Honor, I agree, anybody he

6   sells it to, he directly sells it to, I don't --

7          THE COURT:  That's the distributors.  Mr. Gioia

8   has just told us he sells to distributors and the

9   distributors in turn sell to retailers.

10          MR. HUDSON:  That takes care of it, thank you,

11   Your Honor.

12          MR. GIOIA:  The interrogatory just said all

13   entities (inaudible).

14          THE COURT:  Okay.  All right, so on two, what the

15   plaintiff is going to provide are the identities of any

16   other known infringers, if any.  Entities to which he as

17   licensed the mark or to which he has licensed his marks,

18   independent of the sale of his products, or independently, I

19   guess, of the sale of the products.

20          MR. GIOIA:  And can we tailor that to be just

21   national, is that okay?

22          THE COURT:  You're not going to be seeking letters

23   rogatory in this case, are you?

24          MR. HUDSON:  Seeking what, excuse me, Your Honor?

25          THE COURT:  Letters rogatory?

```
 1                                                25
 2             MR. HUDSON:  Oh, no, sir.
 3             THE COURT:  Hague Convention discovery --
 4             MR. HUDSON:  No, absolutely not.
 5             THE COURT:  Okay.
 6             MR. HUDSON:  But I think, you know, I do think
 7   maybe, you know, dealers in Canada will be applicable, I
 8   doubt he has any in Mexico, but maybe dealers in North
 9   America.
10             MR. GIOIA:  My client is saying no.
11             THE COURT:  Why not?
12             MR. GIOIA:  I don't see the relevance --
13             THE COURT:  North America I can understand, what's
14   the problem with North America?
15             MR. GIOIA:  I don't understand how he needs it to
16   be tailored so large as to encompass all of North America. I
17   feel like the United States, in and of itself, is sufficient
18   to get the information that he's seeking, if any.
19             THE COURT:  I think distributors in North America
20   is appropriate given the nature of the allegation, okay,
21   North America under a protective order.
22             All right, what's next?
23             MR. HUDSON:  Eighteen, Your Honor, it's the last
24   interrogatory.
25             THE COURT:  One second.  Provide the name, phone
```

1                                                              26

2   number and address of each blender, manufacturer, source or

3   producer, packager, and/or distributor of plaintiff's Bee-

4   Quick product. Well distributor we just covered in 2.  And,

5   okay, plaintiff objects to the information as not relevant

6   to the subject matter of the litigation.  All right, and why

7   is this relevant?

8           MR. HUDSON:  Your Honor, it also goes to the

9   supply, a supply issue. If Mr. Fischer wasn't able to get a

10  supply or wasn't placing the supplies with, you know,

11  presumably he has a manufacturer or a blender --

12          THE COURT:  Yeah, but then you'll get that from

13  the distributor.

14          MR. HUDSON:  But also, he claims that we make a

15  cheap knockoff product and so his allegation is we have a

16  cheap knockoff product, we can talk to the distributors and

17  talk to them about the product and then we can, you know, we

18  can, you know, after we know that then we can rebut his

19  allegation there's a cheap knockoff product.

20          THE COURT:  Is there a patent in issue here?

21          MR. HUDSON:  No, Your Honor, but I mean there's

22  some derogatory statements that he's making throughout his

23  complaints that, you know, now available to the public. I

24  mean knockoff is 20-something times --

25          THE COURT:  Well, I'm not sure how, you know,

27

1

2  let's assume plaintiff uses the Acme company to mix and

3  bottle his product, what do you do with that?  They use

4  Acme, so what?

5          MR. HUDSON:  So we can talk to Acme, one, and ask

6  them about orders placed, you know, what their supply is,

7  what their supply timing is, but also --

8          THE COURT:  What does that get you?

9          MR. HUDSON:  I think it goes back to our truth

10 defense.

