# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| | **CIVIL ACTION NO.:** 14-CV-1304 |
| | 14-CV-1307 |
| JAMES H. FISCHER, | |
| Plaintiff, | |
| | **AFFIDAVIT OF SETH L. HUDSON** |
| v. | |
| STEPHEN T. FORREST, JR. | |
| SANDRA F. FORREST, | |
| SHANE R. GEBAUER, and BRUSHY | |
| MOUNTAIN BEE FARM, INC. | |
| Defendants. | |

1. I am over the age of eighteen (18) years, of sound mind, and competent to testify as to the matters contained herein.

2. I am a partner with the law firm of Clements Bernard Walker, PLLC. I am fully familiar with the facts set forth in this Declaration which I submit on behalf of my clients, Stephen T. Forrest, Jr., Sandra F. Forrest, Shane R. Gebauer, and Brushy Mountain Bee Farm, Inc.

3. Annexed hereto as Exhibit A are excerpts from the transcript of the deposition testimony given by James Hendon Fischer on February 15, 2017 in this action.

4. Annexed hereto as Exhibit B are excerpts from the transcript of the deposition testimony given by Shane R. Gebauer on December 16, 2016 in this action.

5. Annexed hereto as Exhibit C are excerpts from the transcript of the deposition testimony given by Sandra F. Forrest on February 10, 2017 in this action.

6. Annexed hereto as Exhibit D are excerpts from the transcript of the deposition testimony given by Stephen T. Forrest, Jr. on February 10, 2017 in this action.

7. Annexed hereto as Exhibit E is a true and accurate copy of excerpts from Fischer's discovery responses dated March 14, 2017.

8. Annexed hereto as Exhibit F is a true and accurate copy of an email from Plaintiff James Fischer to the undersigned dated July 21, 2015.

9. Exhibits 8, 10, and 13 of the attached Memorandum In Support of Summary Judgment are a true and accurate copy of the copyright deposit copy submitted by Mr. Fischer, including a pdf version of the submission for ease of viewing and submission to the Court.

I, under the penalty of perjury, hereby state that all statements and averments made herein are true and correct.

This the _17th_ day of April, 2017.

Seth L. Hudson

SWORN TO AND SUBSCRIBED before me this the _17_ day of April, 2017.

