# EXHIBIT D

# Excerpts From Defendant Sandra Forrest's Deposition

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JAMES H. FISCHER,                )   Case No.
                                 )   CV 14-1304
         Plaintiff,              )   CV 14-1307
                                 )
   v.                            )
                                 )
STEPHEN T. FORREST, JR.,         )
SANDRA F. FORREST, SHANE R.      )
GEBAUER and BRUSHY MOUNTAIN      )
BEE FARM, INC.,                  )
                                 )
         Defendants.             )
                                 )

---

DEPOSITION

OF

SANDRA F. FORREST

Taken at:

Your Office
15720 Brixham Hill Avenue, Suite 300
Charlotte, North Carolina

On Friday, February 10, 2017

REPORTER:   CHRISTINE A. TAYLOR, RPR
            Notary Public

Sandra Forrest (2/10/17)

Page 2

A P P E A R I N G

For the Plaintiff:   Oscar Michelen, Esq.
(via Skype)          Cuomo, LLC
                     200 Old Country Road
                     Suite 2 South
                     Mineola, New York  11501
                     516.741.3222
                     omichelen@cuomollc.com

For the Defendants:  Seth L. Hudson, Esq.
                     Clements Bernard Walker, PLLC
                     4500 Cameron Valley Parkway
                     Suite 350
                     Charlotte, North Carolina  28211
                     704.790.3600
                     shudson@worldpatents.com

Also Present:        Stephen Forrest, Jr.


* * * * * * * *


I N D E X

                                                    PAGE
EXAMINATION BY MR. MICHELEN                          3


E X H I B I T S




(No exhibits were identified.)

Sandra Forrest (2/10/17)

Page 3

1       Pursuant to Notice in the aforementioned matter
2   and in accordance with the Federal Rules of Civil
3   Procedure, this deposition of SANDRA F. FORREST was taken
4   by plaintiff beginning at 11:06 a.m. on February 10, 2017
5   before CHRISTINE A. TAYLOR, Registered Professional
6   Reporter and Notary Public.
7       SANDRA F. FORREST, called as a witness and upon
8   first being duly sworn, testified as follows:
9           EXAMINATION BY MR. MICHELEN
10  Q.  Good morning, Mrs. Forrest.
11  A.  Good morning.
12  Q.  My name is Oscar Michelen.  As you heard, I represent
13      Jim Fischer in this lawsuit.  Now, am I correct that
14      you were in the room for your husband's deposition;
15      correct?
16  A.  Yes.
17  Q.  So it's going to go in a similar fashion, probably
18      less questions.  But, in any event, please wait until
19      my question is completed before you begin your answer.
20      If you need to take a break, you let us know.  If you
21      don't understand the question, I'll read it back to
22      you or have the reporter read it back to you; is that
23      all right?
24  A.  That's fine.
25  Q.  Please keep your voice up as well, so we can hear you

Sandra Forrest (2/10/17)

Page 4

```
 1        loud and clear.
 2    A.  Okay.
 3    Q.  And you understand that the answers to these questions
 4        are the same as if you were giving them in a trial in
 5        front of a judge or a jury?
 6    A.  I do.
 7    Q.  Now, have you ever been deposed before, Mrs. Forrest,
 8        ever given a deposition before?
 9    A.  No.
10    Q.  So, again, if you ever need a break at any time, as
11        long as there's no open question, you just let us know
12        and we'll give you as many breaks as you need, even to
13        speak to Mr. Hudson.  Okay?
14    A.  Okay.
15    Q.  Now, prior to coming to the deposition today, did you
16        review any documents?
17    A.  No, not really.
18    Q.  And when for the first time did you learn that you
19        were subject of a lawsuit by Mr. Fischer?
20    A.  I don't really know the exact date, you know, it was a
21        year or so ago, I guess.  I don't -- I don't know.  I
22        don't have an exact date.
23    Q.  Now, are you presently employed?
24    A.  No.
25    Q.  And when was the last time that you were employed?
```

Sandra Forrest (2/10/17)

Page 5

1  A. Well, I had started reducing my duties and moving out
2     of the business about a year-and-a-half or two years
3     before we sold it. So --
4  Q. So somewhere around 2012?
5  A. Yes. I was reducing my duties by then, so yes.
6  Q. So let's go back to, let's say, the four years before
7     then, from let's say '08 to 2012. What was your
8     general responsibilities -- withdrawn. Were you
9     employed by Brushy Mountain Bee Farm, Inc. at that
10    time?
11 A. Yes. My general duties --
12 Q. And what were your -- yes.
13 A. I had worked on the catalog for a couple of years
14    before Shane came. After Shane came, he started
15    taking over that. So I had that responsibility. I
16    answered the phone. I was the office manager. I took
17    minutes at our weekly meetings. And I also --
18 Q. Were you an officer of the company?
19 A. Yes, uh-huh.
20 Q. What was your title?
21 A. What was my title? I don't remember.
22 Q. Okay. But you had a title?
23 A. I had a title of something, but I'm not sure what it
24    was.
25 Q. Okay. Now, let's go to the preparation of the

Sandra Forrest (2/10/17)

Page 6

1  catalog. Prior to the time that your company had a
2  website, okay, was part of your role the preparation
3  of that catalog?
4  A. Yes.
5  Q. And you heard me ask Mr. Forrest this, so I'll ask
6  you. There was a number of products from other
7  companies that were listed for sale in the catalog;
8  correct?
9  A. Yes.
10 Q. Now, would you or your husband or something else draft
11 the content to describe those products or would you
12 receive it from the supplier or something else?
13 A. We would read what the supplier had to say and then we
14 would write it up in a way that we thought would be
15 best to describe the product to our customers.
16 Q. Now, in addition to Midstates, do you recall any other
17 printer that you used at that time?
18 A. No, I don't.
19 Q. And would you and your husband review the content of
20 the catalog each year and make whatever changes you
21 thought were appropriate each year?
22 A. We did, yes.
23 Q. And that, like we heard earlier, would have included a
24 different cover every year; correct?
25 A. Yes.

