UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAMES H. FISCHER,
                              Plaintiff
            v.
STEPHEN T. FORREST, Jr.,
SANDRA F. FORREST,
SHANE R. GEBAUER and
BRUSHY MOUNTAIN BEE FARM, INC.
                              Defendants

**Affidavit of Plaintiff, James Fischer
in Support of Opposition to
Summary Judgement**

14cv1304
14cv1307

I am the Plaintiff in this action, over 18, of sound mind, and competent to testify as to the matters contained herein.

I respond to Defendants' Summary Judgement Motion, citing its pages and headings.

**Statement of Facts (Pg 5)**

I partnered in significant R&D work with Defendants in the 2000s, attempting to help Brushy to manufacture various prototypes of my design. Some were added to the Brushy Catalog for a time, but sadly, most all were beyond Brushy's abilities, and had to be manufactured elsewhere. The list included the Breeze Board, the Fan Board, the Queen-Catching Frame, 3-Chamber Bee-Lining Boxes, the Drawer Hive, Polymer Film Observation Hive Glazing, Hydrophobic Frame Rest Coatings, the Hydraulic Version of the Nectar Detector Hive Scale, the Excalibur Hive Tool, and so on. The relationship was far closer and more collaborative than an arms-length vendor/dealer relationship.

**Page 6 – "The 2002 catalog"**

While the Forrests' in their depositions claimed to remember absolutely nothing other than a firm certainly that they authored the text at issue in the copyright litigation, I remember having to push hard to convince them to put in the first and only actual humor to ever appear in their catalog. If they had authored the text, they would have also remembered my display ads featuring the same epigrams, two examples shown in Exhibit F.

The image shown in Defendants' brief is not from the 2002 catalog as claimed. It is labeled as from the 2006 catalog. In the 2002 catalog, the sketch of the bottle was at left, in 2006, is was to the right of the text as shown. The Forrests also edited headings, and misspelled "Fischer" as "Fisher" in 2002, an error not made in the web version of the catalog. The web version also did not include any of the humorous text, and had no product image at all for multiple years. By 2008, the annual web site and annual catalog consistently matched.

The difference between the print catalog and the website prior to 2008, and the poor artistry in the line-art sketch of the Bee-Quick product as compared to those for other products was the primary reason why I kept mailing CDs to the Forrests each fall with camera-ready artwork, photos of the products, and point-of-sales materials. In 2005, they again misspelled "Fischer" as "Fisher" in the website description for product 777F, a discounted bundle of Bee-Quick and a "fume board" with which to use it. As I was

giving them a steep discount on the products sold in the bundle, I wanted the brand name "Fischer's" to at least be correctly spelled, motivating me again to stay involved in Defendants' merchandising.

**Page 6 – "An employee… would photograph the products"**

I don't recall that Mr. Gebauer had even been hired by the Forrests when the shift from sketches to photos began, but photos were used as early as 2002 on the web-based catalog, for example, the "Stainless Steel Pail Perch", item 780.  I asked them to also use the photos I supplied, at least as the basis for a better sketch, to no avail.  As to Mr. Gebauer's claims, he provides no support for his contention, no specifics, no names, he fails to even recall if an employee or a contractor did the work.  The preponderance of the evidence, at least in terms of verifiable facts, supports Plaintiff here.

**Page 7 – "Brushy Mountain began having trouble obtaining Bee-Quick"**

In fact, when Defendants at last paid their 90-days-plus-past-due balances ranging from $4,000 to $7,000, shipments were shipped.  Exhibit C shows that Defendants are contradicted by their own sales data.  Except for timeframes where no data was supplied by Defendants at all, Defendants never ran "out of stock", steadily shipping product, with perfectly reasonable slowdowns/lulls during the winter months when there would be no honey harvesting.  Certainly there is no tangible evidence of "not being able to get Bee-Quick for over a year" as claimed in Defendants' depositions.

**Page 8 – "A copy of the catalog was sent to Fischer"**

I did not receive catalogs from Brushy after 2009. I purchased nothing further from Brushy after the NYC Beekeeping Association's order #290054, an order for the non-profit to which I belong. Mr. Gebauer did not supply what he bid.

