USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/16/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
                                :

JAMES H. FISCHER,                  :

                   Plaintiff,       :

              -v-                 :

STEPHEN T. FORREST, JR., SANDRA F. FORREST,    :
SHANE R. GEBAUER, and BRUSHY MOUNTAIN
BEE FARM, INC.,                      :

                   Defendants.     :

---------------------------------------------------------------X

14 Civ. 1304 (PAE) (AJP)

14 Civ. 1307 (PAE) (AJP)

<u>OPINION & ORDER</u>

      These consolidated cases arise out of the termination of a longstanding business relationship between plaintiff James H. Fischer and defendants Stephen T. Forrest, Jr., Sandra F. Forrest, Shane R. Gebauer, and Brushy Mountain Bee Farm, Inc. ("Brushy" and collectively, "Defendants"). Fischer alleges that the Defendants used his likeness and proprietary text and images to promote their own competing knock-off version of his product, Bee-Quick, a honey harvesting aid. He brings claims under the Copyright Act, 17 U.S.C. § 101 *et seq.*, the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201 *et seq.*, and the Lanham Act, 15 U.S.C. § 1051 *et seq.*, along with a claim under New York law for unfair competition.

      Pending now are Brushy's motions for summary judgment. In a thorough and persuasive Report and Recommendation, the Honorable Andrew J. Peck, United States Magistrate Judge, has recommended granting these motion. For the reasons that follow, the Court agrees, and grants these motions in their entirety.

## I. Background[1]

### A. Facts

#### 1.      The Parties

Since 1999, Fischer, an apiarist, has successfully sold the product Bee-Quick. TAC 04 ¶ 26.[2] Fischer promotes "Bee-Quick" as a unique "honey harvesting aid" that it is "food-safe, non-toxic, not foul smelling, and effective." *Id.*

In 2000, Fischer began using the following four phrases, among others, in conjunction with the sale of Bee-Quick on his website:

1. "Are you tired of your spouse making you sleep in the garage after using Butyric Anhydride?"
2. "Are you tired of using hazardous products on the bees you love?"
3. "Fischer's Bee-Quick is a safe, gentle, and pleasant way to harvest your honey."
4. "A Natural, Non-Toxic Blend of Oils and Herbal Extracts."

___

[1] This summary of the factual and procedural history of this matter draws upon the following submissions (and exhibits thereto): Fischer's Second Amended Complaints, 14 Civ. 1304, Dkt. 50 ("SAC 04"), and 14 Civ. 1307, Dkt. 70 ("SAC 07"); Fischer's Third Amended Complaints, 14 Civ. 1304, Dkt. 89 ("TAC 04"), and 14 Civ. 1307, Dkt. 111 ("TAC 07"); Defendants' motions for summary judgment, 14 Civ. 1304, Dkt. 175, and 14 Civ. 1307, Dkt. 177 ("Def. Br."); Fischer's memoranda in opposition to these motions, 14 Civ. 1304, Dkt. 178, and 14 Civ. 1307, Dkt. 179 ("Pl. Br."); 14 Civ. 1304, Dkt. 184 and 14 Civ. 1307, Dkt. 185 ("R&R 2" or "the Report"); Fischer's objections to the Report, 14 Civ. 1304, Dkt. 191, and 14 Civ. 1307, Dkt. 188 ("Obj."); Brushy's response to Fischer's objections, 14 Civ. 1304 Dkt. 193, and 14 Civ. 1307, Dkt. 189 ("Def. Obj. Resp."); and Fischer's reply to Defendants' response to his objections. 14 Civ. 1304, Dkt. 196, and 14 Civ. 1307, Dkt. 192 ("Pl. Obj. Reply").

[2] The two cases addressed herein, 14 Civ. 1304 and 14 Civ. 1307, have been litigated in tandem. On February 27, 2014, Fischer filed similar suits under these docket numbers against Stephen and Sandra Forrest. On June 19, 2014, the Court stated that it was inclined to consolidate the two cases and invited the parties' views. Dkt. 37. Fischer, then *pro se*, objected to the consolidation, stating that combining the suits could impair his ability to recover separate awards for direct and contributory infringement. *See* Dkt. 41 (citing 17 U.S.C. § 504 and *Arista Records LLC v. Lime Grp. LLC*, No. 06 Civ. 5936 (KMW), 2011 WL 1338194, at *3 (S.D.N.Y. Apr. 7, 2011)). In an order dated July 2, 2014, this Court declined to consolidate the cases. *See* Dkt. 44. However, the Court determined that the two cases should be dealt with in concert. *Id.* As a result, the parties' filings in the two cases relevant to the pending motions are substantially identical. Accordingly, for brevity, the Court henceforth will cite to the submission in 14 Civ. 1307 unless otherwise indicated.

*See* SAC 04 Ex. 5. Fischer has created non-website advertisements for Bee-Quick using some of the above phrases. *See, e.g.*, *id.*

Stephen and Sandra Forrest ("the Forrests") are the founders of Brushy Mountain Bee Farm Inc. ("Brushy"). Dkt. 175 ("Stephen Forrest Decl.") ¶ 2. Brushy is a mail-order business that primarily deals in bee-keeping supplies. *Id.* ¶¶ 2–3. In 2007, the Forrests hired Shane Gebauer, Brushy's current President. Dkt. 173 ("Gebauer Decl.") ¶ 1; Dkt. 180, Ex. B ("Gebauer Dep.") at 6.

According to Gebauer, between 2008 and 2013, he worked collaboratively with the Forrests on the Brushy catalogue and website. Gebauer Dep. at 24, 26–29; Dkt. 180, Ex. D ("Sandra Forrest Dep. 2") at 6–7. This collaboration entailed, among other things, selecting photographs and text for the products Brushy sold online and through its catalogue. Gebauer Dep. at 27–31. To that end, Gebauer attests, Brushy "would draft its own copy [and] describe the products that it had purchased from other vendors that it was reselling." *Id.* at 29. Today, Gebauer works with others "to review and approve the Brushy Mountain Bee Farm catalogue." *Id.* at 31.

The Forrests attest that, around 2009, they largely stopped working on the Brushy catalogue. Dkt. 180 Ex. C ("Stephen Forrest Dep. 2") at 26–27, Sandra Forrest Dep. 2 at 5; Dkt. 176 Ex. C ("Sandra Forrest Dep. 1") at 17. When they did work on the catalogue, however, they generally did so in the manner described by Gebauer. *See* Sandra Forrest Dep. 2 at 6 ("We would read what the supplier had to say and then we would write it up in a way that we thought would be best to describe the product to our customers."); *id.* Stephen Forrest Dep. 2 at 12 ("I believe we wrote [product descriptions] when Sandy and I were doing it.").

As of 2014, the Forrests "ceased having any equity interest in Brushy Mountain Bee Farm, Inc." Gebauer Dep. at 9. Brushy Mountain Bee Farm Holdings, Inc. obtained the Forrests' equity in Brushy. *Id.* at 8.

## 2. The Fischer-Brushy Relationship

In 2002, Brushy began selling Bee-Quick. Dkt. 174 ("Sandra Forrest Decl.") ¶ 2; Stephen Forrest Decl. ¶¶ 4–5. At that point, Fischer alleges, Brushy became an "Authorized Dealer" of the product. TAC 04 ¶ 32. Stephen Forrest denies this. He attests that Fisher and Brushy never had a written contract. Stephen Forrest Decl. ¶ 4; *see also* Dkt. 176 Ex. A ("Fischer Dep.") at 9; Gebauer Decl. ¶ 3.

From 2002 onwards, Brushy used the following words (or ones similar to it) to promote Bee-Quick in advertisements:

> This 100% Natural, non-toxic blend of oils and herb extracts works just like Bee Go and it smells good! Fischer's Bee Quick is a safe, gentle, and pleasant way to harvest your honey. Are you tired of your spouse making you sleep in the garage after using Bee Go? Are you tired of using a hazardous product on the bees you love? Then this is the product for you!

Sandra Forrest Decl. ¶ 3; Gebauer Decl. ¶ 14 & Ex. F. Sandra Forrest claims that she wrote the above text, although she and Stephen Forrest recalled with certainty only that they wrote the phrase: "Are you tired of your spouse making you sleep in the garage?" Sandra Forrest Dep. 1 at 8–9; Dkt. 176 Ex. D ("Stephen Forrest Dep. 1") at 19. Fischer attests that the Forrests did not author this text. *See* Dkt. 180 Ex. E ("Fischer Aff.") at 1.

## 3. Termination of the Fischer-Brushy Relationship

Around 2010, Brushy allegedly began having trouble obtaining Bee-Quick and decided to sell its own version of the product, Natural Honey Harvester, which it obtains from a third-party vendor. Gebauer Dep. at 54–56, 71; Stephen Forrest Dep. 2 at 36. As a result, on December 10,

2010, a Brushy employee sent Fischer an email stating that Brushy would not be selling Bee-Quick in its 2011 catalogue and asking for an address to which it could ship back its remaining Bee-Quick supply. *See* SAC 04 Ex. 3b (December 10, 2010 Email).

Fischer asserts that, as a result of the December 10, 2010 email, "Defendants immediately lost any right, license, or permission to use any of [his] intellectual property, as all such use was permitted solely in the selling of Plaintiff's product." *See* TAC 04 ¶ 35; TAC 07 ¶ 47. Defendants accept this proposition in their motions for summary judgment. On the bases of the parties' common attestations, the Court, for purposes of this lawsuit, assumes that as of December 10, 2010, Brushy no longer had any "right," "license," or "permission" to use Fischer's intellectual property.

Fischer did not, however, communicate to Brushy that it no longer had such permission to use his intellectual property until April 2011, when Fischer sent a cease and desist letter, alleging, *inter alia*, that Brushy was engaged in "copyright infringement." *See* Gebauer Decl. Ex. D. In a letter dated April 14, 2011, Gebauer replied that "there [did] not seem to be grounds for [Fischer's] request," and that Brushy would "review" Fischer's concerns if he was more "specific." Gebauer Decl. Ex. E. Fischer does not appear to have responded.