11         THE COURT:  Well, no, if you're looking for the

12 reliability of plaintiff as a source of supply, I think you

13 get that information from the distributor. I mean even, you

14 know, look, who the manufacturer is does not tell you how

15 reliable plaintiff is in getting the product out to

16 distributors.  I mean maybe plaintiff has an inefficient

17 ordering system and maybe things are backlogged in

18 plaintiff's warehouse after he gets it from the compounder,

19 from the entity that manufactures it. I'm not sure what the

20 name of the entities that are involved in the manufacturing

21 of this get you? I don't think --

22         MR. HUDSON:  Well if they have an issue from their

23 supplier --

24         THE COURT:  I'm sorry?

25         MR. HUDSON:  Let's say it's basically a toll

1                                                        28

2  blender that is blending this formula for Fischer, if they

3  have an issue from their supplier, their chain supplier,

4  they can't get the product to Fischer, that basically --

5          THE COURT:  Yeah, you'll get that from the

6  distributor.  I mean if there's a downstream problem, you'll

7  get it from the distributor.  And conversely, I guess you

8  want to look at it from another side, I mean let's assume

9  Mr. Fischer has had these problems in the past, and he's got

10 a reserve that he maintains in his warehouse so that he can

11 maintain delivery from his suppliers, when his own suppliers

12 have production problems or something else.  I mean the

13 reliability of Mr. Fischer as a source of this you're going

14 to get from the distributors.

15         MR. HUDSON:  Unless we're the only distributor

16 during that time period.  And at that point we need

17 information about the toll blender about how fast they were

18 making, how fast they were able to produce it --

19         THE COURT:  No, but that still isn't going to tell

20 you how fast Mr. Fischer is getting it to you.

21         MR. HUDSON:  But that would be a reason why Mr.

22 Fischer couldn't get it to us.

23         THE COURT:  I think, if that's the theory of

24 relevance, I think you get what you need from the

25 distributors, I just don't see how this gets you the

29

1
2  reliability of Mr. Fischer as a source.

3         MR. HUDSON:  We'll stick with distributors for

4  now.

5         THE COURT:  You know, the other side of the coin

6  is, look, if, in terms of reliability of Mr. Fischer as a

7  source, it really doesn't matter whether there's good reason

8  or bad reason. I mean if he's getting it to the distributors

9  as they need it, he's reliable, if he's not, he's not

10 reliable.  Anything else you want to tell me on 18?  I asked

11 you a lot of questions, I interrupted you --

12        MR. HUDSON:  No, no, I mean we'll deal with the

13 distributors right now and if we can get the information out

14 of that then we'll stick with it.

15        THE COURT:  All right, so on 18 the objection is

16 sustained.  All right, any other interrogatories you want to

17 talk about?

18        MR. HUDSON:  No, Your Honor, that's it.

19        THE COURT:  Okay, document requests?

20        MR. HUDSON:  And document requests, I think we may

21 have accomplished 13.

22        THE COURT:  All right.

23        MR. HUDSON:  Your Honor, 21.

24        THE COURT:  Twenty-one, with respect to Fischer's

25 Bee-Quick, all documents and things identifying the amount

1     of product manufactured and shipped between January 1, 2009,

2

3     and January 1, 2014.  This appears to repeat the demand made

4     in item 18.  Let's see what 18 is.

5             MR. HUDSON:  I'll submit, Your Honor, 18 has

6     nothing to do with this.

7             MR. GIOIA:  I could admit that it's slightly

8     different but the demand, the objection still remains in.

9             THE COURT:  Well, your objection is relevance, Mr.

10     Gioia?

11             MR. GIOIA:  No, it's overbroad and it seeks

12     material that is not necessary to the litigation, how much

13     my client produced and shipped.

14             THE COURT:  Well what is your theory of relevance,

15     Mr. Hudson?

16             MR. HUDSON:  Again, I think it goes to the supply,

17     we're going to have a good timeline, we're going to have a

18     good chain of how much product was shipped between January,

19     2009, to January, 2015, that 4 year period where, you know,

20     presumably we're going to see, you know, there are time

21     periods where there was no product shipped. And I'll take,

22     because of our discussion, I'll take manufactured out of

23     there, we'll just talk about shipped.

24             THE COURT:  No, but in terms of, I mean, is the

25     market for this product, for Mr. Fischer's product seasonal?

1
2  I don't know anything about beekeeping, does it go up and
3  down with the --

4           MR. GIOIA:  Highly seasonal.

5           THE COURT:  It is seasonal. I guess, you know, the
6  question with reliability is are they meeting the
7  distributors' demands, are they meeting the distributor's,
8  the volume the distributors want?  And I'm not sure the raw
9  volume, the volume shipped tells you much in that regard.