NOTARY PUBLIC

MY COMMISSION EXPIRES: _1/22/2022_

MARY CLAIRE LANE
NOTARY
PUBLIC
HAYWOOD COUNTY, NC

# Exhibit A

```
                    FISCHER              103
1
2    copyrighted works, plural, yes.
3               MR. HUDSON:  This will be 19.
4               (Whereupon, Bee-Quick brochure was
5        marked as Defendant's Exhibit 19 for
6        Identification.)
7        Q.     Mr. Fischer, I've placed in front of you
8    what's been marked Defendant's Exhibit 19 (handing).
9    We've been talking about a Bee-Quick trifold
10   brochure.
11              Is Defendant's Exhibit 19 a copy of that
12   brochure?
13       A.     This is different -- a different
14   version.  This is a derivative.
15       Q.     What do you mean it's a derivative?
16       A.     It's a derivative work.
17              MR. MICHELEN:  May I see?
18              THE WITNESS:  Notice the bullet points
19       there (handing), below the logo.
20       Q.     When you say bullet points -- I don't
21   see any bullet points, but I do see a number of
22   sentences.
23              MR. MICHELEN:  He means the bullet
24       points -- no bees are harmed -- do you see
25       those?
```

```
                    FISCHER              104
1
2               MR. HUDSON:  I see.
3        A.     Those are the dead giveaway, the bullet
4    points are different, and so is the text above them.
5        Q.     When would you have created Defendant's
6    Exhibit 19?
7        A.     Well, it purports to be 12/2000, but it
8    doesn't look like the 2000s.  The text is different.
9    So I don't know what the story is with this.  Where
10   did you get this?
11       Q.     What is different on the 2000 trifold
12   brochure that you recollect and the one you have
13   that's marked Defendant's Exhibit 19?
14       A.     Well, the whole front panel here is
15   different.  This would be the front, with the logo
16   (indicating).
17              MR. MICHELEN:  Let the record reflect
18       that he's done a trifold on Exhibit 19, and
19       he's referring to the right-hand column on the
20       front page.
21       A.     So everything below the logo is
22   different.  This may have been a draft copy.  I
23   don't know what it is, but it's not authentic.  It's
24   not the real McCoy.
25       Q.     I have something that might help you.
```

```
                    FISCHER              106
1
2        Q.     Okay.
3        A.     So someone was being asked to
4    participate in the wording of the brochure.
5        Q.     Let's look at the phrase, a natural,
6    non-toxic blend of oils and herbal extracts, okay?
7        A.     Yes.
8        Q.     Is Bee-Quick a natural product?
9        A.     Yes.
10       Q.     Is Bee-Quick non-toxic?
11       A.     Yes.
12       Q.     Does Bee-Quick contain oils?
13       A.     Yes.
14       Q.     Does Bee-Quick contain herbal extracts?
15       A.     Yes.
16       Q.     So is Bee-Quick a blend of oils and
17   herbal extracts?
18       A.     Yes.
19       Q.     So really, the phrase a natural,
20   non-toxic blend of oils and herbal extracts
21   describes the Bee-Quick product, correct?
22       A.     Yes.
23              MR. MICHELEN:  Note my objection.
24              But you can answer.
25       A.     Yeah.
```

```
                    FISCHER              107
1
2               MR. HUDSON:  Can you please state your
3    objection for the record?
4               MR. MICHELEN:  You're attempting to
5        phrase it as a legal conclusion of a lay
6        witness, but I'll allow him to answer.  It's a
7        form objection.
8               MR. HUDSON:  I just wanted to know so I
9        could rephrase the question.
10       Q.     Mr. Fischer, is Bee-Quick a natural,
11   non-toxic blend of oils and herbal extracts?
12       A.     Yes.
13       Q.     Can almond oil be used as a honey
14   harvesting aid?
15       A.     Well, there's multiple kinds of almond
16   oil, so I think you're trying to use a slang word to
17   describe a specific extracted form of what is
18   generically called almond oil.
19       Q.     Can any form of almond oil be used as a
20   honey harvesting aid?
21       A.     Almond oil is a slang term for something
22   that you could use in baking that if you used it in
23   sufficient concentration could repel bees, yes.
24       Q.     What is almond oil slang for?
25       A.     The specific chemistry would be a mix of
```

```
                    FISCHER                    109
1
2       A.    Yes.
3       Q.    Let's look at the phrase, a safe,
4  gentle, and pleasant way to harvest honey.
5             Is Bee-Quick safe to use?
6       A.    Yes.
7       Q.    Is it gentle on the bees?
8       A.    Yes.
9       Q.    Is it pleasant to use?
10      A.    I think so.
11      Q.    Does one use Bee-Quick to harvest honey?
12      A.    I'm sorry?
13      Q.    Does one use Bee-Quick to harvest honey?
14            MR. MICHELEN:  Is that what it's used
15  for?
16      A.    Does who?
17            MR. MICHELEN:  One.
18      A.    Oh, a third person, yes, yes, yes, okay.
19  He switched to the third person plural.
20      Q.    Sorry.  Let me ask a better question.
21            Does a beekeeper use Bee-Quick as a
22  honey harvester?
23      A.    Yes.  Okay.  I'm sorry, you just
24  switched tense there.
25      Q.    I'm sorry.
```

```
                    FISCHER                    119
1
2       Q.    I'm going to show you what's been marked
3  Defendant's Exhibit 24 (handing).
4             I think you'll agree with me that
5  appears to be John F. Kennedy?
6       A.    Yes.
7       Q.    Did you take that picture of John F.
8  Kennedy?
9       A.    Of course not.
10      Q.    Did you take the picture that's marked
11  Defendant's Exhibit 24?
12      A.    No.
13      Q.    I'm going to show you what's been marked
14  Defendant's Exhibit 25 (handing).
15            Did you take the picture that's shown on
16  Defendant's Exhibit 25?
17      A.    No.
18      Q.    Are you aware that on your February 7,
19  2011, submission to the Copyright Office, you
20  submitted a number of countries' flags?
21      A.    As I said, there were a number of things
22  that were included in error due to a tree selection
23  error in the backup, meaning in restoring the
24  backup.
25      Q.    Do you remember if your February 7,
```

```
                    FISCHER                    131
1
2       A.    Well, we've added over time, haven't we?
3  It's an ever-growing cast of thousands.
4       Q.    So is it your testimony here today that
5  any time you use Defendants, you may not mean every
6  single defendant in the case?
7             THE WITNESS:  I think we're getting into
8       that legal stuff, aren't we?
9             MR. MICHELEN:  At least ask him about
10      the one that he drafted.
11            MR. HUDSON:  I can ask him about this
12      one.  This is substantially similar to --
13      A.    It's basically the same thing.  We
14  picked up the language pretty much identical.  You
15  know, when I wrote this, yes, the only defendants
16  were Steve and Sandy.  When we added on Shane and
17  Brushy, I'm sorry, I did not put in asterisks and
18  stars and 27 photographs with the paragraphs and
19  pictures and arrows on the back indicating which --
20  you know, the whole Alice's Restaurant thing.  I
21  didn't do that.  Why?  Because I'm not a lawyer.  I
22  did the best I could.
23      Q.    You also alleged that all of the
24  defendants removed a copyright notice.
25      A.    Yes.
```

```
                    FISCHER                    132
1
2       Q.    What copyright notice?
3       A.    The copyright notice attached to the
4  materials that were sent to them.
5       Q.    What materials that were sent to them?
6       A.    Well, for example, you've provided a
7  couple of copies of the brochure, and they have
8  copyright notices on them, don't they?  And by
9  removing the copyright notice, they continued to use
10  the text without license.  License would be selling
11  the product.
12      Q.    Did the defendants make copies of your
13  brochures?
14      A.    They may have.  I don't know.  They may
15  have, because if they ran out, they may have found
16  it easier to just run them off on the Xerox machine
17  themselves than get more printed from me or from
18  Dadant.
19            MR. MICHELEN:  But that's not part of
20      the claim.
21            THE WITNESS:  No, that's not part of --
22      yeah, that's true.
23      Q.    Just to be clear, are you alleging that
24  the defendants copied any of your fliers without
25  copyright notices on them?
```

```
                    FISCHER              133
 1          MR. MICHELEN:  Did they copy your
 2     brochure without the copyright notice on it?
 3          A.    Without?  Did you say without the --
 4          Q.    Yes.
 5          A.    No, I'm not alleging that they ever made
 6     a copy of my brochure without the copyright notice.
 7     The only time they would have done that is when they
 8     were selling the product, and they wouldn't have
 9     bothered to remove the copyright notice then.
10          Q.    But you have alleged that they removed
11     the copyright notice.
12          A.    Yes, that's removal of the CMI.
13          Q.    On what?  I'm trying to get at -- I
14     don't understand what copyright notice they removed
15     if they didn't make a copy of the flier.
16          Q.    Why don't you go back to Engelmayer's
17     denial of the first motion to dismiss back in
18     January of 2015?  Because he explains it really well
19     there.  That's really a very succinct explanation,
20     and that explanation of how simply changing
21     Fischer's Bee-Quick to Natural Honey Harvester to
22     him is sufficient removal of CMI right there.  The
23     replacement of Fischer with Natural -- in other
24     words, the name Fischer in the text, he thought that
```

```
                    FISCHER              137
 2          Q.    So we have a clear record, how many
 3     sentences are you alleging that Brushy Mountain and
 4     the rest the defendants removed from your brochure?
 5          A.    Four.
 6          Q.    You mentioned earlier you're alleging
 7     that you had some photos that were embedded with
 8     metadata; is that correct?
 9          A.    Yes.
10          Q.    And is your allegation that Brushy
11     Mountain removed the metadata from these images?
12          A.    Yes.
13          Q.    How did they do that?
14          A.    Probably through copying it with a
15     program that doesn't -- doesn't copy over the
16     metadata, or erases it deliberately.
17          Q.    How did you determine that Brushy
18     Mountain removed the metadata?
19          A.    Because their JPEG contains zero
20     metadata.
21          Q.    And who at Brushy Mountain would have
22     removed the metadata? '
23          A.    Who?
24          Q.    Yes.
25          A.    I have no idea.  Shane was hired to be
```

```
                    FISCHER              138
 1     the big web expert, so the Forrests are denying
 2     doing anything technical in that regard.  So I guess
 3     we're left with Shane, because at that time, there
 4     was no one else to do that work.
 6          Q.    Are the photos of Bee-Quick that were
 7     contained on Brushy Mountain's website your photos?
 8          A.    Yes.
 9          Q.    Do you have any evidence that Shane
10     Gebauer removed the metadata from your photos?
11          A.    No, I have no evidence.  I only have
12     process of elimination.
13          Q.    Do you have any evidence that Steve
14     Forrest removed any metadata from your photos?
15          A.    Specifically with his own two hands, no.
16          Q.    Do you have any evidence that Sandra
17     Forrest removed any metadata from your photographs?
18          A.    No.  But it happened, and I'd like to
19     know who, if not them, authorized that.  Because
20     that's just as bad as doing it.
21          Q.    Do you have any evidence that Shane
22     Gebauer authorized the removal of the metadata?
23          A.    He claims he's CEO.  Before that, he was
24     general manager.  I don't think that anything
25     happened at that company that he didn't at least
```

```
                    FISCHER              140
 1     Do you have evidence?
 2          Q.    What evidence do you have that shows
 3     Shane Gebauer removed --
 4          MR. MICHELEN:  Just answer the question.
 5          Q.    -- metadata --
 6          A.    I have no such evidence.
 7          Q.    So we have a clear record, do you have
 8     any evidence that Shane Gebauer authorized anyone to
 9     remove the metadata from your photographs?
10          A.    No.
11          Q.    And I'm not sure if I asked this, so if
12     it's a repeat, I apologize.
13          A.    It's okay.
14          Q.    Do you have any evidence that Steve
15     Forrest authorized anybody to remove your metadata
16     from your photographs?
17          A.    Other than owning the company lock,
18     stock, and barrel at the time?  No.
19          Q.    Do you have any evidence that Sandy
20     Forrest authorized anybody to remove the metadata?
21          A.    Same answer as Steve.  Other than owning
22     the company, no.
23          Q.    Do you have any evidence that Shane
24     Gebauer removed your copyright notice?
```