Sandra Forrest (2/10/17)

Page 7

```
 1   Q.   And new products would be added?
 2   A.   And some deleted.
 3   Q.   And some discontinued; correct?
 4   A.   Right.
 5   Q.   And there might be some price changes as well year to
 6        year?
 7   A.   Uh-huh.  That's correct.
 8   Q.   Now, let's talk specifically about Fischer's
 9        Bee-Quick.  Do you recall when your -- the company
10        first started carrying Fischer's Bee-Quick?
11   A.   I don't recall a date, no.
12   Q.   Do you recall how many years you carried it?
13   A.   No, not really.
14   Q.   Did you interact directly with Mr. Fischer in any way
15        prior to Brushy Mountain carrying this product?
16   A.   No.  We would see him at bee meetings.  But, no, we
17        didn't have, you know, any contact.
18   Q.   I mean, did he approach you that you recall or you
19        recall you reaching out to him to carry his product --
20   A.   He approached us.
21   Q.   -- or something else?
22   A.   He approached us.
23   Q.   And were you involved in making the decision to carry
24        the product?
25   A.   Yes.
```

Sandra Forrest (2/10/17)

Page 8

1  Q.  Now, this product basically competed with another
2      called Bee-Go; correct?
3  A.  That's true, yes.
4  Q.  And when you first started to carry the -- Fischer's
5      Bee-Quick product, did Mr. Fischer provide you with
6      any brochures, fliers, material to show how he had
7      sold and marketed in his product beforehand?
8              MR. HUDSON:  You cut up there, Oscar.
9  Q.  Before you first started carrying Fischer's Bee-Quick
10     in your catalog, did Mr. Fischer provide you with any
11     brochures or fliers -- or distribute Bee-Quick?
12 A.  He provided brochures as a table display when we set
13     up the Bee-Quick at shows.
14 Q.  But I meant before, in other words, now you're going
15     to carry his product in the catalog.  Did he ever say
16     to you, hey, here's how I describe it so you could use
17     that language for your catalog?
18 A.  No.  He may have given us some points of sale, but I
19     wrote the description as I did with 95 percent of the
20     products in our catalog.
21 Q.  So you wrote the phrase, "Are you tired of your spouse
22     making you sleep in the garage"?
23 A.  Yes.
24 Q.  And you wrote the phrase, "Are you tired of using a
25     hazardous product on the bees you love"?

Sandra Forrest (2/10/17)

Page 9

```
 1   A.  I think so.  I'm not sure about that one.  But I'm
 2       definitely sure about the husband thing because I
 3       discussed that with many women at the bee shows.
 4   Q.  When you mean many women, you mean you discussed the
 5       problems with Bee-Go?
 6   A.  Right.
 7   Q.  And, by the way, if I told you the first year you
 8       started carrying Bee-Quick in your catalog was 2002,
 9       would that sound about right?
10   A.  I didn't know we had sold it that long, but, you know,
11       time flies by, so I don't know.
12   Q.  Okay.  What about the phrase "Fischer's Bee-Quick is a
13       safe, gentle, and pleasant way to harvest your honey,"
14       is that your authorship?
15   A.  That's kind of general, so I don't -- I don't
16       really -- I don't know.
17   Q.  Well, I mean, did you write it all -- I would imagine
18       you wrote the content all at once, right, it wasn't in
19       various pieces?
20   A.  Well, no, but I -- so, I guess I did.  But I don't --
21       I remember the phrase about the other thing because,
22       like I said, because of the conversations I had with
23       customers.  The other is just kind of a general thing
24       about the product.  So --
25   Q.  So you don't have an independent recollection of
```

Sandra Forrest (2/10/17)

Page 10

```
 1        writing it?
 2   A.   I feel like I probably did, but I -- you know, I can't
 3        say.
 4   Q.   Now, was part of your duties also keeping track of the
 5        customer mailing lists?
 6   A.   We reviewed the list at first when we first -- before
 7        we got too many customers, what we would do in the
 8        office is we would go through the list and we would
 9        mark duplicates and we would also mark people that had
10        fallen off the list.  After a time, the mailing
11        company, Midstates Printing at the time that I was
12        there, would run the list through, and we even sent
13        the list off to have zip codes corrected through the
14        post office.  So we did numerous things working with
15        the list.
16   Q.   And in addition to the addresses that Midstates would
17        send to, would Brushy Mountain also receive a certain
18        number of catalogs for Brushy to distribute itself?
19   A.   Yes.
20   Q.   And how did Brushy distribute those?
21   A.   We would have people that would come into our shop, we
22        would give them a catalog if they needed to it.  We
23        had people call us on the phone from ads that we ran
24        in different gardening magazines and we'd send out
25        catalogs that way.  We took catalogs to our -- the
```