Brushy may have sent catalogs to the addresses of the people running the non-profit with my name on the address label, but as I merely teach the beekeeping classes, everyone was wise enough to not try to hand me a Brushy catalog after the saga of the out-of-stock veils for the novices.

**Pg 8 – 14 Fischer Has No Support For His Allegations Against the Individual Defendants**

Defendants try to make much of the Plaintiff's deposition taken before they complied with even the first discovery requests, but despite the still-incomplete discovery and the many items clearly deliberately withheld, 3 lines from the Shane Gebauer interview in the Dec 2014 Bee Culture magazine ( http://beeculture.com/shane-gebauer-interview/ ) are the best evidence of the actual interaction of the defendants:

> *"Since Shane's arrival at Brushy, some major changes have occurred. They now have an expanded website – complete with an online catalog."*

This credits Mr. Gebauer [Shane] with the website.  Mr. Gebauer was the <u>direct infringer</u>, at least for the website.  This was not known to Plaintiff until the article was published, and was overlooked in the "Relation Back" discussion.  His "role" as GM was irrelevant, the point is that the article credits Mr. Gebauer with doing the website work.  The article was the sole basis for joining Mr. Gebauer as a defendant, and the intent was to join him as both directly liable and vicariously liable.

> *"When Shane originally came aboard as General Manager, part of the agreement was that he would slowly gain more of an ownership role in the business"*

This was also overlooked in the "Relation Back" discussion.  This information was deliberately hidden from Plaintiff, and without an ownership role, Mr. Gebauer could not be held vicariously liable for the acts of those he supervised.  Again, his "role" as GM was not the issue here, as that was known.  It was his ability to personally benefit from infringement that was hidden from Plaintiff by the Defendants.

> *"Steve and Sandy officially retired this past September and formally handed over the company."*

The line above was no surprise: the Forrests [Steve and Sandy] sold the company in 2014, and say they retired in September 2014.  Accepting that statement as true (I don't – they sold an entire company but remain landlords for the corporate HQ, which seems far too easy a way to structure ongoing payouts while deferring taxable income) we have the Forrests clearly identified as at least vicariously liable as officers and owners up to at least fall 2014.

As for the Forrests direct liability prior to their "retirement", one has to consider how the Mom and Pop sole proprietors of a mail-order catalog company for over 30 years could blindly entrust a hired hand with the lifeblood of the company, the catalog itself, without retaining at least some direct involvement and supervision.  When one considers the smoking wreckage of a business Mr. Gebauer left behind him at Betterbee (it had to be sold a few years after Gebauer was fired), anyone involved in the "bee supply business" would find it impossible for the Forrests to resist retaining at least a final review before the catalog was committed to print.  The catalog "is the whole business".

Therefore, at least until fall 2014, the company is simply to small and too closely held for the Forrests to be able to avoid being involved in the catalog and website.

**Pg 15 - Fischer Has No Evidence of Passing-Off His Product By Individual Defendants**

The section above also applies here.

**Pg 15 -Fischer Does Not Have a Contract With Defendants Individually**

Plaintiff may not be an attorney, but he did run a large division of AT&T Bell Labs for a decade, so he still has a copy of "Corbin on Contracts" that he can pretend to understand. A "Contract of Indefinite Duration" under the Uniform Commercial Code would only exist in the absence of a written agreement, and where the parties performed an unwritten agreement that lasted longer than a year.  Defendants' claim seems to support Plaintiff's contention.

**Pg 16 - The Individual Defendants Did Not Engage In A Bait-and-Switch Scheme**

Plaintiff's comments on Pg 8 – 14 above apply here also – the initial interest confusion would entail the same liabilities as described above for the individual defendants, so a reading of the magazine article, combined with a cursory grasp of the business and familiarity with the individuals would leave one with no other reasonable conclusion than that the Defendants did, personally make the ill-advised choices that brought them before this Court.  Again, the company is simply too small for them to not be fully aware, and personally involved.