After Brushy's December 10, 2010 email, Brushy did not immediately remove Bee-Quick from its website. Gebauer Decl. ¶¶ 13–14 & Ex. F. On December 26, 2010, Bee-Quick was still listed for sale there. *See id.* And photos of Bee-Quick remained on Brushy's website until at least January 28, 2011, at which point they appeared to have been replaced by photos of Natural Honey Harvester. Gebauer Decl. ¶ 15. Further, Fischer has adduced exhibits indicating that an image of Bee-Quick remained on Brushy's website until at least March 3, 2014. *See*

SAC 04 Exs. 9–12; *see also* Fischer Aff. at 10 (attesting that links to images of Bee-Quick on Brushy website were still operable as of May 8, 2017).

On January 21, 2011, Brushy shipped its 2011 catalogue advertising Natural Honey Harvester. Def. Br. Ex. 6 at 2–3; Def. Br. Ex. 7 ("Twete Aff.") ¶¶ 3–4 & Exs. A–B. The text in the 2011 catalogue was as follows:

> For years we have promoted the use of a natural product to harvest honey but an unreliable supply of such a product has forced us to come out with our own. This 100% Natural, non-toxic blend of oils and herb extracts works just like Bee Go® and it smells good! Natural Honey Harvester™ is a safe, gentle, and pleasant way to harvest your honey. Are you tired of your spouse making you sleep in the garage after using Bee Go®? Are you tired of using hazardous products on the bees you love? Then this is the product for you!

Def. Br. Ex. 6 at 3. Gebauer attests that Stephen Forrest came up with the name "Natural Honey Harvester" and that he and Stephen Forrest collaborated on the catalogue text. Gebauer Dep. at 55, 23. In contrast, Stephen Forrest attests that Gebauer came up with this wording. Stephen Forrest Dep. 1 at 37. Between 2012 and 2014, the above text remained largely unchanged in Brushy's catalogues, *see* SAC 07 Ex. 20 (excerpts from Brushy's catalogues), and it remained online until at least December 28, 2011, *id.* Ex. 8. Two of Brushy's third-party vendors, The Honey Hole and C&T Bee Supply, used this advertisement in 2012 and 2014. *See* SAC 07 Exs. 21–22.

On February 7, 2011, Fischer filed a copyright registration for the "text and images of [his] Bee-Quick.com website." TAC 04 ¶ 41; Def. Br. Ex. 4.

According to Fischer, Defendants removed Copyright Management Information ("CMI") from his photographs and other unspecified copyrighted works. Fischer Dep. at 133, 137. As to the photographs, Fischer claims that Defendants removed metadata from a Bee-Quick photo he provided them, Fischer Dep. at 137, and put their own watermark over his photo, TAC ¶ 141.

With respect to non-photographic materials, although Fischer's claims as to the precise source of the CMI at issue are elusive,[3] Fischer alleges that when Defendants began selling Natural Honey Harvester, they altered their online and print advertisements by replacing, *inter alia*, the term "Fischer's Bee-Quick" with "Natural Honey Harvester" in a sentence describing the product. *See* Fischer Dep. at 131–33, 137; Fischer Aff. at 6; *see also Fischer v. Forrest*, 14 Civ. 1304, 2015 WL 195822 at *8 (S.D.N.Y. Jan. 13, 2015) ("[T]he Bee-Quick brochure attached to the complaints . . . stated that 'Fischer's Bee-Quick is a safe, gentle, and pleasant way to harvest your honey.' . . . Brushy Mountain replaced the textual reference to 'Fischer's Bee-Quick' with the words 'Natural Honey Harvester.'"). Fischer argues that these acts constitute unlawful CMI removal. Defendants deny ever removing any CMI or metadata. Gebauer Decl. ¶ 8; Sandra Forrest Decl. ¶ 8; Stephen Forrest Decl. ¶ 9.

### B. Procedural History

#### 1. Earlier Proceedings

---

[3] Fischer has not been consistent as to the specific materials, other than his photographs, from which Defendants allegedly removed CMI. In his third amended complaint, Fischer alleged that he had sent Brushy "layout ready text," *see e.g.,* TAC 04 ¶ 92; in a later affidavit, Fischer stated that the "epigrams" were available online, *see* Fischer Aff. at 4; and in his deposition, Fischer appeared to claim that CMI had been removed from his brochure, *see* Fischer Dep. at 137 (Q: "[H]ow many sentences are you alleging [Defendants] removed from your brochure?" A: "Four"). In the same deposition, however, Fischer stated that he was "*not* alleging [that Brushy] ever made a copy of my brochure without the copyright notice." *Id.* at 133 (emphasis added); and, in a later affidavit in opposition to summary judgment, Fischer stated that there is "clear intentional removal of CMI from the copyrighted Works misused on both the website and in the catalog, specifically, the removal of the word 'Fischer' (the author's name) from the text Works, and its replacement with 'Natural Honey Harvester.'" Fischer Aff. at 6. Judge Peck's Report took the brochure as the "source" material for Fischer's DMCA claim. Although Fischer's varying articulations have made it hard to pin down his theories as to the material(s) from which his CMI was wrongfully removed, the Court, in the interests of completeness and of fairness to Fischer, addresses each of the theories Fischer has articulated, in the light most favorable to him.

On July 9, 2014, defendants Stephen and Sandra Forrest moved to dismiss Fischer's *pro se* complaints. In a decision issued January 13, 2015, the Court denied those motions. 14 Civ. 1304, Dkt. 45; 14 Civ. 1307, Dkt. 65 (collectively, "First MTD"). On December 28, 2015, Fischer filed a Third Amended Complaint in each action. *See* TAC 04; TAC 07. After Defendants moved to dismiss various claims, *see* 14 Civ. 1304, Dkts. 102–110; 14 Civ. 1307, Dkts. 123–129, the Court referred the motions to dismiss to the Honorable Henry Pitman, United States Magistrate Judge, for a Report and Recommendation, having earlier referred the cases to Judge Pitman for general pretrial supervision. On December 15, 2016, these referrals were reassigned to Judge Peck.

On January 13, 2017, Judge Peck issued a Report and Recommendation, 14 Civ. 1304, Dkt. 132; 14 Civ. 1307, Dkt. 147 ("R&R 1"), as to the pending motions to dismiss. On January 27, 2017, Fischer filed objections to R&R 1, 14 Civ. 1304, Dkt. 137; 14 Civ. 1307, Dkt. 150, and on February 10, 2017, Defendants filed responses to these objections, 14 Civ. 1304, Dkt. 141; 14 Civ. 1307, Dkt. 151. On March 21, 2017, this Court adopted the entirety of R&R 1 in a written opinion. 14 Civ. 1304, Dkt. 153; 14 Civ. 1307, Dkt. 161. The Court thereby dismissed Fischer's trademark infringement claims and his New York right of publicity claim against all defendants. The Court also dismissed Fischer's copyright infringement claims against Gebauer that had accrued before February 3, 2012 and those against Brushy that had accrued before December 28, 2012.

### 2.     Defendants' Motions for Summary Judgment

On April 19, 2017, following discovery, Defendants filed motions for summary judgment, 14 Civ. 1304, Dkt. 170; 14 Civ. 1307, Dkt. 172, as well as memoranda of law in support, 14 Civ. 1304, Dkt. 175; 14 Civ. 1307, Dkt. 177 ("Def. Br."). On May 8, 2017, Fischer

filed memoranda in opposition.  14 Civ. 1304, Dkt. 178; 14 Civ. 1307, Dkt. 179 ("Pl. Br.").  On

May 15, 2017, Defendants filed reply memoranda.  14 Civ. 1304, Dkt. 180; 14 Civ. 1307, Dkt.

181 ("Def. Reply Mem.").

On July 14, 2017, Judge Peck issued a thorough (59-page) Report and Recommendation

on the motions for summary judgment.  14 Civ. 1304, Dkt. 184; 14 Civ. 1307, Dkt. 185 ("R&R

2" or "the Report").  The Report recommends granting these motions in their entirety.  On

August 11, 2017, Fischer filed objections.  14 Civ. 1304, Dkt. 191; 14 Civ. 1307, Dkt. 188

("Obj.").  On August 25, 2017, Defendants filed a response.  14 Civ. 1304 Dkt. 193; 14 Civ.

1307, Dkt. 189 ("Def. Obj. Resp.").  On September 12, 2017, Fischer filed a reply.  14 Civ.

1304, Dkt. 196; 14 Civ. 1307, Dkt. 192 ("Pl. Obj. Reply").

## II.    Legal Standards

### A.    Reports and Recommendations

After a magistrate judge has issued a Report and Recommendation, a district court may

"accept, reject, or modify, in whole or in part, the findings or recommendations made by the

magistrate judge."  28 U.S.C. § 636(b)(1).  To accept the portions of a report to which no timely

objection has been made, "a district court need only satisfy itself that there is no clear error on

the face of the record."  *Acevedo v. Lempke*, No. 10 Civ. 5285 (PAE) (HBP), 2014 WL 4651904,

at *3 (S.D.N.Y. Sept. 17, 2014) (quoting *King v. Greiner*, No. 02 Civ. 5810 (DLC), 2009 WL

2001439, at *4 (S.D.N.Y. July 8, 2009)).  When a timely and specific objection has been made,

the court is obligated to review the contested issues *de novo*.  *See id.*; Fed. R. Civ. P. 72(b)(3);

*Hynes v. Squillace*, 143 F.3d 653, 656 (2d Cir. 1998).  But when the objections simply reiterate

previous arguments or make only conclusory statements, the court should review the Report and

Recommendation for clear error.  *Dickerson v. Conway*, No. 08 Civ. 8024 (PAE) (FM), 2013

WL 3199094, at *1 (S.D.N.Y. June 25, 2013); *see also Kirk v. Burge*, 646 F. Supp. 2d 534, 538

(S.D.N.Y. 2009) (collecting cases). Further, "[c]ourts generally do not consider new evidence

raised in objections to a magistrate judge's report and recommendation." *Tavares v. City of New*

*York*, No. 08 Civ. 3782 (PAE), 2011 WL 5877548, at *2 (S.D.N.Y. Nov. 23, 2011); *see also Pan*

*Am. World Airways v. Int'l Bhd. of Teamsters*, 894 F.2d 36, 40 n.3 (2d Cir. 1990) ("A district

judge is not required to hear or rehear any witness, and Pan Am had no right to present further

testimony when it offered no justification for not offering the testimony at the hearing before the

magistrate.").