10          MR. HUDSON:  I think it will, Your Honor, I think
11 it will tell us when, you know, when the shipments were
12 made. Like people placed orders, you know, Brushy Mountain
13 placed an order on X day, and, you know, nothing was
14 shipped, not only to Brushy Mountain, which we're going to
15 know that information, but shipped to any other distributors
16 or any other dealers during that time.

17          THE COURT:  Yeah, but why don't you get that from
18 the distributors? I mean I guess, you know, the problem I
19 have with the amount shipped is that it doesn't take into
20 account the amount ordered.  If, you know, in year 1
21 distributor X has ordered 1,000 units, and in year 2
22 distributor X orders 10 units, presumably plaintiff ships
23 1,000 in year 1 and 10 in year 2, the fact that it shipped,
24 you know, in each case it's met 100 percent of the
25 distributor's orders, but the raw volume doesn't tell you

anything about, the raw volume of the amount shipped does

not tell you whether they're meeting the distributor's

demands or not. And again, you'll get that, if you get the

names of the distributors and you take discovery from the

distributors, you will get much more probative evidence in

that regard I think.

MR. HUDSON:  We'll also have the evidence of we

know when Brushy Mountain placed the orders.

THE COURT:  Right.

MR. HUDSON:  And we're going to see the top, I

mean this was months --

THE COURT:  You already know Brushy Mountain.

MR. HUDSON:  Yeah, but we're going to have the

independent documentation from Fischer to back up my

client's testimony, that we place the order the next day --

THE COURT:  You want the numbers as to what

plaintiff shipped to Brushy Mountain?  I mean you want that

half, that half I don't think there's a problem with.

MR. HUDSON:  I mean the other information of the

other distributors, I know I can get it to the other

distributors, too, but this is going to make a determination

of which distributors I've got to go out and, you know,

travel across the country and depose.

THE COURT:  Well, you might start with a phone

```
 1                                                     33
 2   call to ask them whether they're happy or unhappy with Mr.
 3   Fischer's products before you decide to depose them.
 4             MR. HUDSON:  Right.
 5             THE COURT:  I would think you would.  Well let me
 6   turn to Mr. Gioia for a minute, I mean, Mr. Gioia, does your
 7   client ship in response to orders from distributors or does
 8   it work some other way?
 9             MR. GIOIA:  It's usually in terms of response,
10   correct?  He does it usually quarterly, usually on a
11   pattern, or based upon a response for a certain amount.
12             THE COURT:  Um-hmm.  Yeah, just the amount shipped
13   I don't think really tells you anything about whether
14   plaintiff is meeting the distributors' demands, or
15   requirements, or needs.  And that's the issue that you're
16   trying to illuminate.
17             MR. HUDSON:  Can we just limit it to Brushy
18   Mountain and I'll get the information from the dealers?
19             THE COURT:  All right, any objection to providing
20   documentation concerning shipments to Brushy Mountain?
21             MR. GIOIA:  No, that's relevant.
22             THE COURT:  I'm sorry?
23             MR. GIOIA:  That's relevant, yes, Your Honor.
24             THE COURT:  Okay.  All right, any other document
25   requests at issue?
```

```
 1                                                    34
 2            MR. HUDSON:  No, Your Honor, that's it.
 3            THE COURT:  Okay.  All right, Mr. Gioia, anything
 4  you want to discuss today?
 5            MR. GIOIA:  No, Your Honor, we hashed out most
 6  things. Thank you for being here on a Friday afternoon
 7  before Memorial Day weekend, that's about all.
 8            THE COURT:  I'm here every Friday afternoon,
 9  almost every Friday afternoon.
10            MR. HUDSON:  Thank you for your time, Your Honor.
11            THE COURT:  My pleasure.
12            MR. GIOIA:  Thank you, Your Honor.
13            THE COURT:  Have a good weekend.
14                 (Whereupon the matter is adjourned.)
15
16
17
18
19
20
21
22
23
24
25
```

35

<u>C E R T I F I C A T E</u>

I, Carole Ludwig, certify that the foregoing transcript of proceedings in the United States District Court, Southern District of New York, Fischer v. Forrest, Docket #14cv1304, was prepared using PC-based transcription software and is a true and accurate record of the proceedings.

Signature_____*Carole Ludwig*_____

Date:  January 31, 2017