FISCHER                          141

1
2    A.    We just talked about that, extensively.
3         MR. MICHELEN:  He asked about Steve and
4    Sandy.  I don't know if he asked specifically
5    about Shane.
6    A.    Yeah, you asked about Shane.
7    Q.    What was your answer?
8    A.    I said no.  There's no smoking gun here.
9    I don't have video.
10   Q.    Do you have any evidence that Shane
11   Gebauer ordered the verbatim display of your
12   copyrighted works?
13   A.    Well, once again, it's like who else
14   would give that order except one of those three.
15   But no, no specific e-mail, no specific phone call,
16   nothing.
17   Q.    Do you have any evidence whatsoever to
18   prove that Shane Gebauer ordered the verbatim
19   display of your copyrighted works?
20   A.    Pending deposing the entire staff that
21   reported to him, no.
22   Q.    Do you have any evidence that Steve
23   Forrest ordered the verbatim display of your
24   copyrighted works?
25   A.    No.

FISCHER                          142

1
2    Q.    Do you have any evidence that Sandra
3    Forrest ordered the verbatim display of your
4    copyrighted works?
5    A.    No.
6    Q.    Do you have any evidence that Shane
7    Gebauer oversaw, participated in the verbatim
8    display of your copyrighted works?
9    A.    Yes.
10   Q.    What evidence do you have?
11   A.    The sworn testimony of the Forrests
12   themselves in their deposition.
13   Q.    What did they say?
14   A.    They said that Shane did all the website
15   and catalog work starting from two years after his
16   hiring by the Forrests, which was 2007.  So
17   everything after 2009, the Forrests say Shane did,
18   or was at least in charge of and responsible for.
19   Q.    What evidence do you have that he
20   oversaw the verbatim display of the four sentences
21   you allege that the defendants infringed of your
22   copyrights?
23   A.    I just answered that question.  The
24   sworn statement of the Forrests.
25   Q.    Okay.  Other than the sworn statements

FISCHER                          143

1    that you allege the Forrests said, do you have any
2    evidence that Shane Gebauer oversaw or participated
3    in the verbatim display of your copyrighted works?
4    A.    Other than their sworn testimony?
5    Q.    Yes.
6    A.    No.
7    Q.    Do you have any evidence that Steve
8    Forrest oversaw or participated or approved in the
9    verbatim display of your copyrighted works?
10   A.    Other than his management of the
11   company, no.
12   Q.    Do you have any evidence that Sandra
13   Forrest oversaw, participated in, or approved of the
14   verbatim display of your copyrighted works?
15   A.    Other than her management of the
16   company, no.  Management and ownership, I should
17   add, for both Forrests.
18   Q.    What evidence do you have that Shane
19   Gebauer knew the copyright management information
20   had been removed from your photos or your text?
21   A.    Okay.  Wait a minute.  You're putting
22   that in the passive voice.  What evidence do I have
23   that Shane knew that it had been removed?
24   Q.    Yes.  Mr. Fischer, these are based on

FISCHER                          144

1    your allegations in your complaint.
2    A.    Well, Mr. Hudson, I have to say that he
3    knew because it happened.  So if it happened and he
4    didn't know -- if you're saying that this was an
5    inadvertent mistake, I don't know how such
6    inadvertent mistakes happen.
7    Q.    Again, what evidence do you have that
8    Shane Gebauer knew that your copyright management
9    information had been removed?
10   A.    I'm going to impute knowledge on the
11   results.  In other words, the fact that it was
12   removed means that he knew it happened.
13   Q.    Other than imputing knowledge to the
14   results, do you have any other evidence --
15   A.    None whatsoever.
16   Q.    Sir, let me finish.
17        Other than imputing evidence to the
18   results, do you have any evidence that Shane Gebauer
19   knew that copyright information had been removed?
20   A.    He was responsible for the website and
21   catalog at the time.  His responsibility, according
22   to the Forrests, was total.  Therefore, the buck
23   stops with Shane.  So he is responsible.  And if he
24   doesn't know, he should know, because it's his

FISCHER                    150

1   Bee-Quick, and they were buying what they thought
2   was the same product.
3       Q.    Has anybody told you that they thought
4   they were buying Fischer's Bee-Quick, but they'd get
5   Natural Honey Harvester?
6       A.    No specific individual, no.  But as a
7   matter of law, a holdover franchisee, if you will,
8   who continues to use the marks that he's no longer
9   authorized to use is counterfeiting.  So, you know,
10  it's the mere use of it that causes the actual
11  confusion.
12          MR. MICHELEN:  Just answer the question.
13      Q.    Are you aware of anybody who was
14  confused between Bee-Quick and Natural Honey
15  Harvester?
16      A.    Everyone who bought Natural Honey
17  Harvester.
18      Q.    Who?
19      A.    Everyone who --
20      Q.    Tell me their names.
21      A.    -- everyone who purchased it.
22      Q.    Tell me their names.
23      A.    Give me a customer list.
24      Q.    Do you know anybody's name who was
25

FISCHER                    151

1   confused between Bee-Quick and Natural Honey
2   Harvester?
3       A.    Not at this point, no.  Pending
4   discovery.
5       Q.    Are you alleging that any of the
6   defendants sold a product named Bee-Quick that they
7   did not purchase from you or from Dadant?
8       A.    No, I think they used my intellectual
9   property in the marketing of a different product,
10  Natural Honey Harvester.
11      Q.    Did they ever use your trademark in the
12  marketing of Natural Honey Harvester?
13      A.    Yes.
14      Q.    How?
15      A.    They put it on their web pages where
16  they were selling Natural Honey Harvester.
17      Q.    Where did they put it on their web
18  pages?
19      A.    On the visible area of the web page at
20  the top.
21      Q.    What is that called?
22      A.    It's the address bar.
23      Q.    Or the URL?
24      A.    Yeah.
25

FISCHER                    153

1   domain names?
2       A.    No, I'm a computer jerk.
3       Q.    Is Brushy Mountain in the business of
4   selling domain names?
5       A.    I don't know.
6       Q.    Do you have any reason to believe that
7   Brush Mountain is in the business of selling domain
8   names?
9       A.    No.  That's not gonna get you anywhere.
10          MR. MICHELEN:  Jim, don't talk until a
11      question is posed.
12          THE WITNESS:  I'm sorry.
13      Q.    Now, did Brushy Mountain, on their
14  website, use the same URL that they sold Bee-Quick
15  as they did when they switched over and started
16  selling Natural Honey Harvester?
17      A.    Yes.  They continued to use the same
18  URL, so the web page was at the same address, if you
19  will, the edited web page that sold Natural Honey
20  Harvester.  After a time, though, they changed that.
21  It was the other ancillary products that were left,
22  and left to this day at the same URLs.  The bundle
23  with the fume board and the -- the ten frame fume
24  board, the eight frame fume board, the images --
25