**Pg 18 – Bottom of Page**

I will repeat that I did not look at any Brushy Catalog after 2009, until seeing the 2011 catalog. In defense of Defendants' claims, I do live in a co-op with 30 floors and over 300 apartments, so mail is often misrouted. Worse, there is a Ms. Debbi Fisher in the building, and we often toss out each other's junk mail and leave the first-class mail addressed to the other with the doorman. Had I gotten a Brushy Catalog in the mail, it would have gone straight into the Recycle bin. I only saw the infringements because a friend pointed them out, being familiar with my (alleged) sense of humor.

**Pg 19 - Fischer Failed To Provide A Proper Deposit Copy Resulting In An Invalid Registration**

The copyright office does not "examine" as the patent office does. They just register works. The registration was accepted, and sat for most of a year before being glanced at for the first time. Yes, I made errors, but these were minor errors, not an attempt to deceive. The error in restoring the backup files was so obvious, it included in the initial deposit copy the "Wall of Shame". This includes many food company logos of companies who put "Honey" in large print on the front of the box, but very little honey and a lot more sugar in the box. No person in his right mind would attempt to copyright a collection of unpublished works that included Fortune-500 corporate logos. A pdf of the entire book "Windows XP For Dummies" was also in the initial upload of deposit files. This was a clearly defective restore of files, not an attempt to mislead or defraud.

When the error was detected and reported, I quickly did a much better job of restoring only the contents that were from the appropriate time period. Restoring decade-old backups using software that was obsolete five years ago is not easy.

Further, Defendants strive to create the impression that I registered works only after seeing their infringement. This is not the case. I was concerned about another smaller dealer who was buying gallon jugs and rebottling Bee-Quick into 6oz and 4oz bottles, sizes I did not offer, labeling them with a copy of the front panel only of my label, not including the instructions panel on the back of the label. I was concerned about potential liability from a product sold with no instructions, so I registered copyright and discovered the trademark registration lapse. The dealer readily agreed to stop, but instead, put a label of his own making on the bottles, and persisted in rebottling. He only sold locally, and he did not stay in the bee supply business very long after. This was months before I was shown Brushy's 2011 catalog.  See Exhibit A.

**Pg 20 – "pdf brochure"**

This kind of talk is exactly what one should expect from thieves caught red-handed, but the level of desperation is still surprising. First, the "brochure" is not the only source of the epigrams at issue in this case. They are also found on various web pages. Second, the error in the restoring of the backup was inadvertent, not material, and was quickly corrected. Third, I will leave a blank space below for someone who has a copy of my deposition transcript to put in the number of times the phrase "trick question" was used in that deposition, and specifically the number of times Mr. Hudson attempted to qualify his later questions with "*This is NOT a trick question!*" after asking dozens of trick questions.

Just as one example, Defendants' brief from their Summary Judgment Motion Section F:

> Q. *Are you aware of anybody, sitting here today, by name, that was the victim of a bait and switch with Brushy Mountain Bee Farm?*
>
> A. *There's no one sitting here today that has been a victim of the bait and switch –*
>
> MR. MICHELEN: *He said as you sit here today…*

I must continue to disagree with Mr. Michelen in the above, as the transcriptionist and I both heard the questions as actually asked – the question was just one of many very sneakily-worded adversarial questions.  "Anybody sitting here today" included only me, Mr. Hudson, Mr. Michelen, and the transcriptionist.  There was no one else in the room.  When a mere beekeeper finds himself pummeled with sneakily-worded questions from a lawyer, that's how a 3-hour deposition turns into a 7-hour deposition, as many questions are attempts to force answers.

Mr. Hudson gave me a series of documents and demanded that I authenticate them, starting with copies of each complaint revision and each exhibit revision.  The stack of undifferentiated sheets of white paper was several inches thick by the time he flashed in front of me two similar documents, both formatted to look like the Bee-Quick brochure.  The first had to be a draft version, as the "bee" was drawn crudely.  The other was very different from the first, but at least had a proper logo.  Given that I was looking at 17 year-old documents, I did my best to explain what seemed different when comparing the two documents.  But neither document was correctly identified, as the purpose of the questions asked was to force statements to be used as they are being used here.