### B.      Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show . . . that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a

question of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When the movant has properly supported its motion with evidentiary materials, the

opposing party must establish a genuine issue of fact by "citing to particular parts of materials in

the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir.

2009). An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a

verdict for the non-moving party. *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d

Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the

facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir.

2010) (internal quotation marks and citation omitted). "Only disputes over facts that might

affect the outcome of the suit under the governing law" will preclude a grant of summary

judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether

there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III.    Discussion

Fischer makes several objections to the Report. *See* Obj. at 1–2.

### A.    Fischer's Claim for Statutory Damages for Direct Copyright Infringement

Fischer objects on two grounds to the Report's recommendation that he cannot obtain statutory damages for direct copyright infringement. First, he argues that Judge Peck, in determining the date of Brushy's first infringing act, wrongly relied on an affidavit that should have been excluded. Obj. at 2–4. Second, he argues that the Report is wrong that he cannot recover statutory damages because Brushy's first infringing act predated Fischer's copyright registration. *Id.* at 4–6. The Court reviews these arguments in turn, after first reviewing the background legal standards.

#### 1.    Applicable Legal Standards

"Under the Copyright Act, a copyright infringer can be held accountable for either actual damages and profits of the infringer or statutory damages." *Solid Oak Sketches, LLC v. 2K Games, Inc.*, No. 16 Civ. 724 (LTS), 2016 WL 4126543, at *2 (S.D.N.Y. Aug. 2, 2016) (citing 17 U.S.C. § 504(a)). Statutory damages under the Act are designed to "discourage wrongful conduct," as well as to provide "reparation for injury." *F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 233 (1952).

"In order to obtain statutory damages and attorneys' fees, a plaintiff must have registered its copyright prior to the alleged infringement." *Solid Oak Sketches, LLC*, 2016 WL 4126543 at

*2 (citing 17 U.S.C. § 412 and *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1012 (2d Cir. 1995)). "Courts in this district have held that Section 412 of the Copyright Act imposes a bright-line rule that precludes recovery of statutory damages and attorneys' fees where the first act of infringement in a series of ongoing infringements occurred prior to the work's copyright registration." *Id.*

As explained below, this rule, given the dates when Brushy used the allegedly infringing advertisements, precludes Fischer from recovering statutory damages as a matter of law.

### 2.    The Amanda Twete Affidavit

Fischer objects to the Report's consideration of the affidavit of Amanda Twete, which Defendants offered in support of summary judgment. Obj. at 2–4. In fact, the Twete affidavit was properly admitted and considered in the Report.

Twete attests that she works "as the Mailroom Supervisor for Midstates Group," Twete Aff. ¶ 2, that Midstates shipped Brushy's 2011 catalogue, *id.* ¶ 3, that it did so on January 21, 2011, *id.* ¶ 4, and that she "would expect" some, if not all, of Brushy's 2011 catalogues to have been received "within 7–14 days from the shipment date of January 21, 2011," *id.* ¶ 6. Twete's affidavit attaches two exhibits. Exhibit A is a copy of a Midstates' mailing log, which reflects January 21, 2011 as the date on which Midstates shipped Brushy's 2011 catalogues. *Id.* Ex. A. Exhibit B is a copy of a screenshot of the "job ticket" for Brushy's 2011 catalogue. *Id.* Ex. B. It, too, reflects that the shipment date for the 2011 catalogue was January 21, 2011. *Id.*

In objecting that Judge Peck should not have treated the Twete affidavit as admissible, Fischer relies on a LinkedIn page that he had not offered on the motions for summary judgment. Obj. Ex. B. Fischer argues that the page is Twete's and that it establishes that Twete lacked "direct knowledge" of the facts to which she attested because it indicates that Twete joined the

company in 2014—after the events at issue. He argues that the Twete affidavit should be excluded as not based on personal knowledge. Obj. at 3 (citing Fed. R. Civ. P. 56(e)(1)). Fischer further argues that the Twete affidavit is contradicted by its attached exhibits. *See* Obj. at 3. Fischer explains that he did not object earlier to receipt of Twete affidavit because he "felt all the affidavits [submitted] were . . . *clearly* excludable under FRE 806," Pl. Obj. Reply at 3 (emphasis added).

These objections fail. Fischer's objection rests almost entirely on the LinkedIn page. Fischer, however, never adduced that page in evidence in connection with briefing on summary judgment, despite being aware that Defendants had offered Twete's affidavit into evidence. (Indeed, Fischer did not take Twete's deposition or object to receipt of her affidavit until after Judge Peck's Report had issued.) It is, however, well settled that "[c]ourts generally do not consider new evidence raised in objections to a magistrate judge's report and recommendation." *Tavares*, 2011 WL 5877548, at *2. The submission of new evidence following such a Report is merited only in rare cases, where the party objecting to a Report has offered "a most compelling reason" for the late production of such evidence, *Housing Works, Inc. v. Turner*, 362 F. Supp. 2d 434, 438 (S.D.N.Y. 2005), or a "compelling justification for [its] failure to present such evidence to the magistrate judge," *Thomas v. Comm'r of Soc. Sec.*, No. 16 CV 9247-LTS-KHP, 2017 WL 3475064, at *1 (S.D.N.Y. Aug. 11, 2017) (quoting *Berbick v. Precinct 42*, 977 F. Supp. 2d 268, 273 (S.D.N.Y. 2013)). Here, Fischer has not offered any such justification.

Moreover, on its face, Twete's affidavit provides an adequate basis on which she is qualified to testify as to the shipment and expected receipt dates of Brushy's 2011 catalogues. She attests that she serves as mailroom supervisor for Brushy, a position that by its nature would tend to imply experience which such matters. She further attests that the statements to which her

affidavit is attesting are known to her to be true. Fischer was at liberty to test in a deposition her competence to so attest, whether based on her personal experience or as a custodian familiar with and qualified to testify about Brushy's mailroom records. He did not do so.[4] And the LinkedIn page that Fischer now presents, based on an Internet download, is plainly inadmissible for any purpose—it has not been authenticated; and the statements in it are inadmissible hearsay. The Court therefore declines to receive Fischer's new evidence or to rule that Twete's unobjected-to affidavit is inadmissible.

In any event, the affidavit is not the only record evidence that Brushy's acts of alleged infringement date to December 2010. Fischer's own SAC attached as Exhibit 7 a screenshot of a webpage that shows alleged infringement of just such a nature on December 26, 2010, and this exhibit was referenced in Fischer's Third Amended Complaint. TAC ¶ 52.[5] Fischer's own evidence thus supports the Report's assessment of the date of Defendants' first infringing act. Excluding Twete's affidavit would, therefore, not disturb the Report's outcome.

### 3. Statutory Damages for Pre-Registration Infringement

Fischer also objects to the Report's determination that he cannot obtain statutory damages on the ground that Defendants' first infringing act in a series predated Fischer's copyright registration. Obj. at 2–6; *see* R&R 2 at 23–26. On *de novo* review, the Court finds, with the Report, that Fischer cannot recover statutory damages.

---

[4] Defendants represent that, had Fischer deposed Twete, he would have learned that "she has worked at Midstates since at least 2006, personally handled the Brushy Mountain accountant, and that Midstates has a postal facility at is location in South Dakota." Def. Obj. Resp. at 3.

[5] Consistent with this evidence, Defendants' Local Rule 56.1 statement, to which Fischer never responded as to this point, states that Fischer's product was on Brushy's website on December 26, 2010 and that Brushy's 2011 catalogue was mailed on January 21, 2011.

Judge Peck reasoned as follows. He noted that Fischer had repeatedly alleged that Defendants lost all right and license to use his intellectual property on December 10, 2010. R&R 2 at 4 n.4. Judge Peck therefore, without objection, used December 10, 2010 as the date after which any use of Fischer's intellectual property by Brushy would constitute copyright infringement. *Id.* Judge Peck next found that Brushy had kept Bee-Quick on its website until at least December 26, 2010 and had shipped its catalogue containing the allegedly infringing phrases on January 21, 2011. That meant that Brushy had infringed Fischer's copyright in both December 2010 and January 2011. *Id.* at 25–26. Judge Peck further found that Fischer had not registered his copyright until February 7, 2011. *Id.* On these facts, he held, statutory damages are unavailable, based on uniform case law in this District that 17 U.S.C. § 412 imposes a bright-line rule under which such damages (as opposed to actual damages) are unavailable where a defendant's first infringing act occurs before a plaintiff has registered his copyright. *Id.* at 24–26. Judge Peck also rejected Fischer's theory that each republication of his intellectual property constituted a new infringing act. Rather, he held, Brushy's post-registration uses of Fisher's intellectual property were part of a pattern of similar ongoing infringements dating to Brushy's first pre-registration infringement. As Judge Peck explained, Brushy's post-registration uses of Fischer's phrases were largely identical to its pre-registration uses and no appreciable amount of time had passed between the publications. *Id.* at 25–27.

In objecting to this aspect of the report, Fischer makes several arguments. *See* Obj. at 4–5; Pl. Obj. Reply. at 1–2.