FISCHER                    170

1       Q.    Okay.
2       A.    And that was when we moved contract
3   bottlers.
4       Q.    How have you been damaged by Brushy
5   Mountain using the phrase, for years we have
6   promoted the use of a natural product to harvest
7   honey, but an unreliable supply of such a product
8   has forced us to come out with our own?
9       A.    Well, I listed for you a number of
10  competitors that have cropped up since then.  You --
11  I don't know how much you've talked with Greg.  Have
12  you talked with Greg very much about --
13          MR. MICHELEN:  Jim, answer the
14      questions.  Do not pose questions.
15          THE WITNESS:  Okay.
16          MR. MICHELEN:  How have you been
17      damaged?  That's the question.
18      A.    I have been damaged because by
19  besmirching my reputation in a disparaging manner in
20  their false advertising, they have prompted
21  opportunists to come along and make a knockoff just
22  like theirs.
23      Q.    Is Bee-Quick protected by a patent?
24      A.    No.
25

```
                    FISCHER              173
1
2   risk.
3        Q.      Are you aware -- let me ask the question
4   again.
5               Are you aware of any beekeeper that has
6   lost their organic certification by using Natural
7   Honey Harvester?
8        A.      No.  Because we were able to fix that
9   problem.  You're right.  No.  There was a risk of
10  it, yes.  There was a risk of it.  And actually,
11  that's what I alleged, was the risk of it, not
12  anyone actually losing it.  So if you're going to
13  ask me questions about what I said, ask about what I
14  freakin' said.  Don't read words into what I said.
15  Read what I said --
16              MR. MICHELEN:  He asked you a
17      question --
18              THE WITNESS:  No, he's pissing me off.
19              MR. MICHELEN:  Jim.  He asked you
20      whether you knew anybody who lost their organic
21      certification.  Whether that's what you said in
22      the complaint or not doesn't matter.
23              THE WITNESS:  He's playing with people's
24      livelihoods here --
25              MR. MICHELEN:  No, he's not playing with
```

```
                    FISCHER              176
1
2        A.      He runs the equipment.  It's his toy.  I
3   just pay him a fee to run the -- you know, they do
4   like commercial analysis.
5               THE WITNESS:  Is that my phone?
6               MR. MICHELEN:  Yes.  Can he take it?  Do
7       you want to take it?
8               THE WITNESS:  Yeah, all right.
9               (Whereupon, a recess was taken.)
10       A.      Do we want Hugh's last name?
11       Q.      If you could give me Hugh's last name, I
12  would appreciate it.
13       A.      I think it's Dannenhauer,
14  D-A-N-N-E-N-H-A-U-E-R.  I've got his number at home.
15  But I've used several commercial test labs.
16       Q.      Do you have a written contract with
17  Brushy Mountain Bee Farm?
18       A.      No, we've never had a written contract.
19  We drafted up agreements, if you will, or we made
20  agreements about various products at various times,
21  but concerning Bee-Quick, we had purchase orders.
22  That's it.
23       Q.      Did you ever have a written contract
24  with Brushy Mountain concerning Bee-Quick?
25       A.      Yes.  Purchase orders.
```

```
                    FISCHER              177
1
2        Q.      Other than purchase orders, did you have
3   a written agreement with Brushy Mountain regarding
4   Bee-Quick?
5        A.      Not to my knowledge.
6        Q.      Did you ever have any written agreement
7   with Steve Forrest regarding Bee-Quick?
8        A.      As an individual?
9        Q.      Yes.
10       A.      No.
11       Q.      Did you ever have any written agreement
12  with Shane Gebauer individually regarding Bee-Quick?
13       A.      No.
14       Q.      Did you ever have any written agreement
15  with Sandra Forrest individually regarding
16  Bee-Quick?
17       A.      No.
18       Q.      Do you have a written agreement with
19  Dadant?
20       A.      That would be proprietary.
21       Q.      I'm just asking yes or no, not the
22  content.
23              MR. MICHELEN:  Yes or no.  That's not
24      proprietary.
25              THE WITNESS:  The existence of an
```

```
                    FISCHER              183
1
2   read about the product.
3        Q.      And what years did you supply the
4   Bee-Quick brochures to Brushy Mountain?
5        A.      Initially, I think Dadant provided them
6   on my behalf to Brushy.  So when Brushy started to
7   buy direct, I believe at that point I was throwing
8   brochures in with cases of product that I would ship
9   them so that they would be resupplied.  Occasionally
10  they would run low and specifically ask for more
11  brochures.
12       Q.      Who would specifically ask for the
13  brochures?
14       A.      Random people.  I don't know.  It wasn't
15  a normal thing from Betsy, because she didn't, you
16  know, she didn't ship that.  That wasn't a salable
17  product.  So it would have been whoever was packing
18  for a show that would go oh, we need more brochures.
19       Q.      Did Steve ever request more brochures?
20       A.      I don't remember.  I mean, it could have
21  been.
22       Q.      Did Sandra Forrest request more
23  brochures?
24       A.      Sandy really didn't interact with me
25  that much.  So on all of your questions, I don't
```

```
                    FISCHER              184
1
2    believe Sandy and I ever really interacted anything
3    other than socially, really.
4         Q.      Did Shane Gebauer ask for any of your
5    Bee-Quick brochures?
6         A.      Probably when he was at Betterbee before
7    he was at Brushy, but I doubt it.  I think people
8    stopped using the brochures about, I don't know,
9    2008 or 9, because everybody knew what it was.  I
10   really don't know who might have been still putting
11   the brochures out.  You know, it was to introduce
12   the product.
13        Q.      When do you believe that Brushy Mountain
14   first got their shipment of the Bee-Quick brochures?
15               MR. MICHELEN:  I'm sorry.  For the first
16        time ever?
17               MR. HUDSON:  Yes.
18        A.      Well, the first time was -- I think I
19   handed that to Steve at that Tennessee beekeeper
20   meeting in 2000 when I first pitched him for the
21   product, and he said didn't have enough margin for
22   him.
23        Q.      Did you ever display the Bee-Quick
24   brochures at any type of beekeeping meetings or
25   beekeeping shows?
```

```
                    FISCHER              210
1
2    form of trademark infringement as described in the
3    trademark infringement statute, for the 97th time.
4         Q.      Are you aware that Shane Gebauer ordered
5    anyone to engage with trademark infringement?
6         A.      No.
7         Q.      Are you aware that Sandy Forrest, or
8    Sandra Forrest, ordered anyone to engage in
9    trademark infringement?
10        A.      No.
11        Q.      Do you have any evidence that Steve
12   Forrest ordered anyone to engage in trademark
13   infringement?
14        A.      No.
15        Q.      Do you have any proof or evidence that
16   Shane Gebauer participated in or approved of anyone
17   engaging in copyright infringement?
18        A.      I'm sorry.  He engaged in, approve --
19        Q.      Participated in and approved --
20        A.      Yeah.
21        Q.      -- in copyright infringement.
22        A.      I have the sworn statements of the
23   Forrests that Shane Gebauer is the only person who
24   was responsible for the website and the catalog from
25   what I guess to be 2009 forward, because they said
```

```
                    FISCHER              211
1
2    two years after he was hired.  So he was the
3    responsible party doing things at their behest as
4    owners, so he was the one either engaging or
5    approving of it, because they said he was
6    responsible for the publication of the items that
7    infringed.
8         Q.      Other than the testimony of the
9    Forrests, do you have any other evidence that Shane
10   Gebauer participated in and approved of any
11   copyright infringements?
12        A.      No.  Just the sworn statements of your
13   clients.
14        Q.      Do you have any proof that Sandra
15   Forrest participated in or approved of copyright
16   infringement?
17        A.      Only to the extent that she said that
18   she assisted Shane with some of the website and
19   catalog work after he took over doing it.  In other
20   words, even though he was still responsible, I think
21   she said that she worked with him on that
22   occasionally.
23        Q.      Do you have any other evidence?
24        A.      No.
25        Q.      Do you have any evidence that Steve
```

```
                    FISCHER              212
1
2    Forrest participated in or approved of copyright
3    infringement?
4         A.      Nothing other than his sworn testimony
5    to that effect.
6         Q.      You allege a bait and switch.
7         A.      No, I think that was the judge's phrase,
8    actually.
9         Q.      You put it in your complaint, bait and
10   switch.
11        A.      I think the judge said it first in 2015.
12   I don't think we put it in the complaint until after
13   he said it.
14        Q.      You still allege it.
15               So what do you mean by bait and switch?
16        A.      Bait and switch, that's what they did.
17   They misused the trademark to attract customers via
18   search engines, and by people that might have
19   bookmarked the page, and when they get there,
20   there's no Bee-Quick there, and all there is is
21   Natural Honey Harvester.  So by misusing the
22   trademarks and by misusing my surname as the address
23   of the page in the URL, they appear much higher.  I
24   mean, there's metadata, which we haven't really
25   looked at metadata because it doesn't really affect
```

```
                    FISCHER              213
1
2    search engines anymore, but URLs rank very high in
3    how pages appear in search results.  So that's the
4    bait and switch.
5         Q.    Are you aware of anybody who's been the
6    victim of a bait and switch by Brushy Mountain?
7         A.    Every single customer who bought Honey
8    Harvester.
9         Q.    Name names.
10        A.    Give me a customer list.
11        Q.    Are you aware of anybody today that you
12   can name their name that was the --
13        A.    No, you have not provided that
14   information, sir.
15        Q.    Please let me finish my question.
16             Are you aware of anybody, sitting here
17   today, by name, that was the victim of a bait and
18   switch with Brushy Mountain Bee Farm?
19        A.    There's no one sitting here that has
20   been a victim of the bait and switch --
21             MR. MICHELEN:  He said as you sit here
22   today --
23        A.    No, I don't know.  No.
24        Q.    So we have a clear record, can you tell
25   me the name of anybody who has been the victim of a
```

```
                    FISCHER              214
1
2    bait and switch scheme by Brushy Mountain Bee Farm?
3         A.    Not yet.
4              MR. HUDSON:  Can we take a couple-minute
5    break?
6              (Whereupon, a recess was taken.)
7              MR. HUDSON:  Mr. Fischer, thank you for
8    your time.  I don't have any other questions.
9              I will say on the record, what I am
10   doing is, all the exhibits that we have marked
11   today, I'm going to take the originals back
12   with me to Charlotte.  When I get back to
13   Charlotte, someone in my office is going to
14   copy all of them, and they will e-mail them or
15   e-mail a link to your counsel.
16             (Page break for jurat.)
17
18
19
20
21
22
23
24
25
```