**Pg 21 - Fischer admitted during his deposition that he did not submit a genuine copy of his website**

I said no such thing, the above is Defense counsel's attempt to force a conclusion from confusion he planned and sowed, created solely by his own manipulative and abusive tactics.

**Pg 22- No Evidence Of Copying Hi-Key Photo**

I have copyright in the Bottle Label, which includes text and the logo, and a separate copyright in the logo, as each were clearly separate elements in all 3 uploads to the Copyright office.  I can't claim a copyright in a plastic bottle, that's not my original work.  I fail to understand how, even if Defendants did take their own photos, they can claim to have not infringed the label and the logo, which would be the only protectable elements.

It does not matter to me which bottle is which or which photo is which – what matters is what original copyrighted work was copied.  A label and a logo was copied without permission, (and a trademark was also infringed in the process).

**Pg 24 Fischer's Asserted Copyright Registration Is Not For The Asserted Short Phrases, But The Entire Bee-Quick.com Website**

The Copyright Office disagrees with the assertion above. Plaintiff carefully read the Copyright Office web page - http://www.copyright.gov/eco/help-type.html, following the instructions for registering a "*Collection of Unpublished Works: Registration of Multiple Unpublished Works as a Single Claim*".  Under this registration, the "text and images of the Bee-Quick website" are registered as a collection of

individual unpublished works, implying that Plaintiff has a valid basis for designating individual the individual Copyrighted Works at issue as individual works, despite the protestations of the defendants.

It goes without saying that works that are displayed on a website are not published, so all works remain unpublished.

**Pg 26 – DMCA**

Again, Defense counsel preyed upon a first-time deponent who was given an address on the opposite side of town from the actual location of the deposition, a basement of a small hotel in Manhattan's Chinatown, on a street completely blocked to even foot traffic by a massive funeral for a former Chinese military officer. Plaintiff will beg forgiveness for being slightly flustered at being asked to sprint from 450 Murray St on Hudson River to 45 Mott St through rush-hour traffic to be asked questions intended to be twisted just as they are being twisted here.

On the photos, Defendants have offered no evidence that Brushy Mountain took any photos, and on the CMI, we have, at minimum, the clear intentional removal of CMI from the copyrighted Works misused on both the website and in the catalog, specifically, the removal of the word "Fischer" (the author's name) from the text Works, and its replacement with "Natural Honey Harvester".  In the case of Defendants' print catalog and the identical online pdf version of their catalog, there is also the false CMI www.brushymountainbeefarm.com running down the edge of every page.  It is not clear yet how the Defendants website presents CMI, as Defendants have produced no website-related items at all, and it is not clear how they could think that they have complied with the discovery requests without doing so.

**Pg 29 Trademark Infringement**

When pro se, I selected the term "counterfeit" from the 15 USC §1114 list of synonyms - *"reproduction, counterfeit, copy, or colorable imitation of a registered mark"* rather than one of the other synonyms, for example "copy".

Later, still acting pro se, I made a typo in interrogatory reply which he also copied and pasted into an email where "not trademark infringement" should have been "not just", "not only", or "not merely" trademark infringement.  Somehow, this escaped notice, and was never corrected.

Defendants then postured that it was a point of contention that "Natural Honey Harvester" was not a "counterfeit" of "Bee-Quick".   The court agreed with this obvious contention.

Nowhere in any complaint was it claimed that Plaintiff's mark was placed on Defendant's competing product, and the term "trademark infringement" is used early and often to describe the acts of Defendants.  It seems clear that the term "counterfeit" was used as a synonym for "infringing." The 3rd Amended Complaint, clearly states a claim for infringement, and merely uses the term "counterfeit mark" as a synonym for "infringing mark":

¶1 "This is an action for… trademark infringement… using Plaintiff's Trademark"

¶4 "Defendants also misappropriated Plaintiff's trademark…"

¶5 "attempt to trade upon and profit from the goodwill associated with the distinctive trademark…"

¶6 "Plaintiff demanded in writing that Defendants cease and desist their infringement…"