Fischer now claims that Brushy's December 10, 2010 email announcing its cessation of sales of Bee-Quick did not, in fact, result in its losing all rights and licenses to use his intellectual property. This argument, he admits, repudiates a core tenet of his Complaint. *See* Pl. Obj. Reply

15

at 5 ("The Complaint . . . was wrong on contract law, on copyright law, and factually."). Instead, Fischer appears now to characterize Brushy's 2010 email as akin to a notice of intent to breach, Obj. at 4; he claims that Brushy could not have "infringe[d] until 2012," *id.* at 5. This is so, Fischer says, because Brushy "fully performed" in 2011 by selling Bee-Quick in January 2011. *Id.* Fischer notes that among their defenses to Fischer's copyright infringement claim in their Answer, Defendants stated that they had a "license" to sell. Pl. Obj. Reply at 5; *see* 14 Civ. 1304, Dkt. 53 ("Ans.") at 23. Fischer similarly characterizes his April 2011 cease and desist letter as prospective only. Obj. at 4. In effect, Fischer characterizes this letter to convey that rescission of Brushy's license would first occur in 2012. On this basis, Fischer argues, Brushy's first infringing act could not have occurred until 2012, after Fischer's copyright registration in February 2011. *Id.* at 4–5.

Depending on the circumstances, courts in this district have taken differing approaches where a litigant raises new legal theories in objections to a Report and Recommendation. Many hold that new legal theories are akin to new evidence and therefore not a valid basis to oppose a Report. *See e.g., Parks v. Comm'r of Soc. Sec.*, No. 15 CIV. 6470 (ER), 2017 WL 3016946, at *3 (S.D.N.Y. July 17, 2017) (collecting cases). Others use a multi-factor test to determine whether there is good reason to consider the new theory. *See e.g., id.*

For two independent reasons, this Court declines to allow Fischer, at this late stage, to fundamentally reconceive his theory of liability.

First, unlike in cases in which a plaintiff has been silent on the relevant legal point, here, Fischer in his Complaint pled directly contrary to the theory he now pursues, and this litigation has proceeded on Fischer's declared premise that Brushy's right to use his intellectual property terminated in December 2010. It is black letter law that a plaintiff may not alter his pleadings

16

through a brief. *See, e.g., Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998). Here, Fischer has attempted to do just that, and his repudiation of his pleadings comes late in the litigation, no less. *See* Pl. Obj. Reply at 5 ("The Complaint . . . was wrong on contract law, on copyright law, and factually.").[6]

Second, permitting Fischer to reconceive and effectively to restart this case at this late stage—after discovery, full briefing on summary judgment before a magistrate judge, and the rendering of a detailed and thoughtful opinion on the plaintiff's claims as brought—would waste substantial judicial resources and undermine the objectives of the Magistrates Act. "A proceeding before a magistrate judge is not a meaningless dress rehearsal." *Dennard v. Kelly*, 90-CV-0203(E)(F), 1997 WL 9785 at *1 (W.D.N.Y. Jan 2, 1997) (citing *Klawitter v. Chater*, No. 93-CV-0054E(H), 1996 WL 643367 at *1 (W.D.N.Y. Oct. 18, 1995)).

The waste of resources would be particularly acute here because permitting Fischer to alter his theory as to when Brushy first infringed his copyright would open the door to a new round of briefing (if not discovery). In particular, were Brushy treated as having a valid license through 2012, the issue would then arise whether Defendants' use of Fischer's copyright prior to the date of Fischer's copyright registration had been within or outside the scope of the license he granted them. "It is black-letter law that a claim for copyright infringement lies when a party's use of copyrighted material exceeds the scope of its license." *See John Wiley & Sons, Inc. v.*

---

[6] It is no answer to treat Fischer's objections as, effectively, an untimely motion for leave to file an amended complaint. "[W]here a 'plaintiff blatantly changes his statement of the facts in order to respond to the defendant['s] motion to dismiss . . . [and] directly contradicts the facts set forth in his original complaint,' a court is authorized 'to accept the facts described in the original complaint as true.'" *Colliton v. Cravath, Swaine & Moore LLP*, No. 08 CIV 0400 (NRB), 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008) (quoting *Wallace v. New York City Dep't of Corr.*, No. 95 Civ. 4404, 1996 WL 586707, at *2 (E.D.N.Y. Oct. 9, 1996)), *aff'd*, 356 F. App'x 535 (2d Cir. 2009).

*DRK Photo*, 998 F. Supp. 2d 262, 287 (S.D.N.Y. 2014) (quoting *Harrell v. Van der Plas*, No. 08 Civ. 8252 (GEL), 2009 WL 3756327, at *2 (S.D.N.Y. Nov. 9, 2009)) (collecting cases). Thus, to defeat the defense to statutory damages that Brushy's infringement predated registration of Fischer's copyright, Fischer would have to show that Brushy's use of Fischer's copyrighted material to promote Natural Honey Harvester—by shipping its catalogue with Natural Honey Harvester and the infringing phrases on January 21, 2011, and by advertising Natural Honey Harvester on its website by January 28, 2011—was within Brushy's license. Only if those 2011 acts were within Brushy's license would they not give rise to a claim for copyright infringement. To so establish would require Fischer to repudiate his pleadings, in which he consistently contended that these acts by Brushy were unauthorized. *See e.g.*, TAC 07 ¶ 26 ("[N]o permission was granted to use [his] copyrighted works in any way except specifically in the sale of [his] product."); *see also id.* ¶¶ 47, 72. And these pleadings were plausible: As the Court noted in denying the motion to dismiss, "that Fischer['s license] [would] allow[] a competitor to repurpose original works he had created, copyrighted, and continued to use to promote and sell his own product-is highly improbable." *Fischer*, 2015 WL 195822, at *7.[7]

---

[7] Fischer attempts to avoid this result by noting, based on *TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82 (2d Cir. 2005), and *Graham v. James*, 144 F.3d 229 (2d Cir. 1998), that a breach of a licensing agreement cannot give rise to copyright infringement prior to rescission, and positing that he did not rescind the license until after February 7, 2011. But this theory, too, relies on disputed facts and legal conclusions, including that Defendants' license to sell Fischer's goods persisted after Defendants had announced to Fischer their decision to discontinue selling his goods, and that the license entitled them to use Fischer's intellectual property to sell Defendants' competing products. Fischer has long disputed these points. *See, e.g.*, TAC 04 ¶ 237 ("The fact of this breach of contract is of particular note in this litigation as a firm basis for the loss of any and all license, permission, or grant of rights Defendants had as a result of their status as an Authorized Dealer for Plaintiff. Any/all rights terminated in Dec 2010."); TAC 07 ¶ 72 ("Defendants'[sic] had full knowledge of Plaintiff's rights under copyright, and the highly limited nature of the use they were permitted when selling Plaintiff's product."); *id.* at ¶ 26 ("[N]o permission was granted to use Plaintiff's copyrighted works in any way except specifically in the sale of Plaintiff's product.").

The Court therefore adopts this aspect of the Report, which rightly held that, as a matter of law, Fischer cannot recover the statutory damages he elected to pursue. Given Fischer's claim that Brushy's license to use Fischer's intellectual property ceased on December 10, 2010, Brushy's uses of that property in December 2010 and January 2011 were acts of infringement that predated Fischer's February 2011 copyright registration, precluding recovery of statutory damages under 17 U.S.C. § 412. *See Solid Oak Sketches*, 2016 WL 4126543 at *2 (collecting cases). And the law does not support Fischer's claim that Brushy's annual republications were separate infringing acts. *See e.g., id.* at *3 (one-year gap insufficient to give rise to a new infringing act; "when the same defendant infringes on the same protected work in the same manner as it did prior to the work's registration, the post-registration infringement constitutes the continuation of a series of ongoing infringements"); *see Irwin v. ZDF Enterprises GmbH*, No. 04-CV-8027-RWS, 2006 WL 374960, at *6 (S.D.N.Y. Feb. 16, 2006); *cf. Troll Co. v. Uneeda Doll Co.*, 483 F.3d 150, 158–59 (2d Cir. 2007) (finding "nine or ten years" of cessation a "non-trivial period of time" such that "a post-registration act of infringement . . . [could] be deemed [not] to have commenced before registration").

**B.    Fischer's Claim for Statutory Damages Based on Secondary Infringement**

Fischer's Complaints alleged that two third-party vendors, C&T Bee Supply and The Honey Hole, had infringed on his copyrighted works by displaying them online without his permission. *See, e.g.*, TAC 07 ¶ 51. Fischer attached images embodying this alleged infringement. *See, e.g.*, SAC 07 Exs. 21–22. Fischer did not join these vendors; he instead sought to hold Brushy alone liable for their acts. *See* TAC 07 ¶¶ 95, 102, 109, 116. Fischer alleged that Brushy's actions caused the vendors to infringe, for which Brushy is secondarily liable. *See, e.g.*, TAC 07 at ¶¶ 51, 83–89, 95, 102, 109, 116; Pl. Obj. Reply at 7.

The Report recommended granting Brushy's summary judgment motions as to Fischer's secondary infringement claims, substantially because the vendors' infringements were "part of a series of related infringements by defendants and the [third parties] of the same copyrighted work" that predated Fischer's registration of his copyright, *see* R&R 2 at 29, thereby disentitling Fischer to statutory damages. Fischer objects to that recommendation, arguing that Judge Peck overlooked that these two consolidated cases include "a distinct and separate action (14cv1307) for secondary infringement," Obj. at 5–6, and that Fischer's "sole reason for filing 14cv1307 as a separate action was to seek a separate award of statutory damages for the indirect infringement over and above that for direct infringement," *id.* at 6.