# Exhibit B

Shane Gebauer (12/16/16)

Page 6

```
 1  A.  President.
 2  Q.  Of what entity?
 3  A.  Brushy Mountain Bee Farm.
 4  Q.  Now, when for the first time did you begin to have any
 5      involvement with Brushy Mountain Bee Farm?
 6  A.  I became employed with them about nine or ten years
 7      ago.  2007.
 8  Q.  And where were you employed previously?
 9  A.  Betterbee.
10  Q.  And what is Betterbee?
11  A.  It is a bee supply company.
12  Q.  Where are they located?
13  A.  Greenwich, New York.
14  Q.  And what was your title at Betterbee when you left and
15      joined Brushy?
16  A.  General manager.
17  Q.  For how long were you general manager of the
18      Betterbee?
19  A.  It was about four years.
20  Q.  Was that also when you began with the company?  Did
21      you start as general manager or did you start at a
22      different position?
23  A.  I started out just helping on weekends.
24  Q.  When was that?  What year was that?
25  A.  That was just a few months prior to me coming on as
```

Shane Gebauer (12/16/16)

Page 39

```
 1           MR. HUDSON:  Objection to the form.
 2  A.  I don't know what you mean.
 3  Q.  Well, when did you first become aware that there was a
 4      lack of availability for Bee-Quick?
 5  A.  When I started with Brushy.
 6  Q.  What were the circumstances?  What would happen, that
 7      you can't recall?
 8  A.  We couldn't get the product.
 9  Q.  You would run out of stock that you had purchased and
10      reorder, for example?
11  A.  Yes.
12  Q.  And it wouldn't come in time to fulfill orders?
13  A.  Correct.
14  Q.  How would you communicate this to Mr. Fischer, if at
15      all?
16  A.  I would -- it was our purchasing agent that largely
17      communicated.
18  Q.  And who was the purchasing agent when you first
19      started there?
20  A.  Betsy Brey.
21  Q.  Can you spell the last name for the reporter?
22  A.  I'm sorry?  The last name?
23  Q.  Spell her last name for the reporter, please.
24  A.  B-R-E-Y.
25  Q.  Is Ms. Brey still employed by Brushy Mountain?
```

Shane Gebauer (12/16/16)

Page 52

```
 1      Bee-Quick?
 2           MR. HUDSON:  Objection to the form.
 3  A.  I'm not sure I understand your question.
 4  Q.  Well, earlier you mentioned that there was some issues
 5      with availability.  Is that correct?
 6  A.  Availability of Bee-Quick.
 7  Q.  Correct.  Yes.  What I'm asking you is is this e-mail
 8      here dated December 10, 2010, related to that
 9      unavailability that you were talking about before?
10  A.  It doesn't specifically mention that but it sort of
11      implies that, yes.
12  Q.  And the Steve there where it says, "Per Steve and
13      Shane," that refers to Steve Forrest.  Is that
14      correct, to your knowledge?
15  A.  Yes.
16  Q.  And this is from Betsy.  That would be Betsy Brey that
17      we spoke about earlier?
18  A.  Correct.
19  Q.  Okay.  So now, if you could take a look, let's
20      take -- let's just do 008, Seth, as Exhibit 3.
21           MR. HUDSON:  It's marked and Shane has
22      it.
23  Q.  Take a look at that.  Do you recognize that exhibit,
24      Mr. Gabauer?
25  A.  What do you mean?
```

Shane Gebauer (12/16/16)

Page 54

```
 1  Q.  And in what way?
 2  A.  Applied to a fume board, piece of equipment which is
 3      then applied to the hive.
 4  Q.  And what would be the result of doing that?
 5  A.  Under proper conditions, the bees would vacate the
 6      equipment.
 7  Q.  And that would allow the beekeeper to collect the
 8      honey without having the hive full of bees?
 9  A.  With less bees, yes.
10  Q.  Now, did you ever personally use Bee-Quick?
11  A.  Probably.
12  Q.  Now, did Brushy Mountain Bee Farm develop Natural
13      Honey Harvester to be a replacement of Bee-Quick?
14  A.  I'm not sure what you mean by develop.
15  Q.  Well, did you guys decide to start selling Natural
16      Honey Harvester to compete with Bee-Quick?
17  A.  We started selling Natural Honey Harvester to offer a
18      product that wasn't available.
19  Q.  And why wasn't it available?
20  A.  We couldn't get it.
21  Q.  By that you mean your reference to Bee-Quick?
22  A.  Correct.
23  Q.  Okay.  So Natural Honey Harvester, the idea was that
24      it would do basically the same thing that Bee-Quick
25      would do?
```