¶12 "trademark infringement under the Lanham Act"

¶15 "by delivering and offering to deliver materials bearing counterfeit and/or infringing trademarks"

¶125 "Defendants willfully and deliberately continued to display Plaintiff's trademark on Defendants' online ordering website…"

¶129 "Counterfeit Marks infringing Plaintiff's trademark…"

¶133 "…right and ability to supervise the activities that directly infringed Plaintiff's trademarks

¶135 "they continued to infringe Plaintiff's trademark… these infringements of Plaintiff's trademark"

¶137 any misuse of and/or Counterfeiting of Plaintiff's trademark

¶155 This is a willful Counterfeit of Plaintiff's mark in connection with the sale, offering for sale, and distribution of goods other than those made by Plaintiff.

¶156. This is a Counterfeit Mark under 15 USC § 1114.

But having pointed out that the term "counterfeit" was incorrectly used when counterfeiting was not pled, Defendants now want to argue that solely due to the use of the term "counterfeit", that Plaintiff has not pled trademark infringement either.

This is pure semantics. I could not have pled anything but infringement, as it is described as infringement first, and often and the specific acts alleged are clearly infringing acts.

The infringement as pled was described by Judge Engelmayer in 14cv1304 Doc #65 as:

> "articulating a highly plausible theory of consumer confusion: He alleges that Forrest's use of the Bee-Quick name in URLs would make consumers "victims of a bait-and-switch" by leading individuals searching for Bee-Quick to a webpage selling Natural Honey Harvester..."

I do not agree with Defendants highly creative and speculative approach, as it cannot be that Plaintiff has pled nothing at all merely due to the use of a single word with which one might take issue.

**Pg 29 - Fischer Has No Evidence of Actual Confusion**

Evidence of actual confusion is not the issue here, the standard is a likelihood of confusion, but we do have evidence of actual confusion. See Exhibit B. This customer, a Mr. Charles Gardner of South Carolina, was unhappy enough to post a negative review about Natural Honey Harvester, and to specifically say:

> "The first bottle I bought last year worked well but this new stuff
> was a complete waste of time and money."

So, the "new stuff" did not work as well as what he "bought last year", implying that he did not understand that the "new stuff" was a completely different product, "Natural Honey Harvester". Clearly, if Natural Honey Harvester was the "new stuff", the "old stuff" had to have been Bee-Quick.

Defendants' note (8) speaks of "false with no justifiable basis to include in a Complaint", so Plaintiff hopes that this explanation is sufficient.

Regardless, any lack of proof of actual confusion would be irrelevant. The standard is "likelihood of confusion".

**Pg 31 – "URL was Mistakenly not Changed"**

I've read the manuals, studied the training videos, and spoken with tech support staff at Dydacomp, and cannot accept this explanation.  When a product name is changed, the name is automatically used as part of the URL for the page on which the product is sold.  One would change with the other. Mr. Gebauer would have to deliberately work to keep the old URL intact after making a name change.  This also contradicts Mr. Gebauer's sworn deposition where he repeatedly claimed no familiarity at all with any of the details of the systems that he now claims to have mistakenly "not changed".  As discovery includes large numbers of emails from and to Mr. Gebauer concerning technical problems with the Dydacomp software, this raises issues of intent, and contradicts the claim of "mistake".

**Pg 31 – False Advertising**

First, there once again is no requirement to prove "actual confusion".  The standard is likelihood of confusion.  Second, the term "*unreliable supply*" is inherently an opinion.  As such it is not even a falsifiable statement, and could never be the basis for a false advertising claim.

The falsifiable statement is "**come out with our own**". As depositions and discovery verified that Defendants merely bought a product from another company, so it is not "our own".  The falsity is material, in that it misrepresents the nature and characteristics of the "Natural Honey Harvester" product in terms of quality control and purity.  If Defendants did not "come out with our own", but instead merely "buy from a vendor", there is no assurance to the customer at all.  In fact, when asked "Is it actually natural?", Mr. Gebauer stated "I assume so."  An assumption is not a basis for confidence and trust when one is selling bee veterinary products that first and last must do no harm to the bees.  In fact, the supplier making "Natural Honey Harvester" makes nothing but household and industrial cleaning products, calling into question if the product can even be said to be "food grade", let alone "natural".