Fischer's basis for objecting to this aspect of the Report is not entirely clear, but he appears to contend that his filing of two separate lawsuits, rather than consolidating his claims against Brushy into a single lawsuit, entitles him to two statutory damage awards, one for Brushy's direct infringement and another for Brushy's having caused its vendors to infringe on its behalf. Fischer appears to rely on 17 U.S.C. § 504, which allows a copyright owner to elect, in lieu of actual damages, an award of statutory damages "*for all infringements involved in the action* with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally[.]" 17 U.S.C. § 504(c) (emphasis added).

Fischer's critique is not responsive to the Report's basis for recommending against an award of statutory damages from Brushy based on the vendors' alleged infringement. Judge Peck acknowledged—and did not overlook—the fact that Fischer had filed two separate suits, including one pursuing a theory of secondary liability. *See* R&R 2 at 27–30; *see also id.* at 1, 28. But he reasoned that Fischer's claim for separate statutory damages failed as a matter of

substantive copyright law, irrespective of the number of lawsuits into which Fischer segmented his claims. Judge Peck found that Brushy's vendors' infringement was part of the series of infringing acts performed or assisted by Brushy that had commenced on December 10, 2010 before Fischer registered his copyright, and, relying primarily on *Bouchat v. Bon-Ton Dep't Stores, Inc.*, 506 F.3d 315 (4th Cir. 2007), held that the fact that this series of infringing acts predated Fischer's registration of the copyright, barred an award of statutory damages against Brushy for its contributory infringement. R&R 2 at 30.[8]

Fischer's objection does not engage with this critique. He focuses on the fact that he bifurcated his claims into separate lawsuits. He does not, however, respond to the Report's substantive explanation why Brushy does not owe statutory damages. He does not, for example, take issue with the doctrine that disentitles a copyright owner to statutory damages where a series of related infringements began before the owner registered a copyright, or with the Report's conclusion that the vendors' acts of infringement formed part of a series with Brushy's.

Because Fischer has not made a specific objection to the Magistrate Judge's findings, Fischer's objection does not trigger *de novo* review. *Pinkney v. Progressive Home Health Servs.*, No. 06 CIV.5023 (LTS) (JCF), 2008 WL 2811816, at *1 (S.D.N.Y. July 21, 2008), *aff'd*, 367 F. App'x 210 (2d Cir. 2010) (citing *United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997)). Applying that standard, the Court has reviewed the Report's findings on secondary liability for clear error and has found none. For avoidance of doubt, however, even had *de novo* review been

---

[8] Like this case, *Bouchat* involved multiple lawsuits: one against the Baltimore Ravens and National Football League Properties, and four against "several hundred companies (licensees)." *Bouchat*, 506 F.3d at 324; *id.* at 330 ("NFLP's battalion of licensees—not NFLP itself—are the defendants in the cases before us today . . . . *Bouchat* argues that the correct approach would have been to treat the date on which each individual licensee first violated Bouchat's copyright as the date that licensee's infringement commenced under § 412(1). We disagree.").

warranted, the Court would find no error in Judge Peck's articulation of why statutory damages are unavailable based on Brushy's facilitation of its vendors infringement of Fischer's copyrights. The Court therefore adopts Judge Peck's recommendation on this point, too.

### C. Fischer's Claim Under the DMCA

Fischer next objects to the Report's recommendation that this Court grant summary judgment to Defendants on Fischer's claims under the DMCA, 17 U.S.C. § 1202. Obj. at 6–8. Fischer argues that Brushy removed CMI in violation of § 1202 when, in revising its online and print advertisements from promoting Bee-Quick to promoting Natural Honey Harvester, it substituted, in a sentence, the term "Natural Honey Harvester" for the term "Fischer's Bee-Quick." *Id.*; Pl. Br. 17–19. It is undisputed that Defendants made this substitution. However, on *de novo* review, the Court finds, with the Report, that this activity did not constitute CMI removal as a matter of law. The Court therefore adopts the Report's recommendation as to the DMCA claims.

#### 1. Applicable Standards Under the DMCA

Section 1202 prohibits, *inter alia*, "intentionally remov[ing] . . . any copyright management information" with the knowledge (or with reasonable grounds to know) that doing so will "induce, enable, facilitate, or conceal" an infringement of copyright." 17 U.S.C. § 1202(b). To prevail on a claim for CMI removal, a plaintiff must show "(1) the existence of CMI on the [work at issue]; (2) removal and/or alteration of that information; and (3) that the removal and/or alteration was done intentionally." *BanxCorp v. Costco Wholesale Corp.*, 723 F. Supp. 2d 596, 609 (S.D.N.Y. 2010).

As relevant here, CMI includes the name of the author or copyright owner. *See id.*; 12 U.S.C. § 1202(c). CMI can be "contained in the body of a work," *see Bounce Exch., Inc. v. Zeus*

*Enter. Ltd.*, No. 15CV3268 (DLC), 2015 WL 8579023, at *3 (S.D.N.Y. Dec. 9, 2015), and need

not exactly match the name of the copyright owner, *see id.* (a "shorthand form of the official

name of the author of the work" can constitute CMI). In light of the above, Fischer is correct

that the word "Fischer's"—a part of the term that Defendants substituted out of Fischer's

advertisements—is capable of constituting CMI. *See Agence France Presse v. Morel*, 769 F.

Supp. 2d 295, 305 (S.D.N.Y. 2011) ("It is implausible that a viewer of Morel's photos would not

understand the designations 'Morel' and 'by photomorel' appearing next to the images to refer to

authorship.").

But, to qualify, the word or words said to constitute CMI must also be "conveyed in

connection with copies . . . of a work . . . or displays of a work . . . ." 17 U.S.C. § 1202(c)(2).

The CMI must be attached to, depicted in, or broadly "conveyed in connection" with a

copyrighted or copyrightable "work." The works on which CMI removal claims are based

commonly consist of photographs, *see, e.g., Playboy Enterprises Int'l Inc.*, 2016 WL 1023321, at

*4, but CMI removal actions can lie from the removal of such information from other works, *see,

e.g., BanxCorp*, 723 F. Supp. 2d at 609 (citing cases with CMI claims based on architectural

plans, news articles, and drawings). And although a "plaintiff's failure to register its copyrighted

work is not a bar to a DMCA action," *Playboy Enterprises Intl Inc.*, 2016 WL 1023321, at *5

(quoting *I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc.*, 307 F. Supp. 2d 521, 531

n.9 (S.D.N.Y. 2004)), "[a]n action for removal of copyright management information requires

the information to be removed from a plaintiff's product or original work," *Faulkner Press,

L.L.C. v. Class Notes, L.L.C.*, 756 F. Supp. 2d 1352, 1359 (N.D. Fla. 2010) (citing *Schiffer

Publ'g, Ltd. v. Chronicle Books, LLC*, Civil Action No. 03–4962, 2004 WL 2583817, at *14

(E.D. Pa. Nov. 12, 2004) and *Kelly v. Arriba Soft Corp.*, 77 F. Supp. 2d 1116, 1122 (C.D. Cal. 1999) *aff'd and rev'd in part on other grounds,* 336 F.3d 811 (9th Cir. 2003)).[9]

## 2. Discussion

Although Fischer has oscillated in his theories under the DMCA, *see supra,* note 3, the Court, drawing on Fischer's various filings, has identified four items that could serve as an original "work" of Fischer's from which Brushy allegedly removed CMI: (1) the website and/or brochure Fischer submitted in conjunction with his copyright registration; (2) the "description text" Fischer sent to Brushy; (3) the four copyrighted phrases used in the allegedly offending advertisement; and (4) the phrase to which "Fischer's" is attached in the advertisement altered by Brushy: "Fischer's Bee-Quick is a safe, gentle, and pleasant way to harvest your honey." The Court considers these in turn.

### a. Fischer's Brochure and Website

Fischer testified in his deposition that Brushy removed four sentences from his brochure, Fischer Dep. at 137. Fischer further attested in his affidavit opposing summary judgment that the epigrams relating to his product could also be "found on various web pages." Fischer Aff. at 4. However, even assuming that Fischer's brochure and website are "works" covered by the DMCA, the Report correctly found that Fischer cannot maintain a claim based on removal of CMI from either source. That is because no CMI was removed from his original brochure, his website, or a copy or display of them.

---

[9] Brushy argues that "§ 1202(b) 'prohibits the removal or alteration of "copyright management information" from a *validly copyrighted work,*'" rather than a merely copyrightable one, Def. Reply Mem. at 7 (emphasis in original) (citing *Silver v. Lavandeira,* No. 08 Civ. 6522 (JSR), 2009 WL 513031, at *2 (S.D.N.Y. Feb. 26, 2009)), but courts in this district have persuasively held that CMI is not so limited. *See Playboy Enterprises Int'l Inc.,* 2016 WL 1023321, at *5.

Aside from the four phrases noted above, Brushy's advertisement bears no resemblance whatsoever to Fischer's brochure or website. In those cases where claims of removal of CMI have been held viable, the underlying work has been substantially or entirely reproduced. *See, e.g., Bounce Exch.*, 2015 WL 8579023, at *2–4 (CMI removal claim viable where defendants removed "shorthand forms" of plaintiff's name from plaintiff's source code and inserted "portions of [plaintiff's] code, structure, sequence, and organization" into its defendants' own code such that the "[defendant] was selling software source code that was 'substantially similar' to [plaintiff's] proprietary code"); *Associated Press v. All Headline News Corp.*, 608 F. Supp. 2d 454, 458, 461 (S.D.N.Y. 2009) (CMI removal claim viable where defendants "instructed reporters to remove or alter the identification of the [Associated Press] as author or copyright holder of the articles"). This requirement accords with the DMCA text that requires CMI to be "conveyed in connection with copies . . . of a work . . . or displays of a work." 17 U.S.C. § 1202(c). Fischer's brochure and website are not, however, copied here. Aside from four discrete phrases among the many used on Fischer's brochure and website, there is no similarity between Fischer's original works and Brushy's advertisement. Brushy cannot be said to have removed CMI from these of Fischer's "works."