Shane Gebauer (12/16/16)

Page 55

```
 1   A.  It would vacate the supers -- it would vacate the bees
 2       from the equipment, yes.
 3   Q.  Spray it on a fume pad?
 4   A.  Yes.
 5   Q.  Who decided to start distributing that product?
 6   A.  I honestly don't recall.
 7   Q.  Did you have a role in that decision?
 8   A.  I'm sure it was a collaborative conversation.
 9   Q.  And who decided to call it Natural Honey Harvester?
10   A.  I believe that was Steve.
11   Q.  Forrest?
12   A.  Yes.
13   Q.  And did Brushy Mountain Bee Farm, Inc. develop the
14       product itself that it actually created?
15   A.  No.
16   Q.  So -- who, back when it first began being
17       manufactured, who actually created the product?
18   A.  I don't recall.  It was in existence, so I don't know
19       who created it.
20   Q.  When you came on board in '07, it was in existence?
21   A.  No.
22   Q.  I'm sorry.  In 2011, when you first started making it,
23       it was already in existence?
24   A.  My recollection, it was a product that was already in
25       existence, yes.
```

# Exhibit C

Sandra Forrest (2/10/17)

Page 8

1  Q.  Now, this product basically competed with another
2      called Bee-Go; correct?
3  A.  That's true, yes.
4  Q.  And when you first started to carry the -- Fischer's
5      Bee-Quick product, did Mr. Fischer provide you with
6      any brochures, fliers, material to show how he had
7      sold and marketed in his product beforehand?
8          MR. HUDSON:  You cut up there, Oscar.
9  Q.  Before you first started carrying Fischer's Bee-Quick
10     in your catalog, did Mr. Fischer provide you with any
11     brochures or fliers -- or distribute Bee-Quick?
12 A.  He provided brochures as a table display when we set
13     up the Bee-Quick at shows.
14 Q.  But I meant before, in other words, now you're going
15     to carry his product in the catalog.  Did he ever say
16     to you, hey, here's how I describe it so you could use
17     that language for your catalog?
18 A.  No.  He may have given us some points of sale, but I
19     wrote the description as I did with 95 percent of the
20     products in our catalog.
21 Q.  So you wrote the phrase, "Are you tired of your spouse
22     making you sleep in the garage"?
23 A.  Yes.
24 Q.  And you wrote the phrase, "Are you tired of using a
25     hazardous product on the bees you love"?

Sandra Forrest (2/10/17)

Page 9

1  A.  I think so.  I'm not sure about that one.  But I'm
2      definitely sure about the husband thing because I
3      discussed that with many women at the bee shows.
4  Q.  When you mean many women, you mean you discussed the
5      problems with Bee-Go?
6  A.  Right.
7  Q.  And, by the way, if I told you the first year you
8      started carrying Bee-Quick in your catalog was 2002,
9      would that sound about right?
10 A.  I didn't know we had sold it that long, but, you know,
11     time flies by, so I don't know.
12 Q.  Okay.  What about the phrase "Fischer's Bee-Quick is a
13     safe, gentle, and pleasant way to harvest your honey,"
14     is that your authorship?
15 A.  That's kind of general, so I don't -- I don't
16     really -- I don't know.
17 Q.  Well, I mean, did you write it all -- I would imagine
18     you wrote the content all at once, right, it wasn't in
19     various pieces?
20 A.  Well, no, but I -- so, I guess I did.  But I don't --
21     I remember the phrase about the other thing because,
22     like I said, because of the conversations I had with
23     customers.  The other is just kind of a general thing
24     about the product.  So --
25 Q.  So you don't have an independent recollection of

Sandra Forrest (2/10/17)

Page 17

1  A.  That wasn't my job.
2  Q.  Did you ever exchange any e-mails with him, to your
3      recollection, about that?
4  A.  No, I did not.
5  Q.  Now, when Shane came onto the company, did you
6      continue to work with him to, you know, work on the
7      catalog and the website together?
8  A.  I worked for two years after -- on and off on a
9      part-time kind of basis after Shane came.
10 Q.  You told us you started kind of reducing your duties
11     at that point; correct?
12 A.  That's right, yes.
13 Q.  Okay.  But whatever duties that you did continue to
14     have, were they still related mostly to the catalog
15     and the website?
16 A.  No, they weren't.  I supervised the construction of a
17     new building that we put on the place, a new addition,
18     and I took minutes at our weekly staff meeting.  And
19     that's how I heard about the problem with Fischer.
20 Q.  So then your previous duties related to the catalog
21     and the website were transferred over to Shane; is
22     that fair to say?
23 A.  That's right because he had the most computer
24     experience and we were moving in that direction and I
25     didn't know anything about it.

# Exhibit D

Stephen Forrest (2/10/17)

Page 16

1  but -- but not really.
2  Q. Now, what was it?  Can you describe it?
3  A. It was dated 10/10/12 and it had like three columns on
4     it.  But, like I said, you've got a copy of it, so --
5           MR. MICHELEN:  Mr. Hudson, do you have
6        Exhibit 1 from Mr. Gebauer's deposition there
7        with you?
8           MR. HUDSON:  Yeah, I've got it.  I'll
9        put it in front of the witness.
10 Q. So this document, Mr. Forrest, has previously been
11    marked as Exhibit 1 at the deposition of Shane Gebauer
12    on December 16 of last year.  Take a look at that.  Is
13    that the piece of paper you're talking about?
14 A. No, sir.
15 Q. Okay.  So you're talking about a piece of paper with
16    three columns on it?
17 A. Yes, sir.
18 Q. Now, did that piece of paper, to your recollection,
19    include a product description?
20 A. You know, I went to my file, I pulled it out, I gave
21    it to Seth.  I'm not sure.
22 Q. Now, I'll ask you about this phrase, "Are you tired of
23    your spouse making you sleep in the garage," does that
24    phrase sound familiar to you?
25 A. Oh, yes, sir, I remember when we came up with it.

Stephen Forrest (2/10/17)

Page 17

1  Q. So that's something you came up with?
2  A. Yes, sir.
3  Q. And when did you come up with that?
4  A. You know, to be honest with you, when we were coming
5     up here today, I couldn't remember if it was room 200
6     or room 300.  I just don't have much of a memory at
7     all.  But you can look in our catalogs and when we
8     first put it in our catalog is when we came up with
9     it.  And I can tell you how we came about it too.  We
10    had a woman come up to us and we were talking about --
11    we were trying to sell Fischer's product and we were
12    telling this woman about Bee-Go and how bad it was.
13    And she said -- she said I -- she said, "That's he go.
14    When my husband uses that, he goes and he stays in the
15    garage."  And that's how we came up with that.
16 Q. And you decided to use that as a description for
17    Fischer's Bee-Quick?
18 A. Yes, sir.  You can look through our catalog through
19    all the years and through our ads and you'll see that
20    we've always talked badly about Bee-Go.  The first
21    customer that I had take Bee-Go had bees in the wall
22    of his house and he put Bee-Go in there to run them
23    out, which it didn't work, and they ended up selling
24    their house.  You cannot imagine how horrible this
25    stuff smells.