**"An Unreliable Supply"**

Defendants have raised this non-issue so often, I will address it, once and for all.

Brushy was a chronic slow-pay customer, and apparently unable to pay for more than a few cases of product at a time. This was the sole reason for the "unreliable supply" they harp about constantly in these proceedings.  Had Brushy merely paid its bills in a timely manner, there would have never been any problem.  It also would have helped if they would have understood after being told many times that Bee-Quick is made in batches, and that a batch takes a full fiscal quarter from the start of distillation to the bottling of the distillates. Ordering a 3-month supply at a time is the only way to go.

a) In the email of 6/26/09, Ms. Brey, said that Brushy would at last pay a long overdue invoice of $7,576.00, which was reasonable cause for Plaintiff to refuse to ship yet more product on 30-day terms, as stated as nicely as possible on 6/25/09.  Small orders of a handful of 48-bottle cases would be paid for promptly, but larger invoices would chronically go unpaid. (Exhibit D)

b) The email of 3/24/2004 is similar – no amount is mentioned, but Betsy was speaking of yet another outstanding balance of thousands of dollars.  When an unpaid balance exceeded $5,000

with aging of more than 90 days, Plaintiff refused to ship more, as "30 Day Terms" does not mean "120 day terms". (Exhibit D)

c) The disorganization of Brushy remained chronic.  Plaintiff made clear that his product was distilled in batches that took months to run, and hence was bottled quarterly.  As cold ambient temperatures slowed the processes, this was not as fast a process in winter as in summer.  Dealers were asked to place orders in advance of the quarterly runs, so that they would be included in the allocation.  Brushy never got control over inventory planning/forecasting, and expected Plaintiff to supply small numbers of cases "just in time", as Brushy was consistently undercapitalized, and rarely ordered all they needed for even a single quarter in time for the regular March, June, Sept, and Dec bottling runs.

d) In July 2010, I explained my need for payment in timeframes slightly quicker than "Net 120" to Betsy, as she had no ability to address these chronic slow-pay problems herself.

e) In general, I was loathe to make Betsy's job harder, as she was judged harshly for not being to convince vendors to ship more products when Brushy was, in essence, a deadbeat.  Other vendors had similar experiences (of course we compare notes), so I did what I could to soft-pedal, and made sure that the stock never ran down to zero, even occasionally sending more product when I should have refused.  Sometimes, I made lame excuses because I did not want Betsey to feel that I was unsympathetic to the impossible task she faced of keeping stocking levels adequate in the midst of a mismanaged whirlwind.

f) Despite being slow-pay, Defendants continued to steadily ship Bee-Quick, so they never went out-of-stock.  See the Chart in Exhibit C.  The email provided by Defendants on page 32 is dated 4/28/2010.  Defendants' discovery includes product sales and shipping data and Brushy was not "backordered" on Bee-Quick at all.  They sold one bottle that day and more on 4/29, 5/1, 5/3, 5/4, 5/5 and so on. They also sold gallon jugs in the days immediately following, so Betsy was fibbing about backorders to try and cajole me into sending her another case or two of 48 bottles each, hence the "50 backorders".

g) Bushy's chronic disorganization and inability to ship to customers was well-known in the industry – Exhibit E includes some typical complaints about their poor organization and resulting impact on timely customer delivery.  As can be seen from the dates of the comments, the problem has been chronic and long-standing.


**14cv1307 – False Endorsement**

The name "Fischer", in the context of beekeeping, consistently and overwhelming refers to Plaintiff's products and services, showing the extent to which secondary meaning has been established. Google results for [Fischer bee] (which includes "bee", beekeeping", etc.), cite Plaintiff's products and services in 9 of first 10 results, 17 of first 20, and 21 of first 30 results. [Beekeeping Fischer] cites Plaintiff and his

products in 8 of the 1st 10, 16 of the 1st 20, and 22 of the 1st 30 results. [Jim Fischer bee] cites Plaintiff and his products in 37 of the first 40 results.