### b.     Fischer's "Description Text"

The "description text" that Fischer sent Brushy could, in theory, constitute a "work" under the DMCA, because, as noted, the material at issue in a DMCA claim need not be a subject of a registered copyright. *Playboy Enterprises Int'l Inc.*, 2016 WL 1023321, at *5. But Fischer has not shown that Brushy removed CMI from this text, because, at the summary judgment stage, he did not adduce evidence of the content of the "description text" he had sent

Brushy.[10] *See* Pl. Br. at 17–19; Dkt. 180 ("Michelen Aff."). Fischer's complaints alleged that

the images and description text he sent to Brushy "consist[ed] of images of brochures, flyers and

other sales materials," all of which were "derivative works of Plaintiff's original creative

unpublished copyrighted Works." TAC 04 ¶ 92. This description, and descriptions that Fischer

furnished later in this litigation, do not suggest that Fischer sent Brushy *a* singular work; rather,

they suggest multiple materials from which Brushy was to construct its own advertisement. *See*

*e.g.*, Fischer Aff. at 1 ("The difference between the print catalog [text] and the website [text]

prior to 2008, and the poor artistry in the line art sketch of the Bee-Quick product as compared to

those for other products was the primary reason why I kept mailing CDs to the Forrests each fall

with camera-ready artwork, photos of the products, *and point-of-sales materials*.") (emphasis

added); *see also* TAC 07 ¶ 71 ("In all of the above [versions of the online description text],

Defendants' had access to and full knowledge of Plaintiff's copyrighted Works, providing them

the source material with which to infringe."). Fischer also notes that he and Defendants "would

discuss changes to the text . . . of Defendants' product webpage periodically." *Id.* ¶ 70.

These accounts suggest that the work of Brushy at issue here is an advertisement based

upon an earlier advertisement which in turn drew upon various materials Fischer sent Brushy.

Fischer does not identify any case support that DMCA liability encompasses that sort of

composite "work." *See Faulkner Press*, 756 F. Supp. 2d at 1359 ("[N]othing was removed from

the copyrighted works. Instead, information from Dr. Moulton's courses was allegedly copied

---

[10] Fischer attaches an exhibit (Exhibit G) to his objections in an attempt to demonstrate that he authored one "work" claimed to underlie Brushy's advertisement. Fischer comes forward with this exhibit too late. *See Tavares*, 2011 WL 5877548, at *2. In any event, the exhibit that Fischer produces to illustrate what he claims to have authored for Defendants does not appear to be a document that pre-existed this litigation. Instead, it is disembodied and presented in no recognizable context. It appears to be Fischer's written version of the description text used by Defendants, circumscribed by an added black box. *See* Obj. Ex G at 1.

into a different form and then incorporated into the note packages."); *Frost-Tsuji Architects v. Highway Inn, Inc.*, No. CIV. 13-00496 SOM, 2014 WL 5798282, at *7 (D. Haw. Nov. 7, 2014) ("To the extent Frost–Tsuji is arguing that Kadowaki created 'shop drawings' based on Frost–Tsuji's work and left out Frost–Tsuji's copyright management information in the process, no actionable removal of copyright management information is involved, as basing a drawing on another's work is not the same as removing copyright management information."). Fischer's claim instead sounds, if at all, in copyright infringement, but, for the separate reasons noted in the Report relating to the unavailability of the statutory damages that Fisher elected, he cannot prevail on that claim.

  **c.**   **Fischer's Four Phrases**

  The four phrases originally relating to Fischer's product that Brushy used in modified form in its advertisements are of a different character, but they, too, cannot form the basis of a DMCA claim based on the removal of CMI. CMI exists to inform the public that a work is copyrighted and by whom. *See Pers. Keepsakes, Inc. v. Personaliziationmall.com, Inc.*, No. 11-CV-5177, 2012 WL 414803, at *6 (N.D. Ill. Feb. 8, 2012) ("[T]he point of CMI is to inform the public that something is copyrighted and to prevent infringement.") The DMCA exists, in part, to protect that notice. *Id.*

  The four phrases of Fischer's that Brushy modified and used, however, are not of such character. Only one even refers to Fischer. No reader would find that the "Fischer's" as used in the phrase "Fischer's Bee-Quick is a safe, gentle, and pleasant way to harvest your honey" speaks to copyright ownership. No reader would find that this product descriptor signals that a "James H. Fischer" or even someone named "Fischer" is the copyright holder of the phrase to which it is attached and those surrounding it. The sentence instead advertises Fischer's *product*,

and fairly conveys that Fischer is the owner and/or producer of that product. But that phrase—and the other three phrases at issue—do no convey Fischer's authorship or copyright ownership of these expressions. Although Fischer's name is not part of the trademarked name of Fischer's product, his name frequently appears alongside "Bee-Quick" in the product's marketing. *See, e.g.,* SAC 04 Ex. 17.

An analogy illustrates the point. Imagine that the back cover of the Ian Fleming novel *Dr. No.* contained the following encomium: "In Ian Fleming's *Dr. No*, Fleming shows his mastery of Cold War spycraft." Imagine then that a person lifted language from that review to promote a different thriller, writing: "In John Le Carré's *Tinker, Tailor, Soldier, Spy*, Le Carré shows his mastery of Cold War spycraft." Whatever the other legal implications of such conduct might be, it is inconceivable that a DMCA claim would lie from the elimination of Fleming's name. The expression at issue does not connote Fleming's copyright ownership of anything, much less the language common to the two book-promoting blurbs. Fischer's name—whose deletion Fischer's DMCA claim challenges—similarly has no CMI relevance as used in Defendants' advertisement. It neither informs the reader that Fischer wrote either the phrase to which "Fischer's" is attached or the surrounding text. As the Report recognized, Fischer cannot prevail on a DMCA claim based on the claim that the modified four phrases are the "work" from which CMI was removed.

> d. **"Fischer's Bee-Quick is a safe, gentle, and pleasant way to harvest your honey."**

For the same reasons as above, Defendant's having replaced the word "Fischer's" with "Natural Honey Harvester" is not an act of CMI removal. "Fischer's" has no CMI significance as used in the advertisement.[11]

**D.    Fischer's Lanham Act False Endorsement Claim**

Fischer alleges that Defendants violated Section 43(a) of the Lanham Act by including his name in the post-domain path of URLs that linked to Defendants' Natural Honey Harvester. *See* TAC 04 ¶¶ 164–90.  Fischer's examples of this include:

- "http://brushymountainbeefarm.com/Fume-Pad-w_-**Fischers**-Bee-Quick/prodcutinfo/777F," *see* SAC 04 Ex. 12;

- "http://brushymountainbeefarm.com/8-Frame-Fume-Pad-w_**Fischers**-Bee-Quick/product info/254FPQ/," *see id.* Ex. 13;

- "http://brushymountainbeefarm.com/images/799**fischers**.jpg," *see id.* Ex 10;

- "http://brushymountainbeefarm.com//images/799**fischers**sm.jpg," *see id.*

The Report recommended that the Court grant summary judgment for Defendants on these claims, because Fischer has not shown a likelihood of confusion from Defendant's ostensible false endorsement. *See* R&R 2 at 45–50.  Fischer objects that the Report wrongly decided disputed issues of fact against him on this point.  The Court reviews this issue *de novo*.

**1.    Applicable Legal Standards**

To prevail on a false endorsement claim, a plaintiff must prove that "the defendant, (1) made a false or misleading representation of fact; (2) in commerce; (3) in connection with goods or services; (4) that is likely to cause consumer confusion as to the origin, sponsorship, or

---

[11] Although Fischer objects to the Report's discussion of damages under the DMCA, the Court, having found that no DMCA claim validly lies, has no occasion to address those objections.

approval of the goods or services." *Beastie Boys v. Monster Energy Co.*, 66 F. Supp. 3d 424, 448 (S.D.N.Y. 2014) (quoting *Burck v. Mars, Inc.*, 571 F. Supp. 2d 446, 455 (S.D.N.Y. 2008)).

The first three of these factors are not in dispute. Fischer's claim therefore turns on the fourth factor: likelihood of confusion. Although this element ordinarily presents an issue of fact, consumer confusion can become an issue of law where a "[p]laintiff 'cannot possibly show confusion as to source or sponsorship.'" *Roberts v. Bliss*, 229 F. Supp. 3d 240, 251 (S.D.N.Y. 2017) (quoting *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 585 (2d Cir. 1990)).

When determining likelihood of consumer confusion, this Circuit employs an eight-factor test set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961): "The eight factors are: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may 'bridge the gap' by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009). However, "[t]he application of the *Polaroid* test is 'not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused.'" *Kelly-Brown v. Winfrey*, 717 F.3d 295, 307 (2d Cir. 2013) (quoting *Star Indus. Inc. v. Bacardi & Co Ltd.*, 412 F.3d 373, 384 (2d Cir. 2005)).

2.    **Discussion**

For the reasons that follows, as a matter of law, Fischer cannot establish, under the *Polaroid* factors, a likelihood of consumer confusion.

At the outset, the Court finds, substantially for the reasons given by Judge Peck, that Fischer meets or appears to meet the first three factors. As to the first factor, he has profitably marketed his product for a number of years; as to the second and third, Defendants allegedly used Fischer's last name in URLs on web pages marketing a competing product. The Court further finds—as is common in false endorsement cases—that factors four and seven are irrelevant to the false endorsement claim at issue. *See, e.g., Jackson v. Odenat*, 9 F. Supp. 3d 342, 356 (S.D.N.Y. 2014) ("Courts adjust the factors when dealing with false endorsement claims. In such cases, the quality of the products and 'bridging the gap' are often not considered.").