Stephen Forrest (2/10/17)

Page 19

1     hazardous product of the bees you love," did you write
2     that?
3  A. I'm not sure.
4  Q. And by you, I mean you or Sandy.
5  A. Well, we worked together as a team doing it.  And, I'm
6     sorry, I just can't remember.  I would think so
7     because we were always going after natural products as
8     hard as we could go, which is why we picked up
9     Fischer's product.  We believed that chemicals should
10    stay out of the hives and they shouldn't put on there
11    and that's why we were looking for those.
12 Q. Right.  That's why the other -- another phrase that
13    was in the catalog was a natural nontoxic blend of
14    oils and herbal extracts; correct?
15 A. Again, I'm sorry.  When -- I'm sorry, I can't tell you
16    how we came up with that.  But that woman came to me
17    and I thought it was so clever about he go, I do
18    remember that we did that.
19 Q. Now, when you started carrying Fischer's Bee-Quick, do
20    you recall what year that was?
21 A. No, sir.
22 Q. Am I correct that you carried it continuously up until
23    around the time of the lawsuit?
24 A. Oh, no.  We couldn't get it for -- I don't remember
25    how long it was, you know, he wouldn't supply us with

Stephen Forrest (2/10/17)

Page 20

1     it and it put us in a terrible shape.  I don't
2     remember how many months it was.  I know Shane would
3     have a much better touch on that.  But once we ran out
4     of it, we never sold it after that.
5  Q. And do you remember what year that was?
6  A. No, sir.
7  Q. Now, by the way, did you -- when you would distribute,
8     you know, products, whether they were sold online or
9     sold at your farm -- withdrawn.
10       Whenever you sold a product that you shipped,
11    and by that I mean it was sold online or sold through
12    the mail through your catalog, would you include the
13    current year's -- the most current catalog?
14 A. It stopped you again.  You'll have to repeat it.
15 Q. Would you include the company's current annual catalog
16    with every shipment that you sent out to new
17    customers?
18 A. We did some years and some years we didn't.  I'm not
19    sure what period you're talking about.  You know, we
20    did some years and I don't -- you know, I never really
21    wanted to do it, but some years we did and some years
22    we didn't.
23 Q. Well, let's say from 20 -- 2009, let's say, to 2013,
24    did you include an annual catalog when you shipped
25    products to customers through the mail?

Stephen Forrest (2/10/17)

Page 22

```
1    Midstates did it for us.  But after -- after Shane
2    took it over, I have no idea about any of that.
3  Q.  When did Shane get involved?
4  A.  I'm sorry, I --
5  Q.  I said before Shane got involved, you already had a
6    website; correct?
7  A.  We did.
8  Q.  And before Shane got involved, who was predominantly
9    in charge of the content for the website?
10 A.  Sandy and myself were involved in the content and she
11   worked with the webmaster.
12 Q.  Right, to do the physical changes to the website?
13 A.  Right.  Now, Sandy would have a better handle on this
14   but -- I'm a very low-tech redneck, you know, so I try
15   not to, you know --
16 Q.  Okay.  Now, let's go to the point where you stated
17   there was some issues with the supply of Fischer's
18   Bee-Quick.  Can you talk about that?  When did that
19   first arise?
20 A.  I can't tell you when it was and I can't tell you how
21   long it was, but it was a terrible thing.  It was
22   months and I just don't remember how many it was.  And
23   I do remember seeing Jim at a bee meeting and he told
24   me that his problem was bottling the stuff and I told
25   him that if he would send it to us, we would bottle it
```

Stephen Forrest (2/10/17)

Page 23

```
1    for him, and he never did any of that.  It was a
2    horrible thing because when people want to take their
3    honey off, if they don't take it off, the bees mess it
4    up.  So when they need it, they need it, and we
5    couldn't get it.  I wish I could remember how many
6    months it was, but I can't.  It was -- I think it was
7    more than six months.  I don't know.
8  Q.  So was that --
9  A.  I don't know though, I'm sorry.
10 Q.  So it was for about a six-month period where he did
11   not supply new products?
12 A.  I'm sorry, I just don't know.  And we wrote him and
13   wrote him and wrote him and begged him and begged him
14   and we never would get it for a long period of time.
15 Q.  Okay.  Did he ever offer an explanation other than,
16   you know, he was having trouble bottling it?
17 A.  That was when I saw him face to face at a bee meeting
18   together and I don't remember when that was.  I don't
19   know who, you know, the excuses that he made.  I think
20   you've got all of Shane's e-mails so there's so many
21   of them, but I had no contact with him at all.
22 Q.  Okay.  Now, let's go to the point where Shane Gebauer
23   joins the company.  When was that?
24 A.  I'm not sure.
25 Q.  Well, let's do it in terms of --
```

Stephen Forrest (2/10/17)

Page 26

```
1    more and more and more.  I just -- I'm sorry, I just
2    can't tell you.
3  Q.  Was one of those responsibilities revealing the
4    content of the catalog?
5  A.  Well, when Shane came, for the first two years I held
6    his hand and sat down with him and went through the
7    catalogs, went through the copy, went through the
8    pricing, went through the wholesale pricing.  And
9    after two years, I didn't do it anymore.  I wanted to
10   get out of it.  I didn't enjoy doing the -- excuse me?
11 Q.  No, please finish your answer.
12 A.  After I had been through the catalog with him and
13   worked on the catalog for two years, it was totally
14   his baby.
15 Q.  Because you thought at that point he had been
16   comfortable learning the nature of the operation?
17      MR. HUDSON:  Objection to form.
18 A.  As I said, he was from a competing company and I
19   thought the catalog was better and the company was
20   coming up.  I thought he was -- you know, that's why
21   we hired him, was to improve our business, which he
22   the.
23 Q.  And the same with the website?
24 A.  He --
25 Q.  Actually took over the content and the development of
```

Stephen Forrest (2/10/17)

Page 27

```
1    the website?
2  A.  Totally.  When he was at Betterbee, they -- the
3    software that they were using up there had a website
4    that was tied to it.  And when he came down, he took
5    that over and he was in charge of all of that.  He did
6    the website completely.
7  Q.  And if I use the word SiteLink, S-i-t-e-L-i-n-k, would
8    that refresh you as to the website platform you're
9    talking about?
10 A.  That is the website platform, I believe.  Let me
11   reiterate, you know, I just -- I am very low-tech and
12   he handled every bit of this.
13 Q.  So at some point as part of the agreement with Brushy
14   Mountain, Shane began getting equity in the company;
15   correct?
16 A.  That's correct.  I'm sure Shane could look at the
17   stock certificates that we gave him and tell you
18   exactly when that was.
19 Q.  So whenever he would get any part of the company, it
20   would be done through an issuance of a stock
21   certificate?
22 A.  That's correct.
23 Q.  And those were stock certificates that were previously
24   in either yours or in Mrs. Forrest's name?
25 A.  That's correct.
```

1  A.  You got Skyped and I missed the question.

2  Q.  Did the Brushy Mountain catalog ever carry Natural

3      Honey Harvester before this issue with Bee-Quick?

4          MR. HUDSON:  Objection to form.

5  A.  Absolutely not.

6  Q.  Now, when you acquired the product, did the vendor

7      send you a product description or did you write the

8      product description yourself or something else?