All references to Plaintiff are professional, not personal. The name "Fischer" most often identifies Plaintiff's brand name even more often than it identifies Plaintiff himself.

As for Defendant's reference to the Bee-Quick.com FAQ, the question "*Who Is this 'Fischer' Person, Anyway?*" is clearly meant to be humor. The bulk of the FAQ is humor. The bulk of the website from 2002 on was humor. The only humor to ever appear in Brushy's Catalog was Fischer's.

**Exhibits 20, 21, and 22**

These exhibits purport to show how "common" some words are, but they only happen to match small fragments of Plaintiff uniquely creative expression in the combination of the 4 Copyrighted Works together. Further, it could well be that these products directly copied from Plaintiff's web site.

**Gebauer Affidavit**

Mr. Gebauer's point #7 is a falsehood. As of today, 5/8/17, one can see the following images:

http://www.brushymountainbeefarm.com/images/777F-FumeNBQ.jpg - Fume board & Bee-Quick
http://www.brushymountainbeefarm.com/images/779fischerssm.jpg  - Bee-Quick small image
http://www.brushymountainbeefarm.com/images/779fischers.jpg - Bee-Quick larger image


I, under the penalty of perjury, hereby state that all statements and averments made herein are true and correct.

This is the 8th of May, 2017

*James Fischer*

SWORN AND SUBSCRIBED before me this 8th day of May 2017

*Sajjad*

NOTARY PUBLIC

MY COMMISSION EXPIRES   11/14/2020

Sajjad Al Mamun
NOTARY PUBLIC, STATE OF NEW YORK
01MA6350610
QUALIFIED IN NEW YORK COUNTY
COMMISSION EXPIRES NOVEMBER 14, 20 20

 

HTK-Bee-A-Way - 4oz.
HK-BAW4
**$6.25**

HTK-Bee-A-Way - 6oz.
HK-BAW6
**$8.99**

**Exhibit A – Mr. Krantz's Solution to My Concerns About His "Rebottling" of Bee-Quick**
**From Mr. Krantz's Web Site**

 **bees really love this stuff**

I tried harvesting with this was very disappointed. I sprayed the fume board and placed it on the super. After a few minutes I checked and the super was still full of bees. So I smoked it heavily and put the inner cover and top back on and went to the next hive. On this one I really soaked the fume board and placed it on the super. After waiting about 5 minutes, I lifted the fume board and it was completely covered in bees as well as the super. The bees stayed on the soaked fume board until I brushed them off. I just gave up on this and went to the house. My suit was covered in bees by then so I sprayed them directly with the stuff and they refused to fly off. It was as if I had sprayed sugar water on them. The first bottle I bought last year worked well but this new stuff was a complete waste of time and money.

- Charles Gardner, SC

**Exhibit B – Actual Confusion of "this new stuff" with the "bottle I bought last year"**
**from Defendants' own website in the customer reviews of Natural Honey Harvester**
**The "new stuff" is clearly Natural Honey Harvester, as opposed to Bee-Quick, which was sold "last year"**



**Exhibit C – Bee-Quick Shipments from Defendant Data**

> From: Betsy Brey <betsy@brushymountainbeefarm.com>
> Sent: Friday, June 26, 2009 9:03 AM
> To: James Fischer
> Subject:RE: Your Order For More Bee-Quick
>
> Hello again Jim,
> Mindy just informed me that your payment was mailed 6/24.
> Check # 16197.
> You should receive it soon!!!!!
> Betsy
>
> -----Original Message-----
> From: James Fischer [mailto:james.fischer@gmail.com]
> Sent: Thursday, June 25, 2009 5:38 PM
> To: 'Betsy Brey'
> Subject: Your Order For More Bee-Quick
>
> Betsy:
>
> Hey, I'd love to ship more Beep-Quick, but I have to buy everything with real money, and until I get paid for what I have already shipped, I am out of spare cash for things like buy Bee-Quick ingredients and supplies.
>
> Brushy was invoiced for $7,576.00 so if Brushy paid their bill, I'd have enough spare change to bottle some more stuff. :)
>
>        Jim
>
> ==================================================================
> > Mon, 08 Jun 2009
> > From: "Betsy Brey" <betsy@brushymountainbeefarm.com
> >
> > It's also time for me to place another order please:
> >
> > 20 each  GALLON  BEE-QUICK 4/CS
> > 384 each  8 OUNCE BEE-QUICK 48/CS
> >
> > Confirm that you received this order and please give me your best guess for delivery.
> > Thanks,
> > Betsy