The Court's analysis therefore focuses on factors five ("evidence of actual consumer confusion"), six ("evidence that the imitative mark was adopted in bad faith"), and eight ("sophistication of the consumers in the relevant market").

    a.    **Evidence of Actual Consumer Confusion**

Although "actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source," *Beastie Boys*, 66 F. Supp. 3d at 456 (quoting *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986)), "it is certainly proper for the trial judge to infer from the absence of actual confusion that there was also no likelihood of confusion," *Affiliated Hosp. Prods., Inc. v. Merdel Game Mfg. Co.*, 513 F.2d 1183, 1188 (2d Cir. 1975).

Here, Fischer has failed to demonstrate any actual consumer confusion. As ostensible proof of such confusion, Fischer relies on the following evidence: a single review that he claims is from Brushy's website; an observation that Google displays Natural Honey Harvester when

asked to search for Fischer's Bee-Quick; and the claim that the use of his name in certain of Brushy's URLs constituted initial interest confusion. The Court considers each item in turn.

As to the review: Fischer attached a single review which he claims he drew from Brushy's website. It states that an earlier shipment of a product was not as good as a later shipment. *See* Fischer Aff. Ex. B ("The first bottle I bought last year worked well but this new stuff was a complete waste of time and money."). Fischer asks the Court to infer that the customer was referring to Fischer's Bee-Quick in the first instance and Natural Honey Harvester in the second. This, however, is speculation: Fischer apparently did not develop and has not provided any evidence to the effect that either product to which the review refers is Bee-Quick.[12]

As to Google: Fischer alleges that search engines like Google would route customers to Natural Honey Harvester because Fischer's name appeared in the post-domain path in certain Brushy URLs. TAC 04 ¶ 175. But Fischer's evidence does not demonstrate that a purchaser is, in fact, led to Brushy's website by virtue of the URL containing Fischer's name. Rather, Fischer's evidence, as he describes it, reflects only that:

> "Google results for [Fischer bee] . . . cite Plaintiff's products and services in 9 of first 10 results, 17 of first 20, and 21 of first 30 results. [Beekeeping Fischer] cites Plaintiff and his products in 8 of the 1st 10, 16 of the 1st 20, and 22 of the 1st 30 results. [Jim Fischer bee] cites Plaintiff and his products in 37 of the first 40 results."

Fischer Aff. at 9–10. This evidence does not show actual confusion. Indeed, far from showing that customers were led astray, Fischer's Google evidence appears to indicate the opposite, that is, that his own product overwhelmingly appears when his name is searched. As important, this

---

[12] Although not necessary to the Court's ruling, Gebauer's supplemental affidavit states that the review was posted on May 7, 2013, long after Brushy discontinued selling Fischer's products. *See* Dkt 183 (Gebauer Supp. Decl.) ¶¶ 3–4.

evidence does not show that Natural Honey Harvester appears instead—it does not indicate that the few search results for sites other than Fischer's product are for Brushy's website. Fischer's evidence further fails to show that, to the limited extent that non-Fischer websites came up as a result of the Google search, these websites presented as a result of the inclusion of his name in Brushy's post-domain URL.[13]

As to "initial interest" confusion: Although Fischer only obliquely mentioned this item in opposing summary judgment, he alleged in his Complaint that Brushy sought to create "initial interest" confusion by including Fischer's name in the URL for Natural Honey Harvester, and he returns to this point in his objections to the Report. Obj. at 12 ("the initial diversion . . . is the 'actual confusion' here."). Initial interest confusion "arises when a consumer who searches for the plaintiff's website with the aid of a search engine is directed instead to the defendant's site because of a similarity in the parties' website addresses." *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 462 n.13 (2d Cir. 2004). "Because consumers diverted on the Internet can more readily get back on track than those in actual space, thus minimizing the harm to the owner of the searched-for site from consumers becoming trapped in a competing site, Internet initial interest confusion requires a showing of intentional deception." *Id.* But, for the reasons recounted above, Fischer's claim of initial interest confusion is factually threadbare. He has not come forward with any evidence that consumers were diverted to Brushy's website when searching for Fischer's product online, let alone that such diversion resulted from the inclusion of Fischer's name in the post-domain path of the URL.

---

[13] In his objections, Fischer states that he "submitted an affidavit detailing how his name in the URL brought the offending page up in Google searches," citing to Fischer Dep. at 212–13. Obj. at 11. The cited deposition, however, does not establish that point, but merely recounts that Fischer has so alleged.

Fischer thus has not demonstrated any actual confusion.

### b. Evidence That the Imitative Mark Was Adopted in Bad Faith

Fischer argues that Brushy's use of Fischer's name in the post-domain URL was adopted in bad faith because "continuing use of a mark knowing that it is wrongful" demonstrates bad faith. Obj. at 11 (quoting *First Savings Bank, F.S.B. v. U.S. Bancorp*, 117 F. Supp. 2d 1078, 1088 (D. Kan. 2000)). But Fischer has not substantiated his claim that the inclusion of his name in the post-domain URL was done knowingly. There is no evidence direct or circumstantial—whether in the form of testimony, emails and other records, or conduct—so indicating. On the contrary, Gebauer has explained this circumstance as follows:

> When Brushy Mountain switched from the Bee-Quick to the Natural Honey Harvester product, the ad created by Brushy Mountain for the Bee-Quick product was changed, but the URL was mistakenly not changed. Once I learned the URLs contained the words 'Fischers' and 'Fischer's Bee-Quick' I had the URLs changed.

Gebauer Decl. ¶ 9. In his deposition, Fischer gave testimony consistent with this benign explanation. *See* Fischer Dep. at 153 ("Q: [D]id Brushy Mountain, on their website, use the same URL that they sold Bee-Quick as they did when they switched over and started selling Natural Honey Harvester? A: Yes. They continued to use the same URL.").

With the evidence indicating that Brushy's initial maintenance of the earlier URL was an inadvertent error, Fischer is forced to argue that Brushy's failure to remove his name from the URL's was an act of bad faith. But the evidence Fischer adduces does not bear this out.

First, Fischer claims that, based on his "read[ing] the manuals, stud[ying] the training videos, and sp[eaking] with tech staff at Dyacomp," the software used by Gebauer does not now operate as Gebauer claims it does. Fischer Aff. at 8. Fischer's lay conclusion to this effect does not suffice to substantiate this claim as to the operation of his competitor's software. He has not,

for example, deposed a Dyacomp employee or, for that matter, come forward with documentary or testimonial evidence that the website functions other than as Gebauer has stated.

Second, Fischer notes that Brushy's website retains two links, archived in its web server, that contain Fischer's name. Pl. Obj. Reply at 7. At argument before Judge Peck, however, Brushy's lawyer emphasized that the links do not appear on any page advertising Defendants' products, and explained that the two links were not removed from the website archives out of a concern that such removal "could be perceived as spoliation of evidence." R&R 2 at 46 n.30. Fischer has not come forward with contrary evidence as to the operation of, or the reason for the retention of, these two links.

These slender threads are insufficient to establish this important *Polaroid* factor. "[T]o show bad faith, a plaintiff must show that the defendant intended to create confusion between the products or marks at issue." *Crye Precision LLC v. Duro Textiles, LLC*, 689 F. App'x 104, 108 (2d Cir. 2017). Fischer, however, has not shown any action by Defendants undertaken with intent to confuse.

### c.   Sophistication of the Consumers

Fischer argues that "the sophistication of the consumer here actually makes it more likely that they were confused as they would know that Fischer's name was synonymous with quality bee-keeping products." Pl. Br. at 21. However, Judge Peck persuasively refuted that argument, emphasizing the context in which Fischer's name appears on Defendants' website: "Whether defined as the typical consumer of beekeeping products, or Internet users writ large, no ordinary consumer is likely to see Fischer's name in the post-domain path of the URL and wonder if that signified his endorsement of a completely different product in the accompanying web page." R&R 2 at 49 n.34. This factor, too, as Judge Peck found, does not assist Fischer.

### d. Other Considerations and Overall Assessment

The Court considers two other aspects of Judge Peck's analysis with which Fischer takes issue.

First, Fischer objects that the Report, in analyzing the likelihood of consumer confusion, cited a case that dealt with "domain squatting," a situation not present here. Obj. at 10 (citing R&R 2 at 46). But Judge Peck's Report cited *Interactive Products Corp. v. a2z Mobile Office Sols., Inc.*, 326 F.3d 687, 692 (6th Cir. 2004), not as controlling precedent but because that case "provid[es] a helpful discussion of the mechanics of website URLs," R&R 2 at 48 n.32; that decision, however, as Judge Peck emphasized, "d[id] not guide the [Report's] consumer confusion analysis," *id.* And, on its review, the Court agrees that *Interactive Products Corp.* is useful as a guide to the concept of post-domain paths. The Sixth Circuit helpfully explained that while trademark names used in domain names often give rise to trademark infringement claims because domain names "usually signify source," post-domain paths usually do not do so. 326 F.3d at 696–97. As the Sixth Circuit explained: "Typically, web pages containing post-domain paths are not reached by entering the full URL into a browser; instead, these secondary pages are usually reached via a link from the website's homepage, which does not contain a post-domain path." *Id.* at 697. "A post-domain path . . . merely shows how a website's data is organized within the host computer's files." *Id.* at 691. The Sixth Circuit's discussion reasonably informed Judge Peck's assessment that, in considering the likelihood of consumer confusion, it is important to distinguish between a domain name and a post-domain path.

To be sure, that a competitor's trademark was situated in a post-domain path does not preclude a finding of likely confusion. *See, e.g., H-D U.S.A., LLC v. SunFrog, LLC*, No. 17-CV-711-JPS, 2017 WL 3261709, at *4–5 (E.D. Wis. July 31, 2017) (issuing preliminary injunction

based in part on evidence that placement of a trademark in a post-domain path was done with intent to confuse and that the post-domain path led to a website selling counterfeit products). But Judge Peck did not hold otherwise, and, for the reasons noted above, the factors yielding the finding of likely confusion in *H-D U.S.A.*, are not present here.