9  A.  Shane wrote the product description himself.

10  Q.  Now -- and that was a product description that was

11     used in the catalog for Natural Honey Harvester?

12  A.  Yes.

13  Q.  Are you aware that you continued to use the are you

14     tired of your spouse, you know, sleeping in the garage

15     language for that?

16  A.  I was so glad to get out of the catalog, no, I

17     never -- you know, I didn't -- there's so much copy,

18     you know, there's so many pages and so much copy,

19     that, no, I didn't know that.

20  Q.  So what about the text that actually appears on the

21     label of Natural Honey Harvester, does that come from

22     the vendor or company created itself?

23          MR. HUDSON:  Objection to form.

24  A.  Shane created it.

25  Q.  And so is that -- is Natural Honey Harvester something

# Exhibit E

Defendant, as direct competitor of Plaintiff, seeks to harass and/or undermine Plaintiff's proprietary interest.  However, Plaintiffs' Marks were on all the goods sold by Plaintiff. The marks were also displayed on Plaintiff's website as deposited with the Copyright office. The marks were used since the date listed as first use in commerce on Plaintiff's trademark application and registration as exhibited in Plaintiff's complaint. Plaintiff's mark was regularly advertised in Bee Culture magazine, the American Bee Journal, Defendant's catalog, and Plaintiff's website.

8.      Identify any instances of actual confusion involving Plaintiff's Mark and goods or services provided by the Forrests.

**Answer**:      Each and every sale of Defendants' "Natural Honey Harvester" product is a case of actual confusion.  The action brought by Plaintiff is for Trademark Counterfeiting, not Trademark Infringement.  In counterfeiting actions it is unnecessary to perform an in-depth, step-by-step examination of the likelihood of confusion because "counterfeit marks are inherently confusing".  *Philip Morris USA Inc. v. Felizardo*, No. 03 Civ. 5891, 2004 WL 1375277, at *5 (S.D.N.Y. June 18, 2004). In any event, and over objection, Plaintiff is unaware of any instance of actual consumer confusion.

Defendants' own website comments show actual confusion – see attached clip from "customer reviews and ratings" of Natural Honey Harvester at end of this document.

9.      Identify the individual(s) who participated in the conception, selection, and adoption of Plaintiff's Registered Trademark, describing in detail the role or participation of each such individual in such activity.

**Answer**:      Plaintiff is the sole participant in the conception, selection and adoption of Plaintiff's Registered Trademark.

10.      State when and how you first became aware that the Defendants were allegedly infringing your alleged copyrights.

**Answer**:      Defendants mailed their 2011 catalog in March containing the infringement of Plaintiff's Registered Copyrighted Works.  A subsequent review of Defendants' website revealed the addition infringement on Defendant's website of both Plaintiff's Registered Copyrighted Works and Registered Trademark. That is when Plaintiff first became aware of Defendants' infringing use of Plaintiff's intellectual property.

11.      Please provide an accounting of all damages you are seeking from Defendants, including a calculation and explanation of each of said damage categories and amounts for each cause of action alleged in your Second Amended Complaint.

**Answer**:      See Rule 26(a) Disclosure. Plaintiff seeks only statutory damages.

★ ★ ★ ★ ☆               **bees really love this stuff**

I tried harvesting with this was very disappointed. I sprayed the fume board and placed it on the super. After a few minutes I checked and the super was still full of bees. So I smoked it heavily and put the inner cover and top back on and went to the next hive. On this one I really soaked the fume board and placed it on the super. After waiting about 5 minutes, I lifted the fume board and it was completely covered in bees as well as the super. The bees stayed on the soaked fume board until I brushed them off. I just gave up on this and went to the house. My suit was covered in bees by then so I sprayed them directly with the stuff and they refused to fly off. It was as if I had sprayed sugar water on them. The first bottle I bought last year worked well but this new stuff was a complete waste of time and money.

*- Charles Gardner, SC*

**Customer Comment showing that Brushy's "new stuff" was confused with Fischer's Bee-Quick**
**This is clear and compelling evidence of "actual confusion", not that we need to prove it**

# Exhibit F

## Seth L. Hudson

| | |
|---|---|
| From: | James Fischer <james.fischer@gmail.com> |
| Sent: | Tuesday, July 21, 2015 8:18 PM |
| To: | Teresa Bush-Dugar |
| Cc: | Seth L. Hudson |
| Subject: | RE: Fischer v. Forrest (14-CV-1304); (14-CV-1307) |

Seth:

I'm sorry, I am out of the county until at least August 2nd, so I simply cannot accept a "7 day" deadline. I brought nothing "legal" with me on this trip.

To more clearly address several points at first reading, your clients have not been sued for trademark infringement, they have been sued for trademark Counterfeiting. I can't imagine how there might be a misunderstanding on this point, and while I understand that you wish to defend this as if it were a trademark infringement case, the defenses available to you are more limited when your clients counterfeit a trademark and even more limited when your clients profitably used the trademark as an authorized dealer for the product for eight years. This is the basis for our difference of opinion on what is relevant.

I have not yet sent you my own requests for document production as the needs of my elderly parents have taken priority over everything else for the past 60 days. I ask for patience on both my answers to your requests, and my own requests for your clients.

In regard to your claims about what might be or might have been "common knowledge" in the beekeeping industry, please understand that the false advertising claim extends beyond the false "unreliable supply" statement to include multiple other false statements made by the Defendants both in print catalogs and on the Defendants' website.

I hope this suffices for the present, as it is about the best I can do until I get back to the USA.

   Jim

From: Teresa Bush-Dugar [mailto:tbushdugar@worldpatents.com]
Sent: Tuesday, July 21, 2015 4:06 PM
To: james.fischer@gmail.com
Cc: Daniel Cahn; Seth L. Hudson
Subject: Fischer v. Forrest (14-CV-1304); (14-CV-1307)

Re:   Fischer v. Forrest
      Case Nos. 14-CV-1304 and 14-CV-1307

Dear Mr. Fischer:

Attached, please find a letter as executed by Seth Hudson for the above-identified matters. A copy was also mailed to you today.

1

Please do not hesitate to contact us if you have any questions.

Best Regards,


Teresa Bush-Dugar
Paralegal



1901 Roxborough Road, Suite 250
Charlotte, NC 28211 USA
(t) 704.790.3600
(f) 704.366.9744
tbushdugar@worldpatents.com

Notice: This electronic communication may contain information that is privileged, confidential, proprietary, and/or otherwise legally protected and/or exempt from disclosure. If you are not the intended recipient of this electronic communication, you are not authorized to receive, read, retain, print, copy, and/or disseminate this electronic communication and/or any attachments that it may contain. If you have received this electronic communication in error, please delete it and any attachments that it may contain and notify the sender immediately.