**Exhibit D – 6/26/09 Payment of a Long-Overdue Invoice**

14cv1304 / 14cv1307                Fischer Affidavit Exhibits                Page **3** of **9**

From:     Betsy Brey <betsy@brushymountainbeefarm.com>
Sent:     Wednesday, March 24, 2004 9:06 AM
To:       bee-quick@bee-quick.com
Subject:  payment overdue to you

Hi Jim,
Yikes. Not good. Steve has been paying the bills for the last couple seasons as our accountant has had serious health problems. She resigned at the start of the new year and we recently brought another accountant on board.
She is looking into the matter immediately and will make payment today. Her name is Chastity and she will take care of it.
Sorry you had to bother with it. Thanks for working with us,
Betsy

**Exhibit D – 3/24/2004 Payment of a Long-Overdue Invoice**

ekervina                                                                04-21-2010, 07:03 AM

I recently ordered some supplies from Brushy Mountain through their website. Everything I ordered was listed as "in stock."

A day or two later I got an e-mail saying one or more items was out of stock. I undersand that computerised inventories and real-world inventories will often not be perfectly synchronized, and this is the busy time of year, so I wasn't bothered by that.

I called to get more information before deciding what to do, and was told the only item that was out was the one-pound of foundation wire. The lady I spoke to said they still had half-pound rolls, so I asked if they could substitute two half pound rolls. She put me on hold for a while, then came back and said they couldn't do it, I would have to pay the regular price for half-pound rolls. It only came out to about $2 difference, so I agreed.

Then she said that my order wouldn't go out for another two weeks, unless I paid an extra $10 for expedited processing, which I reluctantly agreed to.

I've received the items, and they are all satisfactory. However, I am still bothered by a couple of things. I don't currently run a business, but I have before, and a few times I had to take a loss to meet a customer's needs. I've found that talking to the customer, explaining that you don't have exactly what they need, but working out something that satisfies them pays back large dividends in repeat business. I'm surprised that when I called Brushy Mountain I wasn't asked "Will two half-pound rolls work? We'll lose a bit of money on it, but if that will suit your need, we'll make that substitution."

The other thing that bothers me is I wasn't told it would be two weeks to process until I had already agreed to a more expensive order. What if my order had just sat in the pipeline for two weeks? Maybe they would have had the one-pound wire back in stock by then. If not, get in touch with me then and we'll work things out. If they had waited to see what was in inventory when they actually got to my order, I would have ignored the two-week delay as being just part of the busy season.

Yeah, it's only $12, but between not being willing to make a substitution, and charging me for a substitution that may not actually have even been necessary...

Well, I hope they enjoy the $12 because they will not be my first choice of supplier in the future. I'm not saying I'll never do business with them, but I will be strongly inclined to try other suppliers first.

**Exhibit E – 2010 Customer Observation of Inventory Chaos        http://beesource.com/forums/showthread.php?240361**



**Exhibit E –Observation of Inventory Chaos    http://beesource.com**



**Exhibit E – Observation of Inventory Chaos    http://beesource.com**



The comment above is from the President of the NY State Beekeepers, and is a pointed comment at the "poorly run" Betterbee under Mr. Gebauer's management, and the lack of ability of Brushy to "know what is in the warehouse", even in 2014.



**Exhibit E –Observation of Inventory Chaos    http://beesource.com**



**Exhibit E –Observation of Inventory Chaos    http://beesource.com**



**Exhibit E –Observation of Inventory Chaos   http://beesource.com**

 

**Exhibit F – Plaintiff's Derivative Works Based Upon One of His Original Unpublished Works**