Second, Fischer objects that, in the likelihood of confusion inquiry, the continued use of a mark after the termination of a licensing agreement should be a factor in his favor. Obj. at 11. Courts in this district have indeed held that "'[w]hen an ex-licensee continues to use a mark after its license expires, likelihood of confusion is established as a matter of law.'" *Microban Prod. Co. v. API Indus., Inc.*, No. 14 CIV. 41 KPF, 2014 WL 1856471, at *6 (S.D.N.Y. May 8, 2014) (quoting *L & L Wings, Inc. v. Marco-Destin, Inc.*, 676 F. Supp. 2d 179, 188 (S.D.N.Y. 2009)). Here, however, as Judge Peck recognized, Brushy has not used Fischer's name as a mark. Fischer does not, for example, allege—let alone establish—that, after termination of its license, Brushy continued to sell its products with Fischer's logo attached to them or to use Fischer's name in the domain name of its website. Fischer's claim instead is that consumers are likely to be confused as to whether he sponsors or endorses Natural Honey Harvester merely because his name appears in the post-domain path of some of Brushy's URLs. The cases on which Fischer relies, applying a *per se* rule to use of a mark by former licensees, are not applicable to this circumstance, in which the fact-intensive *Polaroid* test properly applies. *See Kelly-Brown*, 717 F.3d at 307.

In the end, the decisive question is whether, "looking at the [marks] in their totality, consumers are likely to be confused." *Starbucks Corp.*, 588 F.3d at 115 (internal quotation omitted). "Likelihood of confusion means a probability of confusion; it is not sufficient if confusion is merely possible." *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1510 (2d Cir.

1997) (quotations omitted). Here, although there are factors that favor Fischer, those the Court finds most decisive disfavor Fischer's claim. He has not shown actual confusion or bad faith. And the sole use of his name is not as a mark. Fischer's name is instead tucked away in the post-domain path of Brushy's URL. The Court concludes, with Judge Peck, that, as a matter of law, Fischer "'cannot possibly show confusion as to source or sponsorship.'" *Roberts*, 229 F. Supp. 3d at 251 (quoting *Pirone*, 894 F.2d at 585). On the evidence adduced, consumers are not at all likely to be confused as to whether Fischer endorses or sponsors Natural Honey Harvester based on the fact that his name appears in the post-domain path of Brushy's URLs. The Court therefore agrees that Brushy's motions for summary judgment on Fischer's false endorsement claims are property granted.

### E.  Fischer's Unfair Competition Claim Under New York Law

Fischer next objects to the Report's recommendation that the Court grant summary judgment in favor of Brushy on Fischer's common law unfair competition claim, brought under New York law. Obj. at 10–12. Fischer argues that, in so recommending, Judge Peck improperly resolved an issue of fact as to whether there was actual confusion. *Id.*

The Court's discussion above controls as to this point. The elements of an unfair competition claim under New York law are identical to the elements of an unfair competition claim under the Lanham Act, save that the plaintiff must also show "bad faith by the infringing party." *Int'l Diamond Importers, Inc. v. Oriental Gemco (N.Y.), Inc.*, 64 F. Supp. 3d 494, 514 (S.D.N.Y. 2014) (quoting *Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.*, 887 F. Supp. 2d 519, 541 (S.D.N.Y. 2012)). Here, for the reasons above, Fischer has not made out a viable Lanham Act claim, and has not adduced evidence sufficient to support a finding of bad faith on Brushy's part. Brushy's summary judgment motion on this claim is, therefore, granted.

### G. Fischer's False Advertising Claims

"To prevail on a Lanham Act false advertising claim, a plaintiff must establish that the challenged message is (1) either literally or impliedly false, (2) material, (3) placed in interstate commerce, and (4) the cause of actual or likely injury to the plaintiff." *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 65 (2d Cir. 2016).

Here, Fischer brings two false advertising claims under the Lanham Act. The first alleges that Brushy's description of Natural Honey Harvester as "100% Natural" is false. TAC 04 ¶¶ 210(a), 211; *see* Pl. Br. at 26. The second alleges that Brushy's statement that it "c[a]me out with [its] own" product (*i.e.*, Natural Honey Harvester) is false because Brushy purchases Natural Honey Harvester from a third party. TAC ¶¶ 210(d), 211; *see* Pl. Br. at 26. The Court addresses these in turn.

#### 1. "100% Natural"

Brushy describes Natural Honey Harvester as "100% Natural" in its online and print advertisements. Fischer alleged that this claim is false insofar as Natural Honey Harvest is not, in fact, "100% Natural." Fischer does not, however, object to the Report's recommendation that this Court grant summary judgment for Defendants on this claim. The Court, finding no clear error, adopts the Report's recommendation.

#### 2. "Come out with our own"

In its advertisement for Natural Honey Harvester, Brushy states: "For years we have promoted the use of a natural product to harvest honey but an unreliable supply of such a product has forced us to come out with our own." *See* SAC 04 Ex. 8.[14] Fischer argues that "our own" is

---

[14] In his objections, Fischer alternatively styles Brushy's offending phrase as "We *made* our own" and "*We came out with our own*." Obj. at 2, 12. In fact, both as alleged by Fischer and as

false because Brushy purchases the product it sells from a third-party. Pl. Br. at 22. The Report recommended that the Court grant summary judgment for Defendants because the operative term, "our own," is neither literally nor impliedly false. R&R 2 at 54–58. Fischer objects that this was an issue of fact not appropriately resolved by a court. Obj. at 12. The Court reviews this issue *de novo*. For the reasons that follow, the Court agrees with Judge Peck that summary judgment is properly granted for Defendants because the evidence does not show literal or implied falsity.

### a. Literal Falsity

"To establish literal falsity, a plaintiff must show that the advertisement either makes an express statement that is false or a statement that is 'false by necessary implication,' meaning that the advertisement's 'words or images, considered in context, necessarily and unambiguously imply a false message.'" *Church & Dwight Co.*, 843 F.3d at 65 (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007)). A message can only be literally false if it is unambiguous. *Id.*

Here, the Court finds that the statement "come out with our own" is not literally false because it is not unambiguous. *See Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 63 (2d Cir. 2016) ("[O]nly an *unambiguous* message can be literally false." (quoting *Time Warner Cable*, 843 F.3d at 153) (emphasis in original)). The phrase does not unavoidably signify that the product offered by Brushy was created in the first instance by Brushy. Indeed, Fischer's allegations in his complaint, which assign alternative interpretations to this phrase, underscore its uncertain meaning. *See* TAC 04 ¶ 210(d) ("The claim '*has forced us to come out with our own*'

---

reflected in Brushy's advertisement, the phrase used is "forced us to come out with our own." *See* TAC 04 ¶ 210(d); SAC 04 Ex. 8.

implies that they are somehow making the same product, or have taken over the manufacturing of Plaintiff's product, and/or that their product is related to, approved by, endorsed by, licensed, or authorized by Plaintiff."); *see also Classic Liquor Importers, Ltd. v. Spirits Int'l B.V.*, 201 F. Supp. 3d 428, 453 (S.D.N.Y. 2016) (plaintiff's own admission that the term "Since 1867" could have different meanings demonstrated term's ambiguity); *Time Warner Cable, Inc.*, 497 F.3d at 158 ("[I]f the language or graphic is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false.").[15]

### b.     Implied Falsity

Where a message is not literally false, a plaintiff may nonetheless demonstrate that it is impliedly false where the message leaves "an impression on the listener or viewer that conflicts with reality." *Church & Dwight Co.*, 843 F.3d at 65 (quoting *Time Warner Cable*, 497 F.3d at 153). However, "courts have, at times, required a claim of implied falsity to be supported by extrinsic evidence of consumer confusion." *Id.* "Alternatively, courts have allowed implied falsity to be supported by evidence that the defendant intended to deceive the public through 'deliberate conduct' of an 'egregious nature,' in which case a rebuttable presumption of

---

[15] The formulation used by the Second Circuit in *Time Warner Cable* can be read to suggest that a statement cannot be literally false if its meaning is ambiguous, even if each alternative meaning of the statement is itself false. *See Classic Liquor Importers*, 201 F. Supp. 3d at 453 n.27 ("One could argue that, despite the Second Circuit's seemingly clear mandate that a message be 'unambiguous' to be deemed literally false, it would be illogical to require extrinsic evidence of consumer deception if it were the case that each possible message conveyed by an ambiguous statement was indisputably false."). This Court has no occasion to consider that circumstance here, because the expression at issue—"came out with our own"—is susceptible to at least one truthful construction: that Natural Honey Harvester replaced Bee-Quick. Fischer's Complaint recognizes as much. *See* TAC 04 ¶ 211(e). To be sure, Fischer disputes that Brushy's Natural Honey Harvester is equivalent to his Bee-Quick. But, whether or not Brushy's is an inferior product, it is undisputed that Natural Honey Harvester replaced Bee-Quick as the product marketed by Brushy.

consumer confusion arises." *Id.* (quoting *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255–56 (2d Cir. 2104)).

Here, as reviewed above, Fischer has not come forward with any credible evidence of consumer confusion. He therefore cannot establish implied falsity by that route. Nor has he adduced any evidence that Brushy's behavior in advertising its product with the term "come out with our own" was in any sense deliberately deceptive and "egregious." Fischer has therefore failed to add adduce evidence establishing, on the first element of actual or implied falsity, a genuine issue for trial. *See Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993). The Court therefore grants Brushy's motions for summary judgment on this point.

### H.   Remainder of the Report

The Court has reviewed the remaining portions of the Report, as to which Fischer did not file any objections. The Court finds no clear error and adopts Judge Peck's recommendations in full.

## CONCLUSION

For the foregoing reasons, the Court grants Brushy's motions for summary judgment. The Clerk of Court is respectfully directed to close the motions pending at 14 Civ. 1304, Dkt. 170, and 14 Civ. 1307, Dkt. 172, and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: February 16, 2018
      New